**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| GERARD LAYANI,<br>30 Rothschild Boulevard/83, Tel Aviv, Israel<br><br>BRITT INVESTMENT BALTIMORE LLC<br>4904 York Road, Baltimore, MD 21212<br><br>YEHUDA RAGONES<br>6317 Park Heights Avenue, Apt 412, Baltimore,<br>MD 21215<br><br>RDNA Investments, LLC<br>6317 Park Heights Avenue, Apt 412, Baltimore,<br>MD 21215<br><br>       *Plaintiffs,*<br><br>       v.<br><br>ISAAC OUAZANA<br>2728 Lightfoot Dr., Baltimore, MD 21209<br><br>BENJAMIN OUAZANA<br>6110 Greenspring Ave Baltimore MD 21209<br><br>I &B CAPITAL INVESTMENTS LLC<br>4400 Sidehill Rd., Baltimore, MD 21229<br><br>WAZ-BROTHERS, LLC<br>3503 Glen Ave., Baltimore, MD 21215<br><br>WAZ-INVESTMENTS, LLC<br>3503 Glen Ave., Baltimore, MD 21215<br><br>WAZ-MANAGEMENT, LLC<br>3503 Glen Ave., Baltimore, MD 21215<br><br>And<br><br>JOHN AND JANE DOE(s) and<br>JOHN DOE ENTITIES,<br>All whose true names are unknown,<br><br>       *Defendants.* | Case No. _____<br><br>**JURY DEMAND**<br><br><br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR**<br><br>**DAMAGES AND**<br><br>**INJUNCTIVE RELIEF** |

Come Now Plaintiffs Gerard Layani ("Layani"), Britt Investment Baltimore LLC ("Britt"), Yehuda Ragones ("Ragones") and RDNA Investments, LLC (collectively "Plaintiffs") and for their Complaint (the "Complaint"), state and aver as follows:

## I.    Notice of Lis Pendens

1.      This action relates to and involves the ownership and disposition of real property located in and around Baltimore City. Although all the specific real properties for which a Notice of Lis Pendens and/or a Constructive Trust should result from the claims alleged in this action is and will remain unknown until completion of a full accounting of all the Defendants' property-related frauds, notice is hereby given of a Lis Pendens in the following properties.

2.      Notice of Lis Pendens is given about the property known as 2643 Kennedy Avenue, Baltimore, MD, being the same lot of ground recorded in the Land Records of Baltimore City at Liber 13402, folio 057, Tax ID#09-16-4120-034; and about the property known as 1605 Homestead Street, Baltimore MD 21218, being the same lot of ground recorded in the Land Records of Baltimore City at Liber 13382, folio 403, Tax ID#09-16-4120-030.

3.      Notice of Lis Pendens is given about the property known as 4004 Oakford Avenue, Baltimore, MD, being the same property described in a deed from WAZ Investments. LLC to 4004 Oakford Ave, LLC, recorded in the Land Records of Baltimore City at Liber 16881, folio 248.

4.      Notice of Lis Pendens is given about the property known as 3335 Edmonson Avenue, Baltimore, MD, being the same property described in a deed from WAZ Investments, LLC to Yaakov Krozier, LLC, recorded in the Land Records of Baltimore City at Liber 18310, folio 372, Tax ID#20-17-2280-018.

5.      Notice of Lis Pendens is given about the property known as 4415 Pall Mall Rd., Baltimore MD, being the same property described in a deed from RDNA Investments, LLC to

Flextone Capital Investments, LLC, recorded in the Land Records of Baltimore City at Liber
18401, folio 128, Tax ID#15-34-3350-008.

6.        Notice of Lis Pendens is given about the property known as 2802 Hartford Rd.,
Baltimore MD, being the same property described in a deed from RDNA Investments, LLC to
Kosaqui Investments, LLC, recorded in the Land Records of Baltimore City at Liber 18071,
folio 373, Tax ID#09-180-3935-013.

## II.   Introduction

7.   Plaintiffs bring this civil action for monetary damages and injunctive relief against
Defendants Isaac Ouazana, Benjamin Ouazana, I&B Capital Investments LLC, WAZ Brothers
LLC, WAZ Investments LLC, WAZ Management LLC, and JOHN and JANE DOE(s) and
JOHN DOE ENTITIES (interchangeably the "Defendants"), asserting on behalf of themselves
and a Class of similarly situated individuals (the "Class"), ten claims arising under the Federal
Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ("RICO"), and the
common law: (a) Violations of Federal Civil RICO—Conduct of a RICO Enterprise, 18 U.S.C.
§ 1962(c) (**Count One**); (b) Violations of Civil RICO—Conspiracy to Violate § 1962(c) of
RICO, 18 U.S.C. § 1962(d) (**Count Two**); (c) Negligence (**Count Three**); (d) Negligent
Supervision (**Count Four**); (e) Common Law Fraud (**Count Five**); (f) Constructive Fraud
(**Count Six**); (g) Breach of Contract (**Count Seven**); (h) Conversion (**Count Eight**); (i) Unjust
Enrichment (**Count Nine**); and (j) Accounting (**Count Ten**).

8.   This action's central factual premise is that, in violation of RICO, 18 U.S.C. § 1964, over
the past several years, Defendants have defrauded Plaintiffs and scores of out-of-state and
foreign investors of money and property in the context of selling them full or fractional
ownership interests in rental real properties located in Baltimore, and in the context of

managing these investors' properties pursuant to written or implied management agreements intended to fulfill through the efforts of Defendants these investors' profit expectation.

9.   Defendants' fraud, can be broadly divided into two types: (a) Marketing/Selling type of fraud; and (b) Property Management type of Fraud. In the Marketing/Selling type of Fraud, Defendants make deliberate use of false pretenses and representations to market the properties to typically out-of-state and foreign passive investors who cannot easily check the Defendants' representations.  While marketing and selling properties, Defendants misrepresent or conceal various material facts, including: (a) the quality or characteristics of the properties; (b) the management services to be provided; (c) whether the conveyance of the ownership is recorded, with documented instances where the conveyance was not recorded after taking the victims' payment; (d)  whether the transaction recorded reflects truthfully -- or is materially different from -- the parties' agreement, where Defendants often recorded transactions that contained fictitious sale prices or other terms; etc. In the Property Management type of Fraud, Defendants rely on false pretenses and representations in the context of managing the properties entrusted to them as property managers by the out-of-state or foreign passive investors , abusing the trust placed in them in order to continue to defraud these investors of money, property, and benefits of monetary value. In the "Property Management type of Fraud," Defendants systematically loot the investment and allow the properties to deteriorate, while concealing their dishonest acts often for years. Defendants misrepresent or conceal material facts that can include the rental revenue of the properties, the repairs needed or performed, the expenses needed or charged to the victims, the amounts owed by the victims for such repairs or other operational expenses, the existence of city fines for exigent circumstances resulting in housing code violations, etc. The objective of these misrepresentations is to systematically misappropriate the passive investors funds, deprive them of their rightful rental income from these properties, and cause them to pay additional sums for fictitious expenses that Defendants simply keep for themselves. All the

Class Action Complaint                4

while, Defendants prevent victims from discovering dishonest conduct and massive fraud by systematically obscuring the performance of the properties under management, and by denying victims access to Defendants' business and accounting records, to the extent they exist.

### III.   Parties

a)   Representative Plaintiffs

10. Plaintiff Gerard Layani ("Layani") is a citizen of Israel. Plaintiff Layani has standing to bring this action as the victim of the acts and omissions described in this Complaint.

11. Plaintiff Britt Investment Baltimore LLC ("Britt") is a limited liability company set up by Plaintiff Layani for the purpose of investing in the real estate ventures sold by Defendants. Britt has its principal place of business at 4904 York Road Unit 39692, Baltimore, MD 2121, and is registered to do business in the State of Maryland. The sole member of Britt is Plaintiff Layani.

12. Plaintiff Yehuda Ragones ("Ragones") is a citizen of Israel. Plaintiff Ragones also maintains a U.S. address at 6317 Park Heights Avenue, Apt 412, Baltimore, MD 21215. Plaintiff Ragones has standing to bring this action as the victim of the acts and omissions described in this Complaint.

13. Plaintiff RDNA Investments, LLC ("RDNA") is a Maryland Limited Liability Company with a principal place of business at 6317 Park Heights Avenue, Apt 412, Baltimore, MD 21215. The sole member of RDNA is Plaintiff Ragones.

b)   Defendants

14. Upon information and belief, Defendant Isaac Ouazana ("Isaac Ouazana") is a Maryland Citizen, residing in the City of Baltimore, Maryland.

15. Upon information and belief, Defendant Benjamin Ouazana ("Benjamin Ouazana") is a Maryland Citizen, residing in the City of Baltimore, Maryland

16. Upon information and belief, Defendant I&B Capital Investments LLC ("I&B") is a Maryland limited liability company, with a principal place of business registered on the Maryland State Department of assessments and taxation database (SDAT) at 4400 Sidehill Rd. Baltimore, MD 21229. Its registered agent is Defendant Isaac Ouazana.

17. Upon information and belief, Defendant WAZ Brothers LLC ("WAZ-B") is a Maryland limited liability company, with an SDAT-registered principal place of business at 3503 Glen Avenue, Baltimore, Maryland 21215.  Its registered agent is Defendant Isaac Ouazana.

18. Upon information and belief, Defendant WAZ Investments LLC ("WAZ-I") is a Maryland limited liability company, with an SDAT-registered principal place of business at 3503 Glen Avenue, Baltimore, Maryland 21215. Its registered agent is Jeffrey Yablon.

19. Upon information and belief, Defendant WAZ Management LLC ("WAZ-M") is a Maryland limited liability company, with an SDAT-registered principal place of business at 3503 Glen Avenue, Baltimore, Maryland 21215. Its registered agent is Jeffrey Yablon.

20. Upon information and belief, Defendants JOHN AND JANE DOE(s) are physical persons whose names and addresses of residences are unknown. Upon information and belief, Defendants, Defendants JOHN DOE ENTITIES are corporate/legal entities whose names and addresses of residences are unknown. Plaintiffs are aware that Defendants Isaac Ouazana and Benjamin Ouazana have relied on multiple such parties to defraud the Class Members and the named Plaintiffs.  Plaintiffs hereby notice their intent to amend this Complaint upon identifying these Defendants. The JOHN AND JANE DOE(s) and JOHN DOE ENTITIES are referred to collectively in the Complaint as the "JOHN DOE Defendants."

## IV.   Jurisdiction and Venue

21. This Court is vested with subject matter jurisdiction over the RICO claims (Counts I and II) pursuant to 18 U.S.C. section 1964(c) (civil RICO) and 28 U.S.C. sections 1331 (original jurisdiction over federal question) and 1337 (commerce and antitrust).

22. This Court is vested with supplemental jurisdiction over the state claims (Counts III through X) pursuant to 28 U.S.C. section 1367 (District courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.")

23. This Court is also vested with subject matter jurisdiction over all counts, including both the federal and state claims, pursuant to 28 U.S.C. section 1332(d) in that this putative Class action involves, on information and belief: (a) damages exceeding $5,000,000, exclusive of interest and costs; (b) at least one Plaintiff (Layani, citizen of Israel) and one Defendant (all Defendants are Maryland-based) are from a different state or foreign country; and (c) the aggregate number of Members of the proposed Plaintiff Class exceeds 100.

24. This Court is vested with personal jurisdiction over all Defendants in respect of the state claims (Counts III through X) pursuant to Ann. Code Md., Courts and Judicial Proceedings, § 6-102(a) (Persons domiciled or businesses with principal place of business in State) and § 6-103(b)(1) through (5) (Cause of action arising in State by virtue of Defendants having: (1) Transacted any business or performed any character of work or service in the State; (2) Contracted to supply … services … in the State; (3) Caused tortious injur[ies] in the State by an act or omission in the State; (4) Caused tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State; and (5) an interest in, used, or possessed real property in the State).

25. Venue is properly placed in this Court pursuant to 28 U.S.C. sections 1391(b) because it is in this district in the city of Baltimore that some or all: (a) Defendants reside; (b) Defendants' acts and omissions occurred; (c) causes of action asserted arose; and (d) real properties underlying the Defendants' fraud scheme are located.

## V.   Class Action Allegations

26. Plaintiffs bring this Class action on their own behalf and on behalf of a Class comprising all other persons similarly situated pursuant to Federal Rules of Civil Procedure Rules 23(a)(1)-(4), 23(b)(1) and 23(b)(2), and case law thereunder.

27. <u>Class Definition</u>.  The Class is defined as all persons who:

   a.  Purchased a full or fractional interest in properties sold directly or indirectly by Defendants, and whom, within four years before the filing of this action, Defendants misled or defrauded, or attempted to mislead or defraud, irrespective of whether they were in fact misled or defrauded; or

   b.  Entered into a written or implied property management services agreement with Defendants, and whom, within four years before the filing of this action, Defendants misled or defrauded, or attempted to mislead or defraud, irrespective of whether they were in fact misled or defrauded.

28. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and Members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which they have a controlling interest and their current or former, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; and (4) the legal representatives, successors or assigns of any such excluded persons. Plaintiff anticipates that amending the Class Definition may become necessary after completing discovery.

29. Numerosity— Rule 23(a)(1). The proposed Class is so numerous that joinder of all Members is impracticable.  Although Plaintiffs do not know the proposed Class' exact size or identities of the Members, since such information is in the exclusive control of Defendants, Plaintiffs believe that the Class encompasses over 100 individuals and legal entities whose identities can be readily determined from Defendants' books and records.

30. Commonality of Legal or Factual Questions – Rule 23(a)(2). The questions of law and fact involved in this action are common to the entire Class in that all Members of the Class have been subjected to and affected by the same conduct by Defendants. These common questions include, but are not limited to: (a) whether Defendants implemented a scheme to defraud passive investors in real property located in Baltimore of money, property, and benefits of monetary value through false pretenses and representations; (b) whether Defendants implemented, as part of their property management duties, systematically fraudulent accounting and record-keeping practices designed to enable Defendants to misappropriate Plaintiffs and Class Members' funds and property;  (c) whether Defendants conducted an "enterprise" involving a pattern of racketeering activity based on wire fraud in violation of the RICO statute in order to defraud all Class Members of business or property; (d) whether Defendants should be enjoined and an order should issue to order them to cease and desist from committing new RICO violations; and (e) whether Defendants should be compelled to make full disclosures of their business practices, and provide a full accounting of their handling of the Class Members' funds and properties.

31. Typicality of the claims and defenses of the Class representative – Rule 23(a)(3). The claims and defenses of the Class, including those asserted or likely to be asserted by Plaintiffs as representative of the Class, are typical in that these claims and defenses are subject to common proof, and predominate over any questions affecting only individual Members of the Class. For example, the proof for the RICO enterprise conducted by the Defendants as

Class Action Complaint                   9

described in Count I will be established once for all Plaintiffs and Class Members. Also, the proof of a RICO conspiracy as described in Count II will be established once for all Plaintiffs and Class Members.

32. Adequacy of Protection of the Class Interests – Rule 23(a)(4). Plaintiffs and undersigned counsels will fairly and adequately represent and protect the interests of the Class Members for three main reasons.

33. *First*, Plaintiffs all share a common interest with the putative Class Members. They have been aggrieved by the same conduct of Defendants alleged herein. Moreover, as the named Plaintiffs, they have a direct personal financial stake in this lawsuit.

34. *Second*, Plaintiffs are uniquely qualified to represent the interests of the Class Members. They have experience in business, real estate and litigation, including, in one instance, experience litigating the issues involved in this action when, as required by Jewish law, Plaintiff Ragones attempted to resolve claims against Defendants under Rabbinical Supervision in Beit Din, prior to instituting these proceedings, where Defendants refused to appear before the Rabbinical instance. The named Plaintiffs have all a strong and demonstrated commitment to protect all Class Members and pursue required action on their behalf, and by extension, to act in keeping with their obligation or duties as a Class representative.

35. *Third*, all named Plaintiffs and their business representatives have regularly consulted with undersigned counsels in the preparation and filing of the instant lawsuit, and both they and undersigned counsel have the necessary experience and a strong demonstrated interest in the resolution of the issues raised in this action and in representing victims aggrieved by this fraudulent scheme.

36. Rule 23(b)(1). Class certification is appropriate because separate actions would create a risk of "(A) inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the Class." Indeed,

central problems affecting the Class, namely the question of whether Defendants conducted a racketeering enterprise in violation of the RICO statute, should be determined for the Class as a whole, and not on a case-by-case basis. Separate actions would also create a risk of "(B) adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Here, the commonality of both issues and Defendants creates a risk that any issue resolved in this action could unfairly prejudice parties not included if a Class is not certified.

37. Rule 23(b)(2). Class certification is appropriate because "the party opposing the Class has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole." Here, Defendants acted in exactly the same way towards all Members of the Class by resorting to the same deceitful scheme involving investments in real properties located in Baltimore and misappropriations of the Class Members' funds. Therefore, any injunctive or declaratory relief achieved in this lawsuit would be appropriate for the Class as a whole, including present and future Members.

## VI. Facts Common to All Counts

a) Defendants' Scheme to Defraud Investors

38. Over the past several years, Defendants have implemented a scheme to defraud passive investors in and owners of Baltimore real estate of money, property, and benefits of monetary value through false pretenses and representations. These investors and property owners are typically based outside Maryland and, in many instances, outside the United states. The putative class alleged in this action is comprised of these investors.

39. Defendants' scheme to defraud can be broadly divided into two types: (a) Fraud in Marketing/Selling the Baltimore real estate; and (b) Property-Management-related Looting, Concealment, and Related Fraud.

      *i) Type 1 – Fraud in Marketing/Selling the Baltimore Real Estate*

40. In the marketing and selling type of fraud, Defendants, acting directly or indirectly,[1] deliberately used false pretenses and representations to attract passive investors located outside Maryland and, in many instances, outside the United states, for the purpose of inducing them to purchase full or fractional interests in rental real properties located in Baltimore, with Defendants offering to furnish the efforts required to fulfill the investors' profit expectation from the real property interest acquired in exchange for a management fee pursuant to a written or implicit management contract with Defendants.[2]

41. Defendants' deliberate false pretenses and representations in selling these properties include misrepresenting their value, characteristics, and quality. For example, Defendants falsely represented that: (a) they were offering to sell properties below market value by providing investors with false or misleading market information; (b) the properties had characteristics that they in fact did not possess in order to make the properties seem more appealing investments -- for example, Defendants provided investors written materials falsely describing properties as multifamily buildings that actually were single-family; and (c) the

---

[1] Defendants Isaac Ouazana, Benjamin Ouazana, I&B, WAZ-I, WAZ-B, and WAZ-M, received assistance from the JOHN DOE Defendants who include unknown persons or entities that helped the Ouazana Defendants in marketing properties to Plaintiffs and putative Class Members outside Maryland and in foreign countries, or which aided and abetted the Ouazana Defendants in Maryland in selling properties, particularly during real estate closings by facilitating false or fraudulent transactions.

[2] Maryland law views as "securities" any investment schemes combining the sale of an interest in real property with a management agreement with the seller to expend the efforts necessary to fulfill the Plaintiffs' profit expectation. It is a matter of record that Defendants have not registered these securities with the Maryland Securities Division within the Office of the Attorney General. *See MD Code, Corporations and Associations, § 11-501(1)*.  Plaintiffs reserve the right to seek leave to amend this complaint, as warranted, with any proper state or federal securities claims.

quality of the realty and the attractiveness and stability of the investment returns they generated were materially misrepresented by providing the investors falsified rental leases and rent rolls inflating the properties' profitability.

42. In most instances, Defendants offered to sell the properties to the Plaintiffs and the Class Members, in ready to rent condition, fully compliant with the housing code and having passed all necessary inspections, for a "package price" that included: (a) the sale price for the conveyed interest in the real property, including all transfer taxes and charges; (b) an upfront charge by Defendants for any repair and renovation of the properties; (c) an upfront charge for property taxes for the first year of ownership; and (d) an upfront charge for insurance for the first year of ownership.

43. Defendants bundled the real property interests underlying their fraudulent scheme with their offer to manage the properties pursuant to a written or implied management agreement, whereby Defendants undertook to manage the real properties for a fee, purportedly to fulfill the investors' profit expectation. Defendants' services included making or causing to be made all necessary repairs and renovations to the properties, renting them, collecting income, paying expenses from the income (including taxes, utilities, maintenance, etc.), maintaining accounting records and turning over profits to the investors.

44. Once they collect the "package price" from the investors, Defendants conclude the Marketing/Selling Fraud by represented to the investors that the conveyance of the full or fractional interest in the real property is effectuated in a documented closing, which, typically, investors do not attend, trusting Defendants fully. In reality, however, Plaintiff's initial investigation indicates that the Ouazana Defendants conspired with several JOHN DOE Defendants, including title agents and title companies who helped advance the Ouazana Defendants' fraud by falsifying documents at the purported closings in order to help hide from investors that the transactions closed differed materially from the investment terms agreed with

Class Action Complaint                    13

the investors, including that: (a) the actual sale price of the real property agreed with the investors differed from the fictitious sale price reported to the tax authorities and upon which, conveyance taxes were assessed; or (b) Defendants did not own the property they had purportedly covenanted to sell to the investors and were instead acting as intermediaries; or (c) Defendants did not transfer ownership to the agreed buyer; or (d) Defendants pocketed the investor's money without transferring ownership in the property at all; or (e) Defendants re-sold the properties to third-parties without the knowledge or permission of the investors.

      ii)  *Type 2 – Property-management-related Fraud*

45. In the property-management-related fraud, Defendants use their position of trust as managers of the properties under the written or implicit management agreements to defraud the passive property owners located outside Maryland and, in many instances, outside the United states, of money, property, and benefits of monetary value, through false pretenses, while actively concealing Defendants' fraud for years.

46. Defendants' fraud and deception in the context of managing properties in their care takes numerous forms, including, hiding or misrepresenting information about the operation and the condition of the properties under their control, in order to unlawfully obtain or retain funds properly belonging to investors, looting the investors' investment principal and rental income.

47. For example, the Ouazana Defendants falsely claim properties are not rented or tenants refuse to pay rent, thereby hiding rental income and defrauding investors of rents lawfully belonging to them.

48. Even when the Ouazana Defendants acknowledge having received rents rightfully belonging to investors, Defendants misrepresent information about the operation of the properties, in order to dishonestly reduce the amount payable to the investors by claiming false charges for: (a) services that Defendants did not render; (b) expenses for repairs or maintenance

that were not incurred; or (c) property taxes, utilities, and insurance that Defendants then failed to pay and retained for themselves.

49. All the while, the Ouazana Defendants misrepresent, hide, and otherwise fail to adequately disclose the truth of their dishonest acts and omissions, taking advantage of the trust placed in them by the Plaintiffs and putative Class Members who typically reside outside Maryland and/or outside the United States and cannot easily check Defendants' claims.

50. Plaintiffs also uncovered instances where, as happened to Plaintiff Ragones, even after Defendants' fraud was discovered and the management agreement was terminated, the Ouazana Defendants unlawfully continued to exercise control over properties they no longer managed, placing tenants in them, and collecting rents without the owner's knowledge of permission.

51. As a result, the Ouazana Defendants are able to defraud the Plaintiffs and putative Class Members of money, property, and benefits of monetary value, including investment principal and rental income, and to conceal for years that Defendants do not perform management services as agreed, and in many instances that they allow underlying properties to deteriorate, incur fines for code violations, and often wind up listed for tax sale.

b) How Defendants Defrauded the Layani Plaintiffs

52. As with all other investors and property owners in the putative Class, the Ouazana Defendants implemented their fraudulent scheme upon Plaintiff Layani, based in Israel, and non-Party Julien Layani, based in France, by using false pretenses and representations to attract Plaintiff Layani and induce him and Plaintiff Britt to invest in rental real properties located in Baltimore, coupled with management agreements with Defendants who agreed to furnish the efforts required to fulfill the Plaintiffs' profits expectation from the investment. The Layani Plaintiffs' claims are detailed below for each of these properties.

53. Defendants actively concealed their acts and omissions from the Layani Plaintiffs until October 2018, when Defendant Isaac Ouazana revealed for the first time to nonparty Julien Layani via WhatsApp that Plaintiff Britt had been sued in its capacity as owner of a property Defendants sold Plaintiffs.  Plaintiffs discovered subsequently, particularly in the context of investigations conducted in preparation for a related lawsuit filed in the Circuit Court for Baltimore City (*Gerard Layani et al. vs. Isaac Ouazana et al,* 24 -C-19-000100, dismissed on October 17, 2019, by mutual consent and without prejudice to refile), that Defendants had concealed or otherwise misrepresented for years both (a) the characteristics of the properties sold to Plaintiffs and (b) Defendants' performance of their management duties under the management agreement, allowing the managed properties to deteriorate, incur fines for code violations, and be listed for tax sale.

   i)   *314 North Hilton St., Baltimore, Maryland 21229*

54. Marketing/Selling Fraud.  On or about June 24, 2014, Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, acting through a representative, nonparty Simon Jonathan Dahan, emailed the Layani Plaintiffs' representative, Julien Layani, to offer an investment in what Defendants represented was a building located at 314 North Hilton St., Baltimore, Maryland 21229, coupled with a management agreement with Defendants to expend the efforts necessary to fulfill Plaintiffs' profit expectation in exchange for a "Management fees 8 percents" (sic.)."

55. Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, used the international wires, including email, telephone, and WhatsApp voice and text chats, to communicate several false representations material to the Layani Plaintiffs, including the following.

56. During international telephonic conversations between, on one hand, Defendant Isaac Ouazana and Benjamin Ouazana in Baltimore, and on the other hand, Plaintiffs Gerard Layani in Israel and nonparty Julien Layani in Paris, that occurred during the period of June 24 through

July 7, 2014, Defendants Isaac Ouazana and Benjamin Ouazana, falsely represented that they owned this property and that it did or could generate a 22% rate of return on investment after expenses based on monthly rent estimates of US$1,050 to US$1,150.

57. Based on Defendant Isaac Ouazana's representations, the Layani Plaintiffs agreed to pay Defendants the requested "package price" of US$55,000 for this property, which included all renovation work, and on or about July 7, 2014, the Layani Plaintiffs transferred to Defendants, in the manner and for the benefit of the recipient designated by Defendants, to wit, third party Waz Properties Inc., the full "package price" amount of US$55,000.

58. However, Defendants exploited the Layani Plaintiffs' trust and inability to easily check the Defendants' false representations in Baltimore, owing to Plaintiffs residing in France and Israel.

59. On or about July 21, 2014, Defendant WAZ-I, acting through Defendants Isaac Ouazana and Benjamin Ouazana, emailed an invoice to Plaintiff Britt, representing that WAZ-I was selling it to Plaintiffs for US$44,000 and a US$3000 commission.

60. Defendants' July 21, 2014, representation that WAZ-I owned this property at the time of the purported sale to Plaintiffs was false because Maryland land records show that WAZ-I acquired this property later, on July 25, 2014.

61.  The July 21, 2014, representation that Defendant WAZ-I had paid $44,000 for this property including "2014 taxes properties" was false because official land and SDAT records show that WAZ-I bought it for $13,650, ostensibly with the funds Defendants fraudulently obtained from Plaintiffs on July 7, 2014.

62. Defendants' July 21, 2014, representation that WAZ-I was reselling it to Plaintiffs for a US$3000 commission was also false because, in addition to the fact that at the time of the representation, Defendants did not own this property, official land and SDAT records show that

Defendants paid only $13,650 and not US$44,000 for this property, indicating that Plaintiffs actually paid a commission far greater than US $3000.

63. On or about July 22, 2014, Defendant Isaac Ouazana used international wires to email Plaintiff Britt's representative, nonparty Julien Layani, a falsified deed dated July 18, 2014, representing that on that date, Defendant WAZ-I had conveyed title to this property to Plaintiff Britt for the sale price of $44,000.

64. Defendant Isaac Ouazana's representation of July 22, 2014, that Defendant WAZ-I conveyed this property to Plaintiff Britt on July 18, 2014, was false because Defendant WAZ-I did not own this property on July 22, 2014, and had not, nor could it have, conveyed it to Plaintiff Britt.

65. Defendant Isaac Ouazana's representation of July 22, 2014, that it had recorded the emailed deed that reported the sale price of US$44,000 was false because Maryland land records show that Defendants in fact did not record a deed until almost a year later on March 4, 2015, and that this deed differed materially from the one emailed to Plaintiff, in that the sale price reported in it was US$21,000, not US$44,000 as represented to Plaintiffs in July 2014.

66. For the ensuing years, all Ouazana Defendants concealed from all Plaintiffs that Defendant WAZ-I had not conveyed ownership of this property to Plaintiffs on July 18, 2014.

67. For the ensuing years, all Defendants concealed from all Plaintiffs that Defendants had conveyed ownership of this property to Plaintiffs on March 4, 2015.

68. For the ensuing years, all Defendants concealed from all Plaintiffs that Defendants' conveyance of ownership of this property to Plaintiffs of March 4, 2015, was on terms that were materially different from those agreed upon with Plaintiffs.

69. For example, Maryland land records show that Defendants did not report to SDAT the actual "package price" of $55,000 paid by Plaintiffs or even the $44,000 stated on the July 21, 2014, invoice sent to Plaintiff. Instead, Defendants falsely reported to SDAT a fictitious lower

price of $21,000, in order to avoid paying transfer taxes altogether since this lower amount is below the threshold for paying conveyance taxes, and lowering Plaintiffs' tax basis in this property, which exposes Plaintiffs to having to pay higher conveyance taxes than they should when they sell this property. Also, this enabled Defendants to fraudulently keep the "2014 taxes properties" that they charged Plaintiffs in the July 21, 2014, invoice.

70. Property Management Fraud.  Following Plaintiffs' investment, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M, managed the property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

71. To hide their acts and omissions, and cause Plaintiffs to delay taking action with respect to claims accruing from the Ouazana Defendants' management of the property, Defendants made a number of false representations purporting to explain their failure to remit to the Layani Plaintiffs monthly rents of US$1,050 to US$1,150 despite prior representations that this property would produce these rents shortly after making the repairs included in the "package price."

72. To start, Defendants falsely represented on numerous occasions via WhatsApp chats and telephonic conversations between July 2014 and March 2015 that they were making and then, that they had made the repairs included in the "package price" when in fact, they had not.

73. Then the Ouazana Defendants falsely represented that they had hired third-party service providers to perform additional renovation and repairs to the property.

74. Defendants then sought reimbursement from Plaintiffs of US$3,173 for work allegedly done by the Defendants and by third-party service providers, which Plaintiffs paid, believing Defendants' false representation that invoices from the Defendants and from any third parties existed and would be provided in response to Plaintiffs' repeated demand.

75. The Ouazana Defendants delayed providing these invoices using various pretexts, and then simply refused to provide any verifiable proof of renovation or repair expenses.

Class Action Complaint                    19

76. On information and belief, Defendants, also retained monthly rents totaling at least US$6900 for at least the months of January, February, March, April, June, and July 2016.

77. Throughout their dealings with Plaintiffs, Defendants falsely represented that they were diligently managing all of the Plaintiffs' properties, including this property, which included making payments good faith to third-party contractors and pursuing payment of missing rent amounts from tenants in the landlord-tenant court and through debt collectors.

78. Defendants then used pretexts to delay and eventually avoid providing Plaintiffs with access to Defendants' business records kept in the ordinary course of their management of this and other properties sold to Plaintiffs, eventually representing in the context of the prior lawsuit filed by the Layani Plaintiffs against Defendants that they maintained no such records, and that all existing records were shared with Plaintiffs on a cloud-based hard drive from which Defendants were locked out by Plaintiffs.  However, this representation was false because Plaintiffs did not lock-out Defendants from access to any cloud-based hard drive in which Defendants deposited Defendants-prepared files. Moreover, Defendants' claim that they maintain no business records is inconsistent with the operation of a real estate management business necessitating the issuance of leases, the exchange of emails, the hiring of bookkeepers, accountants, plumbers, carpenters, electricians, cleaners, or roofers, and the filing of tax returns, all of which must necessarily be documented.

79. In the end, Defendants refused to respond to Plaintiffs' requests for access to their business records and, on information and belief, simply retained and converted to their own use missing rent amounts after charging Plaintiffs for what appeared to be fictitious repairs that Defendants made up.

80. On or about July 31, 2018, understandably frustrated with Defendants' refusal to provide transparency in their management of Plaintiff's properties, the Layani Plaintiffs terminated all their management agreements with Defendants.

Class Action Complaint                    20

81. However, without the Layani Plaintiffs' knowledge or permission, Defendants continued collecting the Layani Plaintiffs' rents from this property even after termination of the management agreement. Further, Defendants refused to account for the amounts unlawfully retained by them before and after termination of the management agreement, and also refused to turn over rents to the Layani Plaintiffs despite repeated demands.

82. As a result of Defendants' false statements and concealment, Plaintiffs did not discover Defendants' fraud until later, in October 2018, when the Layani Plaintiffs learned for the first time that Defendants had let the property fall into severe disrepair, that they failed to respond to official code violation notices, that they failed to pay assessed fines and that they did not inform Plaintiffs of these failures, which occurred while Defendants were purportedly managing the property. This eventually caused the property to be listed for tax sale. This also caused Plaintiffs to incur in excess of US$4,997.27 to redeem it, in costs and attorney's fees.

83. As a direct, proximate and foreseeable result of Defendants' scheme, the Layani Plaintiffs invested in this property, and agreed to pay a "package price" based on the representations that Defendants made, which turned out to be false. Moreover, the Layani Plaintiffs lost the use, possession, and benefit of any and all investment income Defendants unlawfully retained which was owed or promised to the Layani Plaintiffs, and Defendants were unjustly enriched by the same amount and the Layani Plaintiffs sustained additional damages resulting from Defendants' failures while they managed the property.

### ii) *726 N Hilton St. 21215 Baltimore MD 21215*

84. Marketing/Selling Fraud.  On or about September 1, 2014, Defendants Benjamin Ouazana and WAZ- I, acting through nonparty Simon Jonathan Dahan, offered via email to Plaintiffs Layani and Britt investments to buy what he represented was a building located at 726 N Hilton St., Baltimore, MD 21215, with Defendants agreeing to manage this property, expending the efforts necessary to fulfill Plaintiffs' profit expectation in exchange for a "Management fees 8 percents (sic.). "

85. Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, used the international wires, including email, telephone, and WhatsApp voice and text chats, to communicate several false representations material to the Layani Plaintiffs, including the following.

86. In a September 1, 2014 email, Defendant Benjamin Ouazana, represented about this property: "I have a good FORECLOSURE deal for you in Baltimore, new in the market for 55000 included work… Rent estimate 1100 to 1200 dollars… Also I put you the website of the appraisal of the house that's Baltimore city estimate this house for 64200 dollars."

87. During international telephonic conversations between, on one hand, Defendant Isaac Ouazana and Benjamin Ouazana in Baltimore, and on the other hand, Plaintiffs Gerard Layani in Israel and nonparty Julien Layani in Paris, that occurred during the period of September 1 through September 5 2014, Defendants Isaac Ouazana and Benjamin Ouazana falsely represented that, through Defendant WAZ-I, they owned this property, and confirming their other representations, which included that this property had been appraised at $64,200.

88. Based on Defendant Isaac Ouazana's representations, the Layani Plaintiffs agreed to pay Defendants a "package price" of US$55,000 for this property, and on or about September 5, 2014, the Layani Plaintiffs transferred to Defendants, in the manner and for the benefit of the recipient designated by Defendants, to wit, third party Waz Properties Inc., the full amount of the agreed "package price" of US$55,000, which included a full renovation.

Class Action Complaint                22

89. Defendants' September 1, 2014, representation that WAZ-I owned this property at the time of the purported sale to Plaintiffs was false because official Maryland land records show that WAZ-I never acquired this property, and instead arranged for its direct sale to Plaintiffs from its third-party owner, Munitrust REO, on or about November 14, 2014.

90. The September 1, 2014, representation that Defendant WAZ-I was the seller of this property for a price of US$55,000 was false because on or about November 3, 2014, Defendant Isaac Ouazana used international wires to email Plaintiff Britt's representative, nonparty Julien Layani, a deed bearing the same date of November 3, 2014, which revealed for the first time that it was nonparty Munitrust REO, not Defendant WAZ-I, who was the seller, and the price was not $55,000 as represented, but $16,000, which price Defendants ostensibly paid with the US $55,000 Defendants fraudulently obtained from Plaintiffs on or about September 5, 2014.

91. For the two months that ensued from September 1, 2014 until November 3, 2014, Defendants concealed from Plaintiffs that the terms of the transaction that was actually implemented by the Defendants were materially different from those represented to and agreed by Plaintiffs, with respect to both the identity of the seller and the actual price of the property.

92. Finally, Maryland land records show that Defendants did not report to SDAT the actual "package price" of $55,000 paid by Plaintiffs. Instead, Defendants falsely reported to SDAT a fictitious lower price of $16,000, failing to pay any transfer taxes on that lower amount since it is less than the $22,000 threshold for paying such taxes for owner-occupied properties, and lowering Plaintiffs' tax basis in this property, which exposes Plaintiffs to having to pay higher conveyance taxes than they should when they sell this property. This also enabled Defendants to fraudulently keep conveyance taxes they collected from Plaintiff as part of the $55,000 price.

93. <u>Property Management Fraud</u>.  After the Layani Plaintiffs made their investment, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M,

managed the property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

94. However, Defendants exploited the trust placed in them by the Layani Plaintiffs, and the fact that the Layani Plaintiffs who reside in Israel and in France, could not easily check in Baltimore every one of the Defendants' multiple false representations.

95. To hide their acts and omissions and cause Plaintiffs to delay taking action, Defendants made a number of false representations purporting to explain their failure to remit to the Layani Plaintiffs monthly rents of US$1,100 to US$1,200 despite prior representations that this property would produce these rents shortly after making the repairs included in the "package price."

96. To start, the Ouazana Defendants falsely represented on numerous occasions via WhatsApp chats and telephonic conversations between July 2014 and January 2016 that they were making and then, that they had made the repairs included in the "package price" when in fact, they had not.

97. Then the Ouazana Defendants falsely represented that they had hired third-party service providers to perform additional renovation and repairs to the property.

98. The Ouazana Defendants then sought reimbursement from Plaintiffs of US$1,815.80 for work allegedly done by the Defendants and/or the third-party service providers, which Plaintiffs paid in good faith, believing Defendants' false representation that invoices or proof of the work done by them and/or the third parties existed and would be provided in response to Plaintiffs' repeated demand.

99. The Ouazana Defendants delayed providing these invoices using various pretexts, and then simply refused to provide any verifiable proof of renovation or repair expenses.

100.     On information and belief, Defendants, also retained monthly rents totaling at least US$$7,252 for at least the months of February, March, August, September, October and December 2017, as well as March, April, May, and June 2018.

101.     Throughout their dealings with Plaintiffs, Defendants falsely represented that they were diligently managing all of the Plaintiffs' properties, including this property, which included making payments in good faith to third-party contractors and pursuing payment of missing rent amounts from tenants in the landlord-tenant court and through debt collectors.

102.     Defendants failed to remit the monthly rents of US$1,100 to US$1,200 to the Layani Plaintiffs, despite prior representations that these rents were being collected in this property.

103.     Defendants then used pretexts to delay and eventually avoid providing Plaintiffs with access to Defendants' business records regarding their management of this and other properties sold to Plaintiffs, eventually falsely representing in the context of the 2019 lawsuit filed by the Layani Plaintiffs against Defendants that they maintained no such records, and that all existing records were shared with Plaintiffs on a cloud-based hard drive from which Defendants were locked out by Plaintiffs.  However, this representation was false because Plaintiffs did not lock-out Defendants from access to any cloud-based hard drive in which Defendants deposited Defendants-prepared files. Moreover, Defendants' claim that they maintain no business records is inconsistent with the operation of a real estate management business necessitating the issuance of leases, the exchange of emails, the hiring of bookkeepers, accountants, plumbers, carpenters, electricians, cleaners, or roofers, and the filing of tax returns, all of which must necessarily be documented.

104.     In the end, Defendants refused to respond to Plaintiffs' requests for access to their business records and, on information and belief, simply retained and converted to their

own use missing rent amounts after charging Plaintiffs for what appeared to be fictitious repairs that Defendants made up.

105.     On or about July 31, 2018, understandably frustrated with Defendants' refusal to provide transparency in their management of Plaintiff's properties, the Layani Plaintiffs terminated all their mandatory management agreements with Defendants, including the management agreement pertaining to this property.

106.     As a result of Defendants' false statements and concealment, Plaintiffs did not discover Defendants' fraud until later, in October 2018, when the Layani Plaintiffs learned for the first time that Defendants had let the property fall into severe disrepair, that they failed to respond to official code violation notices, that they failed to pay assessed fines and that they did not inform Plaintiffs of these failures, which occurred while Defendants were purportedly managing the property. This eventually caused this property to be listed for tax sale.  This also caused Plaintiffs to incur in excess of US$6772.89 to redeem it, in costs and attorney's fees.

107.     As a direct, proximate and foreseeable result of Defendants' scheme, the Layani Plaintiffs invested in this property, and agreed to pay a "package price" based on the representations that Defendants made, which turned out to be false.  Moreover, the Layani Plaintiffs lost the use, possession, and benefit of any and all investment income Defendants unlawfully retained which was owed or promised to the Layani Plaintiffs, and Defendants were unjustly enriched by the same amount and the Layani Plaintiffs sustained additional damages resulting from Defendants' failures while they managed the property.

*iii) 3905 W. Forest Park Ave., Baltimore, Maryland 21207*

108.     Marketing/Selling Fraud.  In or about January 2015, Defendants Benjamin Ouazana and WAZ- I, acting through nonparty Simon Jonathan Dahan, offered to the Layani Plaintiffs to invest in a what they falsely represented was a four-unit multifamily building located at 3905 W. Forest Park Ave., Maryland 21207, coupled with a management agreement with Defendants to expend the efforts necessary to fulfill Plaintiffs' profit expectation in exchange for a "Management fees 8 percents" (sic.).

109.     Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, used the international wires, including email, telephone, and WhatsApp voice and text chats, to communicate several false representations material to the Layani Plaintiffs, including the following.

110.     Defendant Isaac Ouazana in Baltimore, used the international wires to send the Layani Plaintiffs' representative, nonparty Julien Layani in Paris, certain descriptive written material about this investment, wherein Defendants represented that the property offered contained four units with 1175 square-foot each.

111.     Defendant Isaac Ouazana also represented to the Layani Plaintiffs in the written descriptive materials that that this property's "Foreclosure listing price" was US$70,000 and that Defendants would then incur renovations costs and other expenses, justifying a sale price to the Layani Plaintiffs of US$170,000.

112.     Based on Defendant Isaac Ouazana's representations, the Layani Plaintiffs agreed to pay Defendants the requested "package price " of US$170,000 for this property, which included all renovation work, and on or about April 23, 2015, the Layani Plaintiffs transferred to Defendants, in the manner and for the benefit of the recipient designated by Defendants, to wit, third party Waz Properties Inc., the full amount of the agreed "package price."

113.     However, although Plaintiffs did not know it when they invested, Defendants'
written representation contained in their offering materials that WAZ-I owned this property
when they offered it for sale to Plaintiffs in January 2015 was false because Maryland land
records show that WAZ-I acquired this property later, on or about June 17, 2015, i.e., after
Defendants claimed they sold it to Plaintiffs.  Defendants' representation was also false because
in January 2015, Defendants did not know and could not have known that WAZ-I was the
successful bidder for this property, because according to the deed recorded on June 17, 2015,
the auction concluded on February 24, 2015, i.e., after January 2015.

114.     Moreover, although Plaintiff did not discover this until March 2018, Defendants
Isaac Ouazana, Benjamin Ouazana, and WAZ-I's representation in the written descriptive
materials that the property was a building containing 4 separate rental units with "2 beds1 bath
1,175 sqft each" was false because the property is a single-family building that does not contain
four separate rental units. Moreover, the four lease agreements provided by Defendants to
Plaintiffs were fraudulent, falsified, documents for the same reason.

115.     The written representation that Defendant WAZ-I had paid US$70,000 for this
property was also false because Maryland land records show that WAZ-I bought it for
US$30,000, ostensibly with the funds Defendants, fraudulently obtained from Plaintiffs on
April 23, 2015.

116.     On or about June 11, 2015, Defendant Isaac Ouazana used international wires to
email Plaintiff Britt's representative, nonparty Julien Layani, a falsified deed dated June 4,
2015, representing that on that date, Defendant WAZ-I had conveyed title to this property to
Plaintiff Britt for the sale price of $145,000.  This representation was false because Defendant
WAZ-I did not own this property and had not, nor could it have, conveyed it to Plaintiff Britt
on that day, as Maryland land records show that it did not own this property until June 17,
2015.

117.    Defendant Isaac Ouazana's emailed representation of June 11, 2015, that Defendants recorded the sale price of US$145,000 that was stated in the deed attached to Defendant's email to the Plaintiffs, also, was false because official Maryland land records show that Defendants recorded another deed that falsely reported a fictitious lower price of $30,000, paying transfer taxes on that lower amount, and lowering Plaintiffs' tax basis in this property, which exposes Plaintiffs to having to pay higher conveyance taxes than they should when they sell this property. Indeed, Defendants did not record a deed to Plaintiff Britt with the actual "package price" of $170,000 paid by Plaintiffs, or even the materially different "package price" of US$145,000, which Defendants claimed was the conveyance price in their fraudulent deed which they emailed to Plaintiffs on June 11, 2015. This also enabled Defendants to fraudulently keep conveyance and recordation taxes they had collected from Plaintiffs as part of the $170,000 they charged them.

118.    For the ensuing years, the Ouazana Defendants concealed from all Plaintiffs that Defendants had not conveyed ownership of this property to Plaintiffs on or about April 23, 2015, when the Layani Plaintiffs paid for it.

119.    For the ensuing years, the Ouazana Defendants concealed from all Plaintiffs that Defendants recorded a conveyance of ownership of this property to Plaintiffs on June 17, 2015, that was effectuated on terms that were materially different from those represented to and agreed by Plaintiffs prior to April 23, 2015, the date on which Plaintiffs paid their investment.

120.    For the ensuing years, the Ouazana Defendants concealed from all Plaintiffs that Defendants recorded a conveyance of ownership of this property to Plaintiffs on June 17, 2015, that contained terms that were materially different from even those terms disclosed to Plaintiffs on June 11, 2015, the date on which Defendant Isaac Ouazana emailed to the Layani Plaintiffs' representative, nonparty Julien Layani, the falsified deed, representing that Defendants had conveyed this property to the Plaintiffs for the made-up price of US$145,000.

Class Action Complaint                    29

121.     Property Management Fraud.  After the Layani Plaintiffs made their investment, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M, managed the property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

122.     However, Defendants exploited the trust placed in them by the Layani Plaintiffs who were unable to easily check the Defendants' false representations in Baltimore because Plaintiffs reside in France and Israel.

123.     To hide their acts and omissions and cause Plaintiffs to delay taking action, Defendants made a number of false representations purporting to explain their failure to remit to the Layani Plaintiffs monthly rents on multiple occasions.

124.     To start, the Ouazana Defendants falsely represented on numerous occasions via WhatsApp chats and telephonic conversations between January 2015 and March 2016 that they were in the process of making repairs, and then, that they had completed the repairs included in the "package price" when in fact, they had not.

125.     Then the Ouazana Defendants falsely represented on multiple occasions between May 2016, and July 2018 that they had hired third-party service providers to perform additional renovation, repairs and upkeep to the property.

126.     The Ouazana Defendants then sought reimbursement from Plaintiffs of US$5,385 for work allegedly done by the Defendants and/or the third-party service providers, which Plaintiffs paid, believing Defendants' false representation that invoices or proof of the work done by them and/or the third parties existed and would be provided in response to Plaintiffs' repeated demand.

127.     Throughout, the Ouazana Defendants obfuscated, claiming the receipts were forthcoming, but never coming through on their promise to provide requested invoices or other proof that the renovation or repair work had been done by Defendants or third-parties, while

Class Action Complaint                    30

insisting that the Plaintiffs reimburse Defendants for unsubstantiated and, ostensibly, made up repairs.

128.    Throughout their dealings with Plaintiffs, Defendants falsely represented that they were diligently managing all of the Plaintiffs' properties, including this property, which included representations that Defendants had made payments in good faith to third-party contractors and Defendants were pursuing payment of missing rent amounts from tenants in the landlord-tenant court and through debt collectors.

129.    Defendants then used pretexts to delay and eventually avoid providing Plaintiffs with access to Defendants' business records kept in the ordinary course of their management of this and other properties sold to Plaintiffs, eventually falsely representing in the context of the prior lawsuit filed by Plaintiffs against Defendants that they maintained no such records, and that all existing records were shared with Plaintiffs on a cloud-based hard drive from which Defendants allegedly were locked out by Plaintiffs.  However, this representation was false because Plaintiffs did not lock-out Defendants from access to the cloud-based hard drive in which Defendants deposited Defendants-prepared files. Moreover, Defendants' claim that they maintain no business records is inconsistent with the operation of a real estate management business necessitating the issuance of leases, the exchange of emails, the hiring of bookkeepers, accountants, plumbers, carpenters, electricians, cleaners, or roofers, and the filing of taxes, all of which must necessarily be documented

130.    In the end, Defendants refused to comply with Plaintiffs' requests for access to Defendants' business records, retaining and converting to Defendants' use Plaintiffs' rents and charging Plaintiffs for fictitious work.

131.    In fact, for eight months, Defendants failed to perform any renovations while charging the Layani Plaintiffs for work that Defendants had not done.

Class Action Complaint              31

132.     To hide their actions from Plaintiffs, Defendants made false statements to the effect that the condition of the property prevented two of the four units from being rented, and that they were diligently completing the needed renovation.

133.     This representation was false because the property does not contain four separate units, but it is a single-family building, as the Layani Plaintiffs discovered, to their surprise, in March 2018, during a site visit.

134.     Post-"renovation," Defendant Isaac Ouazana also provided Plaintiffs four separate lease agreements, representing that Defendants had been collecting monthly rents totaling $3,275 for these four units

135.     Defendants' representation that the property had four units rented to four tenants also turned out to be false because, during their March 2018 site visit, the Layani Plaintiffs discovered for the first time that this single-family building had been rented to one tenant only, a business operating an assisted living facility on the entire premises without Plaintiffs' knowledge or permission, and without proper insurance or business licenses.

136.     On or about the same time, Plaintiffs also learned for the first time that Defendants had collected rents from the assisted living business tenant, which Defendants had failed to remit to Plaintiffs.

137.     On information and belief, Defendants retained rents totaling at least US$24,957, for at least the months of March, April, May June and July 2016, May, June, July, August, September, October, November, and December 2017, January, February, March, April, May, June, and July 2018.

138.     On or about July 31, 2018, understandably frustrated with Defendants, the Layani Plaintiffs terminated all their management agreements with Defendants, including that pertaining to this property.

Class Action Complaint                    32

139.     As a result of Defendants' false statements and concealment, Plaintiffs did not discover the full extent of Defendants' fraud until later, in October 2018, when the Layani Plaintiffs learned for the first time that Defendants had let the property fall into severe disrepair, that they failed to respond to official code violation notices, that they failed to pay assessed fines and that they did not inform Plaintiffs of these failures, which occurred while Defendants were purportedly managing the property, eventually causing this property to be listed for tax sale.  This caused Plaintiffs to incur in excess of US$6,623 to redeem it, in back taxes, penalties, fines and costs and attorney's fees.

140.     As a direct, proximate and foreseeable result of Defendants' scheme, the Layani Plaintiffs invested in this property, and agreed to pay a "package price" based on the representations that Defendants made, which turned out to be false.  Moreover, the Layani Plaintiffs lost the use, possession, and benefit of any and all investment income Defendants unlawfully retained which was owed or promised to the Layani Plaintiffs, and Defendants were unjustly enriched by the same amount and the Layani Plaintiffs sustained additional damages resulting from Defendants' failures while they managed the property.

        *iv) 4004 Oakford Ave., Baltimore, Maryland 21215*

141.     <u>Marketing/Selling Fraud</u>.  On December 14, 2014, Defendants Isaac Ouazana, Benjamin Ouazana, and I&B, acting through nonparty Simon Jonathan Dahan, offered via email to Plaintiffs Layani and Britt investments to invest $112,500 to acquire a 50% ownership interest, with the Ouazana Defendants owning the other 50%, in a four-unit multifamily building located at 4004 Oakford Ave., Baltimore, Maryland 21215, with Defendants agreeing to manage this property without fee, expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

142.     On or about the same time, Defendants Isaac Ouazana, Benjamin Ouazana, and I&B, used the international wires, including email, telephone, and WhatsApp voice and text

chats, to communicate several false representations material to the Layani Plaintiffs, including the following statements.

143.     Defendant Isaac Ouazana, Benjamin Ouazana, and I&B,  in Baltimore, acting through nonparty Simon Jonathan Dahan, used the international wires on December 14, 2014, to email the Layani Plaintiffs' representative, nonparty Julien Layani in Paris, descriptive written material about this investment, wherein Defendants represented that this was a "contractor bankruptcy foreclosure" with a "foreclosure listing price" of US$143,000 for the property. They also represented that in addition to closing fees and recording expenses totaling US$14,500, this property needed US$64,500 in repairs and renovations.  To the resulting US$222,000 purchase and refitting price which Defendants represented was the true price of acquisition of this property, Defendants asked for a $3000 finders' or investment fee to which Plaintiffs assented, making the full "package price" for this property, US$225,000.

144.     Defendant Isaac Ouazana, used the international wires on December 22, 2014, to email the Layani Plaintiffs' representative, nonparty Julien Layani in Israel, with copy to Defendant Benjamin Ouazana, to further represent to the Layani Plaintiffs that the Ouazana Defendants had established a new entity, 4004 Oakford Ave. LLC, for the purpose of holding this property, and had also opened a bank account for 4004 Oakford Ave. LLC, stating "please find in an attachment a new company open and the bank info for your first wire of 75+15=90K for 29 December."

145.     Defendant Isaac Ouazana, used the international wires on January 2, 2015, to email the Layani Plaintiffs' representative, nonparty Julien Layani in France, to represent to the Layani Plaintiffs that the Ouazana Defendants "had fixed" the operating agreement for 4004 Oakford Ave. LLC "like you [i.e., the Layani Plaintiffs] want."  Specifically, the operating agreement specified that the shares of 4004 Oakford Ave. LLC are divided equally between Plaintiff Britt, who owned 50% of the share capital, and another company owned by the

Class Action Complaint                34

Defendants, Defendant I&B, who owned the other 50%.  The operating agreement states in Article III. B: "Initial Contribution.  Each member shall make an Initial Contribution to the Company.  The Initial Contributions of each shall be described in attachment A, Initial Contributions of the Members."  In turn, attachment A, states the initial contributions of the Members of 4004 Oakford Ave. LLC are as follows: I&B Capital Investments LLC (50%) Contribution: Cash: $112,500."

146.     Based on Defendants' representations, on or about January 7, 2015, Plaintiffs purchased this 50% property interest, transferring to Defendants full payment of US$112,500, amounting to 50% of the full "package price" of US$225,000, which included charges for renovations, as well as all conveyance related taxes and charges.

147.     Defendants representations made first via email on December 14, 2014, and repeated or left uncorrected during the period of December 2014 through January 7, 2015, that the property was available for sale in a "contractor bankruptcy foreclosure" with a "foreclosure listing price" of US$143,000 was false because Maryland land records show that this property was not the subject of a "contractor bankruptcy foreclosure" on January 7, 2015, when Plaintiffs paid for their 50% ownership interest in it.  According to a deed dated January 12, 2015 and recorded January 28, 2015 in the Maryland land records, Defendant WAZ-I acquired this property not in a foreclosure but directly from its then owner, nonparty Northstar Realty Management Inc.

148.     The Ouazana Defendants' representations made first via email on December 14, 2014, and repeated or left uncorrected during the period of December 2014 through January 7, 2015, that when they offered this property for sale to Plaintiffs, it had a "foreclosure price" of US$143,000 was false because the aforementioned January 12, 2015 deed recorded in the Maryland land records shows that Defendant WAZ-I paid $90,000 for it, not US$143,000.

149.     The Ouazana Defendants' representation made first via email on December 14, 2014, and repeated or left uncorrected during the period of December 2014 through January 7, 2015, that Defendants' finder's fee was $3000, was false because the true purchase price of the property to the Ouazana Defendants was $90,000 and not the represented "foreclosure listing price" of $143,000.  Defendants therefore obtained by means of fraud and deception a commission far greater than the US$3000 which they represented to Plaintiffs was the amount of their finder's fee.

150.     The Ouazana Defendants' representation made first via email on January 2, 2015, and repeated or left uncorrected during the period of December 2014 through January 7, 2015, that the Ouazana Defendants paid $112,500 in cash for their 50% interest in this property was false as well because the Ouazana Defendants used false pretenses and deception to fraudulently induce the Layani Plaintiffs to wire US$90,000, on January 7, 2015, which was the true purchase price for 100% ownership of this property and which the Ouazana Defendants used to pay its then owner, nonparty Northstar Realty Management Inc.. By fraudulently and deceptively misrepresenting that this property was being conveyed for a "foreclosure listing price" of US$143,000 at a "contractor bankruptcy foreclosure," when it was in fact sold directly by its then owner for $90,000, and by providing false repair estimates to Plaintiffs, Defendants induced the Layani Plaintiffs to unwittingly pay for 100% of the purchase price for this property, including the Ouazana Defendants' 50% share, which the Ouazana did not pay.

151.     Furthermore, the Ouazana Defendants' representation made during the period of December 2014 through January 7, 2015, that the Ouazana Defendants had established a separate bank account for 4004 Oakford Ave. LLC and would transact all business relating to this property through this account was false because Defendants did not use this bank account to transact the business of 4004 Oakford Ave. LLC. On information and belief, Defendants

used a separate bank account to which Plaintiffs had no access in order to fraudulently conceal from the Layani Plaintiffs the truth of Defendants' dealings with respect to this property.

152.     Although Plaintiffs did not discover this for months due to the Defendant's active concealment, Defendants' representation that they were selling "their" 50% interest but not the Layani Plaintiffs' 50% ownership in 4004 Oakford Ave. LLC, was false because in or about August 22, 2018, without the Layani Plaintiffs' knowledge or permission, Defendant Isaac Ouazana filed amended articles for 4004 Oakford Ave. LLC which list as a new 100% owner, a third party named Laurindo Figueiredo Dacosta, to whom Defendants appear to have sold for an undisclosed price all shares in 4004 Oakford Ave. LLC, including the Layani Plaintiffs' shares, amounting to at least 50% ownership, if not 100% interest in light of Defendants' fraud.  Defendants also retained for themselves any and all proceeds of the sale of the shares of 4004 Oakford Ave. LLC, concealing from Plaintiffs this transaction's occurrence.

153.     Property Management Fraud.  Following Plaintiffs' investment, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M, allegedly managed the property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

154.     However, Defendants exploited the Layani Plaintiffs' trust and inability to easily check the Defendants' false representations in Baltimore, owing to Plaintiffs residing in France and Israel.

155.     To hide their acts and omissions and cause Plaintiffs to delay taking action, Defendants made a number of false representations purporting to explain their failure to account and remit to 4004 Oakford Ave. LLC monthly rents despite Defendants' prior representations that this property was generating these rents.

156.     To start, Defendants falsely represented on numerous occasions via WhatsApp chats and telephonic conversations between January 2015 and August 2015 that they were

making and then, that they had made the repairs included in the "package price" when in fact, they had not because the amounts shared with Plaintiffs pre-investment appear to have been fictitious numbers whose sole purpose was to induce the Layani Plaintiffs to overpay for their 50% interest in this property, in order to effectively subsidize and pay for the Ouazana's 50% share of this property as the Ouazana Defendants did not pay their cash contribution of $122,500.

157.    Then, from August 2015 until June 2018, Defendants falsely represented on multiple occasions that they had hired third-party service providers to perform additional maintenance, upkeep and repairs to the property, enabling Defendants to then seek reimbursement from Plaintiffs of US$11,872.30 for work allegedly done by these third-party service providers, which Plaintiffs paid, believing Defendants' false representation that invoices from the third parties existed and would be provided in response Plaintiffs' repeated demand.

158.    The Ouazana Defendants delayed providing these invoices using various pretexts, and then simply refused to provide any verifiable proof of renovation or repair expenses.

159.    On information and belief, Defendants, also retained monthly rents rightfully belonging to Plaintiffs, and totaling at least US$7077 for at least the months of December 2015, January, February, March, April, May, June, and July 2016, July, August, September, October, November, and December 2017, and January, February, March, and May 2018.

160.    Throughout their dealings with Plaintiffs, Defendants falsely represented that they were diligently managing all of the Plaintiffs' properties, including this property, which included making payments in good faith to third-party contractors and pursuing payment of missing rent amounts from tenants in the landlord-tenant court and through debt collectors or by dealing directly with the tenants.

Class Action Complaint                    38

161.     Defendants then used pretexts to delay and eventually avoid providing Plaintiffs with access to Defendants' business records kept in the ordinary course of their management of this and other properties sold to Plaintiffs, eventually falsely representing in the context of a 2019 lawsuit filed by Plaintiffs against Defendants that they maintained no such records, and that all existing records were shared with Plaintiffs on a cloud-based hard drive from which Defendants were locked out by Plaintiffs.  However, this representation was false because Plaintiffs did not lock-out Defendants from access to the cloud-based hard drive in which Defendants deposited Defendants-prepared files purporting to inform Plaintiffs of the performance of their investments under Defendants' management.

162.     In the end, Defendants refused to respond to Plaintiffs' requests for access to their business records and, on information and belief, simply retained and converted to their own use missing rent amounts and amounts charged Plaintiffs for fictitious third-party contractor work that Defendants made up.

163.     As noted previously, in June 2018, Defendants Isaac Ouazana appears to have sold all shares in 4004 Oakford Ave. LLC, including Plaintiffs' shares, representing 50% of the share capital of the company, without the Plaintiffs' knowledge or consent, and without turning over to Plaintiffs the amount that Defendants collected for the unauthorized sale of Plaintiffs' shares.

164.     Defendants unjustly and unlawfully converted to their own use -- and continue to retain -- the proceeds of the sale of all the shares of 4004 Oakford Ave. LLC., including the proceeds of the unauthorized sale of Plaintiffs' shares.

165.     Without any information about the actual terms of the sale of Plaintiffs' shares, Plaintiffs believe that Defendants also unjustly and unlawfully continue to retain and convert to their own use rents from the operation of this property until the time of their unauthorized sale, which rental income properly belongs to Plaintiffs, and Defendants refuse to account for the

funds that they unlawfully retain in violation of Plaintiffs' rights despite repeated demand for turning over these funds to Plaintiffs and providing an accounting for the sums that Defendants unlawfully keep.

166.     As a direct, proximate and foreseeable result of Defendants' scheme, Plaintiffs invested in this property, and agreed to pay a "package price" based on the representations that Defendants made, which turned out to be false.  Moreover, Plaintiffs lost the use, possession, and benefit of any and all investment principal and income collected by Defendants which were owed or promised to Plaintiffs, and Defendants were unjustly enriched by the same amount, including Plaintiffs share of any proceeds that Defendants received for the unauthorized sale of Plaintiff's shares ownership in 4004 Oakford Ave. LLC.

   *v)* _626 E 35th St. Baltimore, Maryland 21229_

167.     Marketing/Selling Fraud.  On or about February 3, 2015, Defendants Isaac Ouazana, acting through nonparty Simon Jonathan Dahan, used the international wires to offer via email to Plaintiffs Layani and Britt investments to invest US$73,000 in what Defendant Isaac Ouazana represented was a single unit rental property (a rowhouse) located at 626 E 35th St. Baltimore, Maryland 21229, coupled with a management agreement with Defendants to manage this property, expending the efforts necessary to fulfill the Plaintiffs profit expectation in exchange for a management fee of 8 percent.

168.     Defendants Isaac Ouazana, Benjamin Ouazana, and I&B, used the international wires, including email, telephone, and WhatsApp voice and text chats, to communicate several false representations material to the Layani Plaintiffs, including the following.

169.     During international telephonic conversations between, on one hand, Defendant Isaac Ouazana and Benjamin Ouazana in Baltimore, and on the other hand, Plaintiffs Gerard Layani in Israel and nonparty Julien Layani in Paris, that occurred during the period of February 3 through March 26, 2015, Defendants Isaac Ouazana and Benjamin Ouazana, falsely

represented that they owned this property, which they claimed to have purchased for US$45,000. They also represented that this property generated a "cash on cash return" of 14.73% after expenses based on monthly rent of US$1,250 and gross yearly income of US$15,000.

170.     In support of the foregoing representations, Defendants used the international wires to email Plaintiffs written offering materials for this property, representing that Defendant WAZ-I was offering this property, which it purportedly had bought at auction for the auction buying price of US$45,000.

171.     Defendants' written offering materials also represented that the property package of $73,000 was based on a "Price breakdown" which included, in addition to the "Auction buying price of $45,000," Settlement fees and recording expenses of US$7,000, needed repairs and permits totaling US$17,800, and "Waz Investment Fees" of $3,200.

172.     In reliance on Defendants' representation that the auction buying price that Defendant WAZ-I paid was in fact US$45,000, Plaintiffs agreed to a "package price" of US$68,000 for this property, and on March 26, 2015, Plaintiffs transferred funds to Defendants, in the manner and for the benefit of the recipient designated by Defendants, to wit, third party Waz Properties Inc., for the full amount of the agreed "package price" of US$68,000.

173.     Defendants' material representation that Defendant WAZ-I owned this property in February 2015, when Defendants offered it for sale to Plaintiffs was false because a deed dated April 10, 2015 and recorded in the Maryland land records April 15, 2015 shows that Defendant I&B (and not WAZ-I) did not own this property until April 10, 2015.

174.     Defendants' material representation made in the offering materials emailed to Plaintiffs that Defendant WAZ-I purchased this property for an "Auction buying price" of US$45,000, was false because the aforementioned deed dated April 10, 2015 shows that

Defendant I&B – not Defendant WAZ-I -- bought this property for the auction price of $25,000, not $45,000.

175.     Defendants' written representation made in the offering materials emailed to Plaintiffs that Defendant WAZ-I charged "Investments Fees" (sic.) of  US$3,200 to Plaintiffs was also false because the aforementioned April 10, 2015 deed shows that Defendant I&B (not WAZ-I which never owned this property) paid $25,000 for this property, not US$45,000, such that Plaintiffs actually paid "investments fees" far greater than US $3,200.

176.     For the ensuing years, all Defendants concealed from all Plaintiffs that Defendants' conveyance of ownership of this property to Plaintiffs, was on terms that were materially different from those agreed upon with Plaintiffs.

177.     For example, Maryland land records show that Defendants did not report to SDAT the actual "package price" of $45,000 paid by Plaintiffs. Instead, Defendants falsely reported to SDAT a fictitious lower price of $25,000, paying transfer taxes on that lower amount, and lowering Plaintiffs' tax basis in this property, which exposes Plaintiffs to having to pay higher conveyance taxes than they should when they sell this property. This also enabled Defendants to retain the major portion of conveyance and recordation taxes that they collected from Plaintiffs as part of the $45,000 price.

178.     <u>Property Management Fraud</u>.  After Plaintiffs made their investment, Defendants Isaac Ouazana, and through him Defendant WAZ-B and WAZ-M, managed the property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

179.      However, Defendants exploited the Layani Plaintiffs' trust and inability to easily check the Defendants' false representations in Baltimore, owing to Plaintiffs residing in France and Israel.

180.     To hide their acts and omissions and cause Plaintiffs to delay taking action, Defendants made a number of false representations purporting to explain their failure to remit

to the Layani Plaintiffs monthly rents of US$1,300 that Defendants had disclosed to Plaintiffs were being collected on an ongoing basis, and that Plaintiffs relied on in agreeing to make this investment.

181.    To start, Defendants falsely represented on numerous occasions via WhatsApp chats and telephonic conversations between February 2015 and October 2016 that they were making and then, that they had completed the repairs included in the "package price" when in fact, they had not and in any event took far longer than represented to Plaintiffs, thereby delaying Plaintiffs' ability to rent the property and generate rental income.

182.    Then Defendants falsely represented that they had hired third-party service providers to perform additional renovation and repairs to the property, enabling Defendants to then seek reimbursement from Plaintiffs of US$3,491.25 for work allegedly done by these third-party service providers, which Plaintiffs paid, believing Defendants' false representation that invoices from the third parties existed and would be provided in response Plaintiffs' repeated demand.

183.    The Ouazana Defendants delayed providing these invoices using various pretexts, and then simply refused to provide any verifiable proof of renovation or repair expenses.

184.    On information and belief, Defendants, also retained monthly rents totaling at least US$15,398 for at least the months of June, July, August, September, October, November, December 2017, and January, February, March, April, May, and June 2018.

185.    Throughout their dealings with Plaintiffs, Defendants falsely represented that they were diligently managing all of the Plaintiffs' properties, including this property, which included making payments good faith to third-party contractors and pursuing payment of missing rent amounts from tenants in the landlord-tenant court and through debt collectors or by dealing directly with the nonpaying tenants.

Class Action Complaint                       43

186.     Defendants then used pretexts to delay and eventually avoid providing Plaintiffs with access to Defendants' business records kept in the ordinary course of their management of this and other properties sold to Plaintiffs, eventually falsely representing, in the context of a 2019 lawsuit filed by Plaintiffs against Defendants, that they maintained no such records, and that all existing records were shared with Plaintiffs on a cloud-based hard drive from which Defendants were supposedly locked out by Plaintiffs.  However, this representation was false because Plaintiffs did not lock-out Defendants from access to any cloud-based hard drive in which Defendants deposited Defendants-prepared files purporting to inform Plaintiffs of the performance of their investments under Defendants' management.  Moreover, Defendants' claim that they kept no records in their own computers or offices strains credulity and appears to be one more attempt to interfere with or prevent Plaintiffs' access to relevant records.

187.     In the end, Defendants refused to respond to Plaintiffs' requests for access to their business records and, on information and belief, simply retained and converted to their own use missing rent amounts and charged Plaintiffs for fictitious third-party contractor work that Defendants made up.

188.     On or about July 31, 2018, understandably frustrated with Defendants' refusal to provide transparency in their management of Plaintiff's properties, the Layani Plaintiffs terminated all their mandatory management agreements with Defendants, including this one.

189.     However, Defendants continued collecting the Layani Plaintiffs' rents from this property despite having been notified of the termination of the management agreement. Further, Defendants refused to account for the amounts unlawfully retained by them before and after termination of the management agreement, and also refused to turn over rents to the Layani Plaintiffs despite repeated demands.  On information and belief, Plaintiffs estimate the amount of the rents improperly collected and retained by the Defendants to be at least US$7143.

Class Action Complaint                    44

190.     As a result of Defendants' false statements and concealment, Plaintiffs did not discover Defendants' fraud until later, in October 2018, when the Layani Plaintiffs learned for the first time that Defendants had let the property fall into severe disrepair, that they failed to respond to official code violation notices, that they failed to pay assessed fines and that they did not inform Plaintiffs of these failures, which occurred while Defendants were purportedly managing the property, eventually causing this property to be listed for tax sale. This caused Plaintiffs to incur in excess of US$3,600.12 to redeem it, in costs and attorney's fees.

191.     As a direct, proximate and foreseeable result of Defendants' scheme, the Layani Plaintiffs invested in this property, and agreed to pay a "package price" based on the representations that Defendants made, which turned out to be false. Moreover, the Layani Plaintiffs lost the use, possession of the property, and benefit of any and all investment income Defendants unlawfully retained which was owed or promised to the Layani Plaintiffs, and Defendants were unjustly enriched by the same amount and the Layani Plaintiffs sustained additional damages resulting from Defendants' failures while they purportedly managed the property.

        *vi) 805 N Lakewood Ave 21205 Baltimore Maryland 21205*

192.     Marketing/Selling Fraud. On or about April 19, 2015, Defendants Isaac Ouazana, acting through nonparty Simon Jonathan Dahan, offered to Plaintiffs Layani and Britt investments to invest US$55,000 in a joint enterprise combining Plaintiffs' purchase of what Defendants Isaac Ouazana represented was a single unit rental property (a rowhouse) located at 805 N Lakewood Ave Baltimore Maryland 21205, coupled with a mandatory management agreement with Defendants who would manage this property, expending the efforts necessary to fulfill the Plaintiffs profit expectation in exchange for a management fees of 8 percent.

193.     Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, used the international wires, including email, telephone, and WhatsApp voice and text chats, to

Class Action Complaint                45

communicate several false representations material to the Layani Plaintiffs, including the following.

194.     During international telephonic conversations between, on one hand, Defendant Isaac Ouazana in Baltimore, and on the other hand, Plaintiffs Gerard Layani in Israel and nonparty Julien Layani in Paris, that occurred on April 20, 2015 and on multiple other occasions during the following days, Defendants Isaac Ouazana falsely represented that Defendant WAZ-I owned this property, which Defendants claimed to have purchased at auction for US$24,000.

195.     In written offering materials emailed to Plaintiffs' representative, nonparty Julien Layani, Defendants Isaac Ouazana, and WAZ-I, LLC, represented that Defendants had purchased this property at auction for US$24,000 and would then incur renovations costs and other expenses, justifying a "package price" to Plaintiffs of US$55,000.

196.     In the same written offering materials emailed to Plaintiffs' representative, nonparty Julien Layani, Defendants Isaac Ouazana, and WAZ-I, LLC, represented that this property was or would be generating soon after completing renovations, annual rental income of $12,600, further justifying a "package price" to Plaintiffs of US$55,000

197.     Based on Defendant Isaac Ouazana's representations, the Layani Plaintiffs agreed to pay Defendants a "package price" of US$52,000 for this property, which included all renovation work, and on or about April 23, 2015, the Layani Plaintiffs transferred the full "package price" amount of US$52,000 to Defendants, in the manner and for the benefit of the recipient designated by Defendants, to wit, nonparty Simon Jonathan Dahan, who on information and belief, forwarded payment as directed by Defendant Isaac Ouazana.

198.     Defendants' representation contained in their offering materials that WAZ-I owned this property at the time of the purported sale to Plaintiffs on April 23, 2015 was false

because official records from SDAT show that WAZ-I acquired this property later, on July 17, 2015.

199.     Defendants representation contained in their offering materials that Defendant WAZ-I had paid $24,000 for this property was false because official SDAT records show that WAZ-I bought it for $5,000, ostensibly with the funds Defendants fraudulently obtained from Plaintiffs on April 23, 2015, in a non-arm's length transaction from nonparty Lady D's Creative Investments.

200.     Defendants' representation contained in their offering materials that WAZ-I was reselling this property to Plaintiffs without commission and would be making money solely from the renovation work and the management of the properties was also false because, in addition to the fact that at the time of the representation, Defendants did not own this property and had not paid US$24,000 for it, a deed dated June 4, 2015 recorded in the Maryland land records on June 17, 2015 shows that Defendants paid only $5,000 for the property, such that Plaintiffs actually paid, in effect, a commission of at least $19,000.

201.     For the ensuing years, all Defendants concealed from all Plaintiffs that Defendants' material representations contained in their written description materials, particularly about the $24,000 price that Defendants claimed to have paid for this property and the $3,000 amount of Defendants' commission were false.

202.     On or about June 11, 2015, Defendant Isaac Ouazana used international wires to email Plaintiff Britt's representative, nonparty Julien Layani in France, a deed dated June 4, 2015, containing terms of sale that were materially different than agreed by the parties and representing that on that date, Defendant WAZ-I had conveyed title to this property to Plaintiff Britt for the sale price of $5,000.

203.     Defendant Isaac Ouazana's representation of June 11, 2015, made both to Plaintiffs and to the Maryland SDAT that Defendants had conveyed this property to Plaintiff

Britt on June 4, 2015, for a price of $5000 was false because Plaintiff Britt had actually paid

$52,000.  Maryland land records confirm that Defendants did not report to SDAT the actual

"package price" of $52,000 paid by Plaintiffs but the fictitious price of $5000, paying transfer

taxes on that lower amount, and lowering Plaintiffs' tax basis in this property, which exposes

Plaintiffs to having to pay higher conveyance taxes than they should upon selling this property.

This also enabled Defendants to fraudulently keep conveyance taxes collected from Plaintiffs

as part of the $52,000 price.

204.     Property Management Fraud.  Following Plaintiffs' investment, Defendants

Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M, managed the

property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

205.     However, Defendants exploited the Layani Plaintiffs' trust and inability to easily

check the Defendants' false representations in Baltimore, owing to Plaintiffs residing in France

and Israel.

206.     To hide their acts and omissions and cause Plaintiffs to delay taking action,

Defendants made a number of false representations purporting to explain their failure to remit

to the Layani Plaintiffs monthly rents of US $1050 despite prior representations that this

property produced or would soon produce these rents after making the repairs included in the

"package price."

207.     To start, Defendants falsely represented on numerous occasions via WhatsApp

chats and telephonic conversations between April 2015 and January 2016 that they were

making and then, that they had made the repairs included in the "package price" when in fact,

they had not.

208.     Then Defendants falsely represented that they had hired third-party service

providers to perform additional renovation and repairs to the property, enabling Defendants to

then seek reimbursement from Plaintiffs of US$2,470.25 for work allegedly done by these

third-party service providers, which Plaintiffs paid, believing Defendants' false representation that invoices from the third parties existed and would be provided in response Plaintiffs' repeated demand.

209.    The Ouazana Defendants delayed providing these invoices using various pretexts, and then simply refused to provide any verifiable proof of renovation or repair expenses.

210.    On information and belief, Defendants, also retained monthly rents totaling at least US$3184 for at least the months of February, April, May, June, August, and September 2017, and February 2018.

211.    Throughout their dealings with Plaintiffs, Defendants falsely represented that they were diligently managing all of the Plaintiffs' properties, including this property, which included making payments good faith to third-party contractors and pursuing payment of missing rent amounts from tenants in the landlord-tenant court and through debt collectors, or by dealing directly with nonpaying tenants.

212.    Defendants then used pretexts to delay and eventually avoid providing Plaintiffs with access to Defendants' business records kept in the ordinary course of their management of this and other properties sold to Plaintiffs, eventually falsely representing in the context of the 2019 lawsuit filed by Plaintiffs against Defendants in Baltimore Circuit Court (dismissed by mutual agreement without prejudice to refile) that they maintained no such records, and that all existing records were shared with Plaintiffs on a cloud-based hard drive from which Defendants were locked out by Plaintiffs.  However, this representation was false because Plaintiffs did not lock-out Defendants from access to the cloud-based hard drive in which Defendants deposited Defendants-prepared files purporting to inform Plaintiffs of the performance of their investments under Defendants' management.

Class Action Complaint                    49

213.     In the end, Defendants refused to grant Plaintiffs' requests for access to their business records and, on information and belief, simply retained and converted to their own use missing rent amounts and other amounts charged Plaintiffs for fictitious third-party contractor work that Defendants made up.

214.     On or about July 31, 2018, understandably frustrated with Defendants' refusal to provide transparency in their management of Plaintiff's properties, the Layani Plaintiffs terminated all their mandatory management agreements with Defendants, including the management agreement relating to this property.

215.     However, after Defendants were notified of the termination of the management agreement, they refused to account for the Layani Plaintiffs' rents in their possession that they had collected in this property prior to termination, unlawfully retaining these rents and refusing to turn them over to the Layani Plaintiffs despite repeated demands.

216.     As a result of Defendants' false statements and concealment, Plaintiffs did not discover the full extent of Defendants' fraud until later, in October 2018, when the Layani Plaintiffs learned for the first time that Defendants had let the property fall into severe disrepair, that they did not perform the renovations agreed with Plaintiffs as part of the "package price," and that Defendants failed to maintain the property while charging Plaintiffs for work that they were not doing.

217.     As a direct, proximate and foreseeable result of Defendants' scheme, the Layani Plaintiffs invested in this property, and agreed to pay a "package price" based on the representations that Defendants made, which turned out to be false.  Moreover, the Layani Plaintiffs lost the use, possession, and benefit of any and all investment income Defendants unlawfully retained which was owed or promised to the Layani Plaintiffs, and Defendants were unjustly enriched by the same amount and the Layani Plaintiffs sustained additional damages resulting from Defendants' failures while they managed the property

Class Action Complaint                    50

*vii)* 2649 Marbourne Ave., Baltimore, Maryland 21230

218.     Marketing/Selling Fraud.  On or about July 23, 2015, Defendants Isaac Ouazana, acting through nonparty Simon Jonathan Dahan, offered to Plaintiffs Layani and Britt investments to invest US$60,000 in what Defendants Isaac Ouazana represented was a single unit rental property (a rowhouse) located at 2649 Marbourne Avenue, Baltimore, Maryland 21230, coupled with a management agreement with Defendants who would manage this property, expending the efforts necessary to fulfill the Plaintiffs profit expectation in exchange for a management fees of 8 percent.

219.     Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, used the international wires, including email, telephone, and WhatsApp voice and text chats, to communicate several false representations material to the Layani Plaintiffs' investment, including the following.

220.     During international telephonic conversations between, on one hand, Defendant Isaac Ouazana and Benjamin Ouazana in Baltimore, and on the other hand, Plaintiffs Gerard Layani in Israel and nonparty Julien Layani in Paris, that occurred during the period of July 23 through July 30, 2015, Defendant Isaac Ouazana, falsely represented that the Ouazana Defendants owned this property, which they claimed to have purchased at auction for US$35,000, and which they represented did or could generate a 15.26% rate of return on investment after expenses based on monthly rent estimates of US$1,050.

221.     Based on Defendant Isaac Ouazana's representations, the Layani Plaintiffs agreed to pay Defendants a negotiated "package price" of US$58,000 for this property, which included all renovation work, and on or about July 30, 2015, the Layani Plaintiffs transferred to Defendants, in the manner and for the benefit of the recipient designated by Defendants the full "package price" amount of US$58,000.

222.     Defendants' representation made orally between July 23 and July 30, 2015 using the international wires via phone call, WhatsApp and email, and contained in Defendants written offering materials emailed to Plaintiffs, that Defendant WAZ-I owned this property at any time prior to its purported sale to Plaintiffs was false because official Maryland land records show that Defendant WAZ-I never owned this property.  Actually, Maryland land records show that Defendant I&B, and not Defendant WAZ-I, acquired this property, on or about August 11, 2015, well after it was supposedly sold to Plaintiffs on or about July 30, 2015.

223.      Defendants' representation made orally between July 23 and July 30, 2015 using the international wires via phone call, WhatsApp and email and contained in Defendants written offering materials emailed to Plaintiffs, that Defendant WAZ-I had paid $35,000 for this property was false because a deed dated August 5, 2015 and recorded in the Maryland land records on August 11, 2015 shows that Defendant I&B bought it for $30,000, ostensibly with the funds Defendants collected from Plaintiffs on or about July 30, 2015.

224.     Defendants' July 21, 2014, representation that WAZ-I was reselling it to Plaintiffs without taking a commission was also false because, in addition to the fact that at the time of the representation, Defendants did not own this property and had not paid US$35,000 for it, official Maryland land records show that Defendants paid only US$30,000 for this property, such that, in actuality, Defendants fraudulently obtained by means of fraud and deception an additional US$5000 from the Layani Plaintiffs.

225.     Defendants' representation made orally between July 23 and July 30, 2015 by international telephone call that the material term regarding the agreed upon package price for this property was $58,000 would be documented in Defendants' conveyance of ownership of this property to Plaintiffs was false because Defendants documented a conveyance on August 5, 2015, on terms that were materially different from those agreed upon with Plaintiffs.

226.     Specifically, Maryland land records show that Defendants did not report the actual "package price" of $58,000 paid by Plaintiffs. Instead, Defendants falsely reported to SDAT a fictitious lower price of $30,000, paying transfer taxes on that lower amount, and lowering Plaintiffs' tax basis in this property, which exposes Plaintiffs to having to pay higher conveyance taxes than they should when they sell this property.

227.     Property Management Fraud.  Following Plaintiffs' investment, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M, managed the property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

228.     However, Defendants exploited the Layani Plaintiffs' trust and inability to easily check the Defendants' false representations in Baltimore, owing to Plaintiffs residing in France and Israel.

229.     To hide their acts and omissions and cause Plaintiffs to delay taking action, Defendants made a number of false representations purporting to explain their failure to remit to the Layani Plaintiffs monthly rents of US$1,048 despite prior representations that this property was producing and would continue to produce these rents upon making the repairs included in the "package price."

230.     To start, Defendants falsely represented on numerous occasions via WhatsApp chats and telephonic conversations between July 2015 and May 2016 that they were making and then, that they had made the repairs included in the "package price" when in fact, they had not.

231.     Then Defendants falsely represented that they had hired third-party service providers to perform additional renovation and repairs to the property, enabling Defendants to then seek reimbursement from Plaintiffs of US$1773.91 for work allegedly done by these third-party service providers, which Plaintiffs paid, believing Defendants' false representation that

invoices from the third parties existed and would be provided in response Plaintiffs' repeated
demand.

232.     The Ouazana Defendants delayed providing these invoices using various
pretexts, and then simply refused to provide any verifiable proof of renovation or repair
expenses.

233.     On information and belief, Defendants, also retained without justification
monthly rents totaling at least US$675, corresponding to at least the months of August 2017,
February, May, and June 2018.

234.     Throughout their dealings with Plaintiffs, Defendants falsely represented that
they were diligently managing all of the Plaintiffs' properties, including this property, which
included making payments good faith to third-party contractors and pursuing payment of
missing rent amounts from tenants in the landlord-tenant court and through debt collectors or
by dealing directly with the nonpaying tenant.

235.     Defendants then used pretexts to delay and eventually avoid providing Plaintiffs
with access to Defendants' business records kept in the ordinary course of their management of
this and other properties sold to Plaintiffs, eventually falsely representing in the context of a
2019 lawsuit filed by Plaintiffs against Defendants that they maintained no such records, and
that all existing records were shared with Plaintiffs on a cloud-based hard drive from which
Defendants were locked out by Plaintiffs.  However, this representation was false because
Plaintiffs did not lock-out Defendants from access to the cloud-based hard drive in which
Defendants deposited Defendants-prepared files purporting to inform Plaintiffs of the
performance of their investments under Defendants' management.

236.     In the end, Defendants refused to respond to Plaintiffs' requests for access to
their business records and, on information and belief, simply retained and converted to their

own use missing rent amounts and charged Plaintiffs for fictitious third-party contractor work that Defendants made up.

237.    On or about July 31, 2018, understandably frustrated with Defendants' refusal to provide transparency in their management of Plaintiff's properties, the Layani Plaintiffs terminated all their mandatory management agreements with Defendants.

238.    However, Defendants continued to retain the Layani Plaintiffs' rents from this property which had been collected prior to termination of the management agreement. Further, Defendants refused to account for the amounts unlawfully retained by them before and after termination of the management agreement, and also refused to turn over rents to the Layani Plaintiffs despite repeated demands.

239.    As a result of Defendants' false statements and concealment, Plaintiffs did not discover Defendants' fraud until October 2018, when the Layani Plaintiffs learned for the first time that Defendants had let this property fall into severe disrepair, that they failed to respond to official code violation notices, that they failed to pay assessed fines and that they did not inform Plaintiffs of these failures, which occurred while Defendants were purportedly managing the property, eventually causing this property to be put up for auction as an abandoned structure, and causing Plaintiffs to incur significant additional redemption costs, attorney's fees, and repair and renovation expenses exceeding US$21,000, and which Defendants had failed to perform despite receiving Plaintiffs payment for them as part of the package price and as part of other payment requests that Defendants submitted to Plaintiffs.

240.    As a direct, proximate and foreseeable result of Defendants' scheme, the Layani Plaintiffs invested in this property, and agreed to pay a "package price" based on the representations that Defendants made, which turned out to be false.  Moreover, the Layani Plaintiffs lost the use, possession, and benefit of any and all investment income Defendants unlawfully retained which was owed or promised to the Layani Plaintiffs, and Defendants were

Class Action Complaint                     55

unjustly enriched by the same amount and the Layani Plaintiffs sustained additional damages resulting from Defendants' failures while they managed the property

      *viii)*    *1605 Homestead, 2643 Kennedy KD43, 2651 Kennedy KD51, Baltimore, Maryland 21207*

241.    <u>Marketing/Selling Fraud</u>. In October 2016, Defendant Isaac Ouazana offered to Plaintiffs Layani and Britt investments to invest $137,500 to acquire a 50% ownership interest, with Defendants owning the other 50%, in a 26-unit rental property consisting of three buildings described as "1605 Homestead, 2643 Kennedy-KD43, and 2651 Kennedy-KD51" in Baltimore, Maryland. This investment was coupled with a management agreement with Defendants who would manage this property, expending the efforts necessary to fulfill the Plaintiffs' profit expectation in exchange for a management fee of 5%.

242.    The terms of the investment were memorialized in a written contract (the "Investment Contract") executed by all parties on January 10, 2017, titled "Promissory Note." In addition to stating terms of the investment, this agreement contains terms of a loan from Plaintiffs to Defendant Isaac Ouazana to finance his and Defendants' 50% share of the investment.

243.    Specifically, the Investment Contract stated that a new company (the "Investment Vehicle") called "Homestead 613 LLC will be registered and be owned by equal parts (50%-50%) (sic) by WAZ BROTHERS LLC and BRITT INVESTMENTS BALTIMORE LLC to buy Buildings of the Operation."

244.    The Investment Contract specifies that this Property's purchase price of approximately $1,200,000 would be financed with a loan of $878,000 to Defendant WAZ-B LLC, and require a $300,000 down payment advanced by Plaintiffs.

245.     Defendant Isaac Ouazana represented that he had already paid acquisition costs of $25,000 for this property, and requested that he be given credit for half of this $25,000 amount in his cash contribution towards the $300,000 down payment for the property.

246.     The Investment Contract provides that "as the Borrower and the Lender agreed to be equal partners in this Operation, (50%-50%), the Borrower must refunds (sic) to the Lender the sum of $137,500.00 USD, corresponding to $300,000.00 USD less $25,000 USD = $275,000 USD divided into equal parts."

247.     The Investment Contract also states that "On the 11th of January 2017, the Lender pays the sum of $300,000, corresponding to the Principal Amount, on the personal bank account of Mr. Isaac OUAZANA (BankWELLSFARGO)."

248.     The Investment Contract further specified that Defendant "WAZ-MANAGEMENT LLC, 4400 Sidehill Rd., 21229 Baltimore, MD will operate the management of this Operation. The Manager will charge 5% of the gross rents."

249.     In addition, between October 2016 and January 2017, Defendant Isaac Ouazana made a number of material representations to the Layani Plaintiffs to induce them to invest, which representations were communicated using the international wires, particularly email, telephone, and WhatsApp text messaging, and which, without being all-inclusive, included the following statements.

250.     During international telephonic conversations between, on one hand, Defendant Isaac Ouazana and Benjamin Ouazana in Baltimore, and on the other hand, Plaintiffs Gerard Layani in Israel and nonparty Julien Layani in Paris, that occurred between October 2016 and January 2017, Defendants Isaac Ouazana and Benjamin Ouazana, falsely represented that they were in the process of establishing Homestead 613 LLC for the purpose of owning this property, further representing to Plaintiffs that the shares of this entity would be divided equally between Plaintiff Britt, who owned 50% of the share capital, and another company

owned by Defendant WAZ-B, who would own the other 50%. Defendants also represented that they were in the process of establishing a separate bank account for Homestead 613 LLC, from which all business related to this investment would be transacted.

251.     In reliance on the Investment Contract and Defendants' representations, in or about the later part of January 2015, Plaintiffs wired $300,000 to Defendant Isaac Ouazana's personal account, in full payment of Plaintiffs' 50% ownership interest in this property, including all conveyance related charges. This amount was also intended to advance Defendants a loan financing Defendants' portion of the investment corresponding to Defendants' 50% ownership interest, with the expectation that Defendants would reimburse Plaintiffs for this amount.

252.     Property Management Fraud. Following Plaintiffs' investment, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M, managed the property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

253.     However, Defendants exploited the Layani Plaintiffs' trust and inability to easily check the Defendants' false representations in Baltimore, owing to Plaintiffs residing in France and Israel.

254.     To hide their acts and omissions and cause Plaintiffs to delay taking action, Defendants made a number of false representations purporting to reassure Plaintiffs and hide Defendants' refusal to effectuate the transfer of 50% of the property's ownership, and their systematic looting of Plaintiffs' investment.

255.     To start, Defendants falsely represented on numerous occasions via email, WhatsApp chats and telephonic conversations between January 2015 and May 2018 that they were managing this property and were in the process of transferring ownership to the single-purpose company, Homestead 613 LLC, and would provide the Layani Plaintiffs with evidence of their 50% ownership interest in accordance with the parties' agreement.

Class Action Complaint                    58

256.      Defendants made repeated representations during the period of October 2016 through January 2017, communicated using the international wires (email, WhatsApp and phone), that Defendants had established or were in the process of establishing the agreed-upon separate entity, Homestead 613 LLC, for the purpose of holding this property. This representation was false or misleading because an entity search of SDAT records of Maryland business entities (https://egov.maryland.gov/BusinessExpress/EntitySearch , last visited 12/4/2019) shows that no business entity by this name was ever established or registered to do business in Maryland.

257.      Defendants made repeated representations during the period of October 2016 through January 2017, and repeated to Plaintiffs' representative, nonparty Julien Layani, using the international wires, via email that the ownership of the property was being transferred to Homestead 613 LLC. This representation was false because as of 12/4/2019, a search of the Maryland land records shows that 100% of the ownership of this property was at all times since March 11, 2011, held by third party 1605 Homestead LLC, and 2643 Kennedy, LLC, where both entities appear to be under the full control of Defendants.

258.      Although Plaintiffs did not discover this for months due to Defendant's active concealment, Defendants representation that they had conveyed Plaintiffs their 50% ownership in Homestead 613 LLC and through this entity, in the underlying property, is false because as late as June 6, 2019, Defendants engaged in various transactions which they recorded in the Maryland land records, purporting to unlawfully establish Defendants' 100% ownership of this property through entities under their full control (WAZ Project 2, LLC, and WAZ project 3, LLC), without Plaintiff's knowledge or permission.

259.      Defendants' representations made during the period of October 2016 through January 2017, and repeated to Plaintiffs' representative, nonparty Julien Layani, using the international wires, via email, WhatsApp and telephone, are also false because a search of the

Maryland land records conducted on December 4, 2019 revealed that on or about February 3, 2017, an assumption and release agreement was entered into between Fannie Mae and various parties, which never mentions Homestead 613 LLC or Plaintiff Britt, completely omitting to state their ownership interest, and instead falsely and fraudulently declares that Defendant WAZ Project 2, LLC is the 100% owner of 1605 Homestead, LLC, and 100% owner of 2643 Kennedy, LLC.  Moreover, this assumption and release agreement also states that the key principal in the loan agreement is to be changed to Defendant Isaac Ouazana. As noted previously, at the same time that Defendants were representing to Plaintiffs that they were about to formalize the conveyance of Plaintiffs' 50% interest, in fact Defendants falsely represented to Fannie Mae that Defendant Isaac Ouazana was the de-facto property owner and key principal in the loan, following all these transactions.  Defendants also misappropriated for themselves the full proceeds of the Plaintiff's investment, concealing from Plaintiffs these transactions.

260.     Then, from August 2015 until June 2018, Defendants falsely represented on multiple occasions that they had hired third-party service providers to perform additional maintenance, upkeep and repairs to the property, and Defendants then sought reimbursement from Plaintiffs of US$11,872.30 for this property that Defendants claimed as theirs, and for work allegedly done by third-party service providers, obtaining payment from Plaintiffs, who believed in good faith Defendants' false representation that their interest in the property had been recorded and that invoices from the third parties existed and would be provided to Plaintiffs.

261.     The Ouazana Defendants delayed providing these invoices using various pretexts, and then simply refused to provide any verifiable proof of renovation or repair expenses.

Class Action Complaint                          60

262.     Finally, starting in May 2018, Defendants retained monthly rents rightfully belonging to Plaintiffs, and refused to account for these amounts.

263.     Throughout their dealings with Plaintiffs, Defendants falsely represented that they were diligently managing all of the Plaintiffs' properties, including this property, which included making payments in good faith to third-party contractors and pursuing payment of missing rent amounts from tenants in the landlord-tenant court and through debt collectors or by dealing directly with the tenants.

264.     Defendants then used pretexts to delay and eventually avoid providing Plaintiffs with access to Defendants' business records kept in the ordinary course of their management of this and other properties sold to Plaintiffs, eventually falsely representing in the context of the 2019 lawsuit filed by Plaintiffs against Defendants that they maintained no such records, and that all existing records were shared with Plaintiffs on a cloud-based hard drive from which Defendants were locked out by Plaintiffs.  However, this representation was false because Plaintiffs did not lock-out Defendants from access to the cloud-based hard drive in which Defendants deposited Defendants-prepared files purporting to inform Plaintiffs of the performance of their investments under Defendants' management.

265.     In the end, Defendants refused to respond to Plaintiffs' requests for access to their business records and, on information and belief, simply retained and converted to their own use missing rent amounts and amounts charged Plaintiffs for fictitious third-party contractor work that Defendants made up.

266.     Defendants unjustly and unlawfully converted to their own use -- and continue to retain -- the Plaintiffs' ownership shares in this property.

267.     Defendants also unjustly and unlawfully continue to retain and convert to their own use rents from the operation of this property, which rental income properly belongs to Plaintiffs, and Defendants refuse to account for the funds that they unlawfully retain in

Class Action Complaint                    61

violation of Plaintiffs' rights despite repeated demand for turning over these funds to Plaintiffs and providing an accounting for the sums that Defendants unlawfully keep.

268.     As a direct, proximate and foreseeable result of Defendants' scheme, Plaintiffs invested in this property, and agreed to pay a "package price" based on the representations that Defendants made, which turned out to be false.  Moreover, Plaintiffs lost the use, possession, and benefit of any and all investment principal and income collected by Defendants which were owed or promised to Plaintiffs, and Defendants were unjustly enriched by the same amount, including Plaintiffs share of any proceeds that Defendants received for the unauthorized sale of Plaintiff's shares representing 50% ownership in this property.

   c)  How Defendants Defrauded Plaintiff Ragones.

269.     As with all other investors in the putative Class, the Ouazana Defendants implemented their fraudulent scheme upon Plaintiff Ragones, then based in Las Vegas,  by using false pretenses and representations to attract and induce him and Plaintiff RDNA to invest in 6 rental real properties located in Baltimore, coupled with management agreements with Defendants who agreed to furnish the efforts required to fulfill the Plaintiffs' profits expectation from the investment. The Ragones Plaintiffs' claims are detailed below for these properties.

270.   Defendants actively concealed their acts and omissions from Plaintiff Ragones until August 29, 2017, when Plaintiff Ragones first heard rumors leading him to discover by happenstance that Defendant Isaac Ouazana and the other Ouazana Defendants had sold a property that was jointly owned with Plaintiff Ragones, without his knowledge and permission. Upon learning this information, Plaintiff Ragones started making inquiries about the other investment opportunities that Defendants sold him and visiting each of the many properties that he bought from or through Defendants, discovering only then, the extent of the fraud conducted

by Defendant Isaac Ouazana and his brother, Defendant Benjamin Ouazana. Plaintiff Ragones outlines below Defendants' fraudulent acts and omissions pertaining to four of the properties underlying the many investment opportunities sold by Defendants to Plaintiff Ragones. These properties however are not the only ones implicated in Defendants' fraud, and are cited in this complaint to illustrate, without being all inclusive, the breadth of Defendants' massive fraud.

     *i)*   *3335 Edmondson Ave., Baltimore MD 21229*

271.     <u>Marketing/Selling Fraud</u>. In July 2016, Defendant Isaac Ouazana, offered Plaintiff Ragones an introductory deal to invest US$2,500 to purchase a 50% interest in a single unit rental property located at 3335 Edmondson Ave., Baltimore MD 21229, with Defendant Isaac Ouazana owning the other 50%, and where Defendants were to manage this property for a fee, expending the efforts necessary to fulfill Plaintiff Ragones' profit expectation.

272.     On or about the same time of this proposal, in face-to-face conversations between Defendant Isaac Ouazana and Plaintiff Ragones that occurred in Baltimore, Defendant Isaac Ouazana made the material representation to Plaintiff Ragones that Defendants Isaac Ouazana, and through him, the other Defendants, would promptly arrange for a real estate closing documenting Plaintiff Ragones' 50%-ownership interest in the property after collecting his payment of US$2,500.

273.     On or about the same time of this proposal, in face-to-face conversations between Defendant Isaac Ouazana and Plaintiff Ragones that occurred in Baltimore, Defendant Isaac Ouazana made the material representation to Plaintiff Ragones that Defendants Isaac Ouazana, and through him, the other Defendants, would obtain all necessary permits and complete all renovations, including inspections by the Department of Housing, such that this property, which was a boarded up empty shell, could obtain a use and occupancy permit, be rented, and generate rental income within four months.

Class Action Complaint         63

274.     Based on Defendant Isaac Ouazana's representations, promptly after being offered this investment in July 2016, Plaintiff Ragones paid Defendants the full amount of US$2,500, corresponding to Plaintiff Ragones' 50% interest in the property into the joint enterprise with Defendants Isaac Ouazana, and through him, the other Defendants.

275.     <u>Property Management Fraud</u>.  Following Plaintiff Ragones' investment, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M, managed the property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

276.     However, Defendants exploited Plaintiff Ragones' trust and inability to easily check the Defendants' false representations in Baltimore, owing to Plaintiff residing in Las Vegas, Nevada.

277.     To hide their acts and omissions and cause Plaintiff Ragones to delay taking action, Defendants made a number of false representations purporting to hide their failure to make agreed repairs and to document the conveyance of Plaintiff Ragones' 50% interest.

278.     To start, on numerous occasions between July 2016, and August 29, 2017, Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, falsely represented to Plaintiff Ragones, then out-of-state, via the wires, including email, telephone, and WhatsApp voice and text chats, that Defendants Isaac Ouazana, and through him, the other Defendants, were in the process of arranging for a real estate closing documenting the conveyance of the agreed 50%-ownership interest in the property to Plaintiff Ragones for his US$2,500, but had not been able to complete the conveyance, and therefore could not start the repair and renovation work.

279.     Defendant Isaac Ouazana represented repeatedly to Plaintiff Ragones, initially in July 2016 orally in person, in Baltimore, and subsequently at various times until August 2017, in several interstate telephone calls, that he and the other Ouazana Defendants had arranged for a real estate closing documenting the conveyance to Plaintiff Ragones of a 50% ownership

interest in the property. This was false because on July 20, 2016, Defendant Isaac Ouazana, with the help of Defendants JOHN DOE or JANE DOE and JOHN DOE ENTITIES, which appear to have included a title company and title agent, caused Defendant WAZ-I to make and record a deed conveying full ownership of this property to third-party Yaakov Krozier, LLC, for the recorded consideration of US$5,000. This transaction was materially different from the one represented to Plaintiff Ragones in that, Defendants Isaac Ouazana, and through him, WAZ-I and the other Defendants, did not transfer any ownership interest in this property to Plaintiff Ragones on July 22, 2016.  Instead, official records show that Defendants Isaac Ouazana, and through him Defendant WAZ-I, transferred full ownership to third-party Yaakov Krozier LLC.

280.     For over a year thereafter, between July 20, 2016, and August 2017, all Defendants hid their fraud by continuing to falsely represent to Plaintiff Ragones that a real estate closing documenting the conveyance to Plaintiff Ragones of his 50% ownership interest in the property had taken place. Defendants Ouazana, and through him Defendant WAZ-I, and the other Defendants, also concealed from Plaintiff Ragones that, in fact, not only had they never transferred any ownership interest in this property to Plaintiff Ragones, but they had in fact transferred ownership to third-party Yaakov Krozier, LLC.

281.     To further conceal from Plaintiff Ragones the extent of Defendants' fraud and dishonesty and induce him to not take action on his claim, Defendant Isaac Ouazana entered into a written agreement with Plaintiff Ragones on August 29, 2017, which agreement states, in relevant parts, that Plaintiff Ragones and Defendant Isaac Ouazana are partners, and that each has 50% ownership in this property. The agreement also states that "[B]oth parties agree that they cannot and will not sell above properties without the signed consent of either party.  They cannot sell their 50% partnership without signed consent and acknowledgment from each party individually.  If any of the parties bring an offer on any of the properties listed above, the other

party will accept offer or each partner can pay out the other partner their 50% share according to the offer in 90 business days grace period."

282.     Defendant Isaac Ouazana's oral, and written representation in the August 29, 2017, agreement, that he had not sold the property and would not sell it without the consent of Plaintiff Ragones, was false and had been false for over a year because the deed conveying full ownership of this property from Defendant WAZ-I to third-party Yaakov Krozier LLC was recorded on July 22, 2016. Moreover, Defendant Isaac Ouazana knew this representation was false because he personally signed the deed on July 20, 2016.

283.     The August 29, 2017 written agreement also stated that Plaintiff Ragones, rather than Defendants, would do the renovation, and Defendants would get reimbursed for supplies and materials they claimed to have purchased. Specifically, the agreement states, in relevant parts, that "The property located at 3335 Edmondson Ave., Yehuda is responsible to rehab the house up to code and Isaac will pull permits and inspections in order for Yehuda to obtain the use and occupancy.  As of today's date Isaac Ouazana paid for sheet rock of the house, doors, siding, new roof, new windows, framing, new electric throughout the house, electric heat throughout the house, plumbing, insulation, foundation repair for the back of the house, and structure of rear of house fully renovated.  Isaac Ouazana is responsible that these items or by code and you will be responsible for the above renovation."

284.     As a result of Defendants' concealment, Plaintiff Ragones remained unaware of the fraud perpetrated by the Ouazana Defendants until much later when Plaintiff Ragones heard rumors that Defendant Isaac Ouazana had sold this property, without Plaintiff Ragones' knowledge or permission for US$75,000.

285.     When Plaintiff Ragones confronted Defendant Isaac Ouazana about the unauthorized sale of the property, Defendant Isaac Ouazana made many excuses, claiming that he had sold it to a friend of his because he thought Plaintiff Ragones did not want it.  Defendant

Class Action Complaint                66

Isaac Ouazana finally represented to Plaintiff Ragones, ostensibly to cause him to delay taking action on his claims, that the property was still in Defendant Isaac Ouazana's possession, and that the sale was not fully consummated, promising that he would not sell the property without permission from Plaintiff Ragones. Defendant Isaac Ouazana concealed from Plaintiff Ragones during this conversation the existence of the deed signed by Mr. Isaac Ouazana that had been recorded on July 22, 2016, to document a consummated sale to Mr. Krozier.

286.    A review of the land records shows that this representation remains false as of the date of this complaint because no transaction involving title to this property and reflecting Plaintiff Ragones' 50% interest in this property has been recorded after July 22, 2016.

287.    In addition to these statements, on numerous occasions between July 2016, and August 29, 2017, Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, falsely represented to Plaintiff Ragones, then in Israel, via the international wires, including email, telephone, and WhatsApp voice and text chats, that Defendants Isaac Ouazana, and through him, the other Defendants, were making all necessary renovations to this property, even though the agreement was that Plaintiff Ragones would have responsibility for making necessary repairs while the Ouazana Defendants were responsible for obtaining all permits.

288.    Defendants Isaac Ouazana, and through him, the other Defendants, did not only conceal until then that despite their representations to the contrary, they in fact had made no repairs to the property, which was still in a state of severe disrepair and still lacked a use and occupancy permit, but the Ouazana Defendants also represented on November 7, 2017, via WhatsApp chat, to Plaintiff Ragones, that they had performed necessary renovation and repairs to the property at a cost of $36,500 to Defendants, who then sought reimbursement from Plaintiff for this US$36,500.

289.    Defendants' representations that they had done $36,500 worth of renovations were false because sometime between August 27, 2017 and November 7, 2017, Plaintiff

Ragones inspected the property, at which time he found the property was still boarded up, in shell condition and that no repairs had in fact been done beyond demolition work that he himself had done.

290. Given the evident lack of repairs, and believing Defendants' representations regarding the existence of his 50% interest in this property, Plaintiff Ragones, repeatedly asked Defendants to produce copies of invoices from the third parties before authorizing payment.

291. Throughout, Defendant Isaac Ouazana represented that the repairs had been completed, and that he would provide – although he never did -- the requested invoices and other evidence of the renovation or repair work done

292. In the end, Defendants refused to respond to Plaintiffs' requests for access to their business records for all aspects of their management of this property.

293. Defendants Ouazana, and through him Defendant WAZ-I, and the other Defendants, while they continued to hide from Plaintiff Ragones their failure to convey his 50% interest to him and their sale of the property without his knowledge of consent, still sought and collected from Plaintiff Ragones US$2,081 on November 10, 2017 corresponding to his purported share of property taxes for two tax years during which Plaintiff Ragones was not its owner of record.

294. As a result, Plaintiff Ragones sustained damages which include these and other sums that Defendants obtained from him with respect to this investment using deceit, as well as the proceeds of any sale to third-party Yaakov Krozier, LLC.

295. As a direct, proximate and foreseeable result of Defendants' scheme, Plaintiff invested in this property, based on the representations that Defendants made, which turned out to be false and which caused Plaintiff corresponding damage.  Moreover, Plaintiffs lost the ownership, use, possession, and benefit of the property, together with any and all income and profits resulting from the investment that were owed or promised to Plaintiffs, and which

Defendants retained unlawfully, such that Defendants were unjustly enriched by the same amount.

ii) *4415 Pall Mall Rd. Ave., Baltimore MD 21225*

296.     <u>Marketing/Selling Fraud</u>.  In or about July 2015, Defendant Isaac Ouazana, offered Plaintiff Ragones to invest US$53,000 in order to acquire a single family one-unit rental property located at 4415 Pall Mall Rd. Ave., Baltimore MD 21225, with the agreement that Defendant Isaac Ouazana, and through him the other Defendants, were to manage this property, expending the efforts necessary to fulfill Plaintiff Ragones' profit expectation in exchange for a management fee.

297.     On or about the same timeframe of July 2015, in face-to-face conversations between Defendant Isaac Ouazana and Plaintiff Ragones that occurred in Baltimore, Defendant Isaac Ouazana made the material representation to Plaintiff Ragones that Defendant Isaac Ouazana, and through him, the other Defendants, owned this property outright and were ready, willing and able to sell it to Plaintiff Ragones. On or about the same time of this proposal, in face-to-face conversations between Defendant Isaac Ouazana and Plaintiff Ragones that occurred in Baltimore, Defendant Isaac Ouazana made the material representation to Plaintiff Ragones that Defendants Isaac Ouazana, and through him, the other Defendants, would promptly arrange for a real estate closing documenting Plaintiff Ragones' acquisition of a full ownership interest in the property after collecting his payment.

298.     These representations (Defendants owned this property; were ready, Defendants willing and able to sell it to him; and Defendants would promptly arrange a closing to document their conveyance of title to him) were false because the Maryland land records show that, from the time of Defendants' representations to Plaintiff Ragones until August 21, 2015, third-party Jackson Santvil was the registered owner of this property pursuant to a deed from Fannie Mae dated September 26, 2014.

Class Action Complaint                    69

299.     Defendant Isaac Ouazana also represented to Plaintiff Ragones, using the international wires by emailing him on August 21, 2015, that he and the other Defendants had arranged for a real estate closing documenting Defendants' conveyance to Plaintiff Ragones of a full ownership interest in this and a few other properties and were waiting for his payment, stating in the email: "Confirm reception.  Waiting for deposit of 175k.  Waiting for article of organization of each company with tax ID for.  Title company.  Thank you.  Shabbat shalom."

300.     This representation too was false because neither Defendant Isaac Ouazana nor the other Defendants had arranged to transfer ownership to Plaintiff Ragones for this property nor did they in fact transfer ownership to Plaintiff Ragones.

301.     On or about August 21, 2015, unaware of the falsity of Defendants material representations, and believing them to be true, Plaintiff Ragones wired in good faith to Defendants US$175,000, which included US$35,000 in payment for the full amount of the purchase price for this property, including closing costs, with the expectation that renovations would start at which point Plaintiff would pay the balance of the agreed $53,000.

302.     Property Management Fraud.  After Plaintiff Ragones sent his investment of $35,000 as part of the $175,000 wire, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M, claimed to be managing the property for Plaintiff Ragones, supposedly expending the efforts necessary to fulfill Plaintiffs' profit expectation.

303.     However, Defendants exploited Plaintiff Ragones' trust and inability to easily check the Defendants' false representations in Baltimore, owing to Plaintiff residing out-of-state.

304.     To hide their acts and omissions and cause Plaintiff Ragones to delay taking action, Defendants made a number of false representations designed to hide their failure to document the conveyance to Plaintiff Ragones of his 100% interest, to make agreed repairs, and to rent this property.

Class Action Complaint                    70

305.     To start, on numerous occasions between August 21, 2015, and August 19,

2016, Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, falsely represented to

Plaintiff Ragones, then out-of-state, via the interstate wires, including email, telephone, and

WhatsApp voice and text chats, that Defendants Isaac Ouazana, and through him, the other

Defendants, had arranged for a real estate closing documenting truthfully the conveyance of a

full ownership interest in the property to Plaintiff Ragones and the terms of this conveyance.

306.     Defendant Isaac Ouazana's representation, that he and the other Defendants had

truthfully documented the conveyance to Plaintiff Ragones of a full ownership interest in the

property was false because a review of the Maryland land records shows that the deed from

then owner, third-party Jackson Santvil, to Plaintiff Ragones' designated entity, RDNA

Investments LLC, dated September 8, 2015 and recorded on October 1, 2015, reports a

fictitious price of $22,000, which bears no relation to the full package price of $53,000 or the

initial payment of $35,000 for the acquisition of the property itself made by Plaintiff Ragones

to Defendant Isaac Ouazana and through him to the other Ouazana Defendants.

307.     In early August 2016, Plaintiff Ragones decided to sell this property and asked

Defendant Isaac Ouazana to help find a purchaser for it.

308.     Shortly thereafter, Defendant Isaac Ouazana, without informing Plaintiff

Ragones or obtaining his prior consent to any terms of sale, sold the property, telling Plaintiff

Ragones that he had sold it for US$48,000 to third-party Flextone Capital Investment, LLC.

309.     This representation was false because, the Maryland land records show that

Defendant Isaac Ouazana recorded a deed on August 25, 2016, conveying ownership of this

property to third-party Flexstone Capital Investment LLC for the evidently false consideration

of US$5000, not $48,000 as represented to Plaintiff Ragones.

310.     Defendant Isaac Ouazana had no authority to do so since he was not a member

of RDNA Investments, LLC, which is the company that Plaintiff Ragones had set up to own

Class Action Complaint                          71

this property. Defendant Isaac Ouazana fraudulently signed, on behalf of RDNA Investments, LLC, documents purporting to convey ownership of this property, including a deed dated August 19, 2016 and recorded August 25, 2016, conveying full ownership of this property to Flexstone Capital Investment LLC for the evidently false consideration of US$5,000.

311.    Having received no closing documentation to approve prior to consummation of the transaction, Plaintiff Ragones did not know or agree to the consideration of US$5000 listed on the deed, which, in any event, having paid $53,000 for this property's "full package" price, would not have been acceptable to him had he known about it prior to Defendant Isaac Ouazana's fraud.

312.    In the end, Defendant Isaac Ouazana, and through him, the other Defendants, refused to respond to Plaintiffs' requests for information about this sale and/or for access to their business records and, on information and belief, simply retained and converted to their own use any and all proceeds from the unauthorized sale of this property.

313.    As a result, Plaintiff Ragones sustained damages which include these and other sums that Defendants obtained from him with respect to this investment by means of deception and fraud.

314.    As a direct, proximate and foreseeable result of Defendants' scheme, Plaintiff Ragones invested in this property, based on the representations that Defendants made, which turned out to be false and which caused Plaintiff corresponding damage.  Moreover, Ragones lost the ownership, use, possession, and benefit of the property, together with his principal investment and any and all income and profits resulting from the investment that were owed or promised to Plaintiffs, and which Defendants retained unlawfully, such that Defendants were unjustly enriched by the same amount.

   iii) *2802 Harford Rd., Baltimore 21218*

Class Action Complaint                    72

315.     Marketing/Selling Fraud.  In or about July 2015, Defendant Isaac Ouazana, offered Plaintiff Ragones to invest US$53,000 in order to acquire a single family one-unit rental property located at 2802 Harford Rd., Baltimore 21218, with the agreement that Defendant Isaac Ouazana, and through him the other Defendants, were to manage this property, expending the efforts necessary to fulfill Plaintiff Ragones' profit expectation in exchange for a management fee.

316.     On or about the same timeframe of July 2015, in face-to-face conversations between Defendant Isaac Ouazana and Plaintiff Ragones that occurred in Baltimore, Defendant Isaac Ouazana made the material representation to Plaintiff Ragones that Defendant Isaac Ouazana, and through him, the other Defendants, owned this property outright and were ready, willing and able to sell it to Plaintiff Ragones and would promptly arrange for a real estate closing documenting Plaintiff Ragones' acquisition of a full ownership interest in the property after collecting his payment.

317.     Defendant Isaac Ouazana also represented to Plaintiff Ragones then in Las Vegas, using the international wires by emailing him on August 21, 2015, that he and the other Defendants had in fact arranged for a real estate closing documenting Defendants' conveyance to Plaintiff Ragones of a full ownership interest in this and a few other properties Plaintiff Ragones wanted to buy and were waiting for Plaintiff Ragones' payment, stating in the email: "Confirm reception.  Waiting for deposit of 175k.  Waiting for article of organization of each company with tax ID for.  Title company.  Thank you.  Shabbat shalom."

318.     On or about August 21, 2015, in reliance on Defendants material representations, and believing them to be true, Plaintiff Ragones wired in good faith to Defendants US$175,000, which included the full amount of US$35,000 in payment for this property.

319.     Then, on numerous occasions starting on August 21, 2015, Defendants Isaac
Ouazana, Benjamin Ouazana, and I&B, falsely represented to Plaintiff Ragones, then in Las
Vegas, Nevada, via the international wires, including email, telephone, and WhatsApp voice
and text chats, that Defendants Isaac Ouazana, and through him, the other Defendants, had
arranged for a real estate closing documenting truthfully the conveyance of a full ownership
interest in the property to Plaintiff Ragones and the terms of this conveyance, for the full
package price of $53,000, which included the acquisition of the property itself for $35,000.

320.     Defendant Isaac Ouazana's representation, that he and the other Defendants had
truthfully documented the conveyance to Plaintiff Ragones of a full ownership interest in the
property was false because a review of the Maryland land records shows that the deed from
Defendant I&B, to Plaintiff Ragones' designated entity, RDNA Investments LLC, dated
August 25, 2015, and recorded on September 16, 2015, reports a fictitious price of $21,000,
which bears no relation to the full package price of $53,000 or the initial payment of $35,000
made by Plaintiff Ragones to Defendant Isaac Ouazana and through him to the other Ouazana
Defendants.

321.     Property Management Fraud.  After Plaintiff Ragones sent his investment of
$53,000, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and
WAZ-M, claimed to be managing the property for Plaintiff Ragones, purportedly expending the
efforts necessary to fulfill Plaintiff Ragones' profit expectation.

322.     However, Defendants exploited Plaintiff Ragones' trust and inability to easily
check the Defendants' false representations in Baltimore, owing to Plaintiff being out-of-state.

323.     To hide their acts and omissions and cause Plaintiff Ragones to delay taking
action, Defendants made a number of false representations designed to hide their failure to
make agreed repairs to this property, and to rent it.

Class Action Complaint                    74

324.     From August 21, 2015 until March 23, 2016, Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, falsely represented to Plaintiff Ragones, then in Las Vegas, via the international wires, including email, telephone, and WhatsApp voice and text chats, that Defendants Isaac Ouazana, and through him, the other Defendants, were making all necessary renovations to this property, in accordance with the parties' standing agreement, which required them to complete these renovations inside of four months from August 21, 2015, i.e., by December 21, 2015 for a group of five properties that Plaintiff Ragones purchased from the Ouazana Defendants.

325.     To conceal his claims from Plaintiff Ragones, not only did Defendants Isaac Ouazana, and through him, the other Defendants, conceal until March 23, 2016, that the property was still boarded up, in a state of severe disrepair, but they also falsely represented to Plaintiff Ragones that the renovations were complete and that they had rented this property, even going so far with their deceitful scheme as to remit to Plaintiff Ragones one month rent, which Defendants claimed to have collected from a tenant living in this property.

326.     Plaintiff Ragones also asked Defendant Isaac Ouazana to produce evidence of the repairs made, and a copy of the lease for the tenant that the Defendant supposedly brought into the property.

327.     Throughout, Defendant Isaac Ouazana represented that the repairs had been completed, that proof of these repairs in the form of invoices existed and would be provided. Defendant Isaac Ouazana also represented repeatedly that a lease existed and a copy of such lease was going to be produced.  However, despite repeated demands, Defendants never produced evidence of the repairs or a lease for this property, and stopped remitting rent payments after the one-month rent payment, they had made earlier.

328.     However, Defendants' representations that the renovations had been completed and the property rented out were false because during a trip to Baltimore, in the early part of

March 2016, Plaintiff Ragones inspected the property, at which time he discovered for the first time that the property was still boarded up, not in rentable condition, that no repairs had in fact been completed and that no tenant lived or had lived in this property during the time that Plaintiff Ragones owned it, from August 21, 2015 until March 23, 2016, signifying that the one rent payment remitted by Defendants had not been paid by a tenant but by Defendants in order to deceive Plaintiff Ragones and cause him to delay taking action.

329.    Given the evident lack of repairs and rent income, in or about March 2016, Plaintiff Ragones decided to ask Defendant Isaac Ouazana to find a buyer for this property.

330.    Shortly thereafter, Defendant Isaac Ouazana, without informing Plaintiff Ragones or obtaining his prior consent to any terms of sale, sold the property, telling Plaintiff Ragones that he had sold it for US$48,000.

331.    This representation was false because, the Maryland land records show that Defendant Isaac Ouazana recorded a deed on March 23, 2016, conveying ownership of this property to third-party Kosaqui Investments LLC,[3] a Florida limited liability company, in exchange for the consideration of US$62,000, not $48,000 as represented to Plaintiff Ragones.

332.    Moreover, the representations made by Defendant Isaac Ouazana in the deed are false because Defendant Isaac Ouazana signed on behalf of the property's owner and grantor, RDNA investments, LLC, i.e., Plaintiff Ragones' company set up to own this property, when Defendant Isaac Ouazana lacked the authority to do so. He falsely represented in the document that he is a member of this limited liability company.  In fact, Defendant Isaac Ouazana is not and never was a member of RDNA Investments, LLC, whose sole member is Plaintiff Ragones.

---

[3] A search of the Maryland land records reveal that this company has purchased at least three properties from Defendants, including this one.

333.     In the end, Defendant Isaac Ouazana, and through him, the other Defendants,
refused to respond to Plaintiffs' requests for access to their business records and, on
information and belief, simply retained and converted to their own use all proceeds from the
conveyance of this property to third-party Kosaqui investments, LLC.

334.     In the performance of their fraudulent scheme, Defendants appear to have
benefited from the active help of various third parties, Defendants JOHN (JANE) DOE and
JOHN DOE ENTITIES including the party who performed the real estate closing documenting
the conveyance recorded in the Maryland land records on March 23, 2016, and who arranged to
forward the sale proceeds to Defendant Isaac Ouazana, and not to the actual seller, RDNA
Investments, LLC.

335.     As a result, Plaintiff Ragones sustained damages which include loss of the full
amount of the sale proceeds from Kosaqui Investments LLC, liability for capital gains realized
on amounts that Plaintiff has not received as a result of the Ouazana Defendants' fraud and
other sums that Defendants obtained from him with respect to this investment using deceit and
fraud.

336.     As a direct, proximate and foreseeable result of Defendants' scheme, Plaintiff
Ragones invested in this property, based on the representations that Defendants made, which
turned out to be false and which caused Plaintiff corresponding damage.  Moreover, Plaintiffs
Ragones lost the ownership, use, possession, and benefit of the property, together with his
principal investment and any and all income and profits resulting from the investment that were
owed or promised to Plaintiffs, and which Defendants retained unlawfully, such that
Defendants were unjustly enriched by the same amount.

Class Action Complaint                   77

*iv) 1109 Lyndhurst St., Baltimore MD 21229*

337.　　Marketing/Selling Fraud.  In or about July 2015, Defendants Isaac Ouazana, offered to Plaintiff Ragones to purchase of a single unit rental property located at 1109 Lyndhurst St., Baltimore MD 21229 for US $53,000, including a full renovation, where Defendants were to manage this property, expending the efforts necessary to fulfill the Plaintiffs profit expectation in exchange for a management fee.

338.　　On or about the same time of this proposal, in face-to-face conversations between Defendant Isaac Ouazana and Plaintiff Ragones that occurred in Baltimore, Defendant Isaac Ouazana made the material representation to Plaintiff Ragones that Defendants Isaac Ouazana, and through him, the other Defendants, would promptly arrange for a real estate closing documenting Plaintiff Ragones' acquisition of the property after collecting his payment for the price of US$35,000 before renovations of $18,000, for a total of $53,000.

339.　　On or about the same time of this proposal, in face-to-face conversations between Defendant Isaac Ouazana and Plaintiff Ragones that occurred in Baltimore, Defendant Isaac Ouazana also made the material representation to Plaintiff Ragones that Defendants Isaac Ouazana, and through him, the other Defendants, would complete all renovations, such that this property could be rented, and generate rental income within four months.

340.　　Defendants Ouazana, however, omitted to disclose the material fact that the property was Classified as a vacant building that lacked a use and occupancy permit, and thus could not be rented without undergoing extensive renovations of all systems and full inspections by the Department of Housing. This disclosure is material because it impacted the length of time and effort required before this property could be rented.

341.　　Based on Defendants' representations, Plaintiff Ragones transferred to Defendants the full amount of the agreed acquisition price of US $35,000, which included all recordation taxes and fees.

Class Action Complaint　　　　　　　78

342.     <u>Property Management Fraud</u>.  Following Plaintiff Ragones' investment, Defendants Isaac Ouazana and Benjamin Ouazana, and through them, WAZ-B and WAZ-M, managed the property, purportedly expending the efforts necessary to fulfill the Plaintiffs' profit expectation.

343.     However, Defendants exploited Plaintiff Ragones' trust and inability to easily check the Defendants' false representations in Baltimore, owing to Plaintiff not residing in Baltimore.

344.     To hide their acts and omissions and cause Plaintiffs to delay taking action, Defendants made a number of false representations purporting to hide their failure to make agreed repairs and to document the conveyance to Plaintiff Ragones of this property.

345.     To start, on numerous occasions between July 2015, and October 11, 2017, Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, falsely represented to Plaintiff Ragones, then out of state, via the wires, including email, telephone, and WhatsApp voice and text chats, that Defendants Isaac Ouazana, and through him, the other Defendants, had arranged for a real estate closing documenting the conveyance of the ownership of the property as directed by Plaintiff Ragones after Defendants collected Plaintiff Ragones' full payment of $35,000.

346.     This representation was false because Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, did not transfer the title of the property as agreed, and concealed this from Plaintiff for nearly 22 months when Plaintiff confronted Defendants after discovering this misrepresentation by accident.

347.     Plaintiff Ragones confronted Defendants about this failure, so that Defendants finally documented the conveyance as demanded, representing to him that the documentation of the conveyance reflected the agreed terms of the sale of the property.

Class Action Complaint                    79

348.     Although Plaintiff Ragones did not discover this for months as Defendants did not provide him any documentation, this material representation also turned out to be false, because when Plaintiff eventually was able to check the terms of the conveyance through other means, he discovered that Defendant Ouazana recorded a deed dated June 19, 2016, wherein Defendants falsely reported a sale price of US$5,000 -- instead of the actual price of US$35,000-- in a non-arm's length transaction to the tax authorities -- even though this was an arm's length transaction, enabling the Defendants to pay significantly lower recordation taxes and fees, despite having collected from Plaintiff a higher amount of conveyance taxes and fees included in the US$35,000 price.

349.     After they finally recorded the change of ownership of the property, Defendants Isaac Ouazana, Defendants Benjamin Ouazana, and through them the other Defendants, also arbitrarily retained another $2,000 in rent belonging to Plaintiff, falsely representing to Plaintiff Ragones that they were holding onto this money because Plaintiff Ragones needed to pay property taxes for fiscal years 2017-18. This representation was false because Defendants held onto this $2,000 amount which they did not remit to the tax authority.

350.     Defendants also falsely represented that they were conveying ownership free and clear of any and all encumbrances, but this was false because Defendants concealed that they had incurred US$3415 in outstanding city fines and penalties that Defendants failed to pay, so that Plaintiff Ragones did not discover this misrepresentation until the property had been listed for tax sale, as a result thereof.

351.     Defendants Isaac Ouazana, Defendants Benjamin Ouazana, and through them the other Defendants, omitted to disclose to Plaintiff Ragones the material fact that they had not paid a significant amount of property taxes, even though Defendants had collected the amount of these taxes from Plaintiff Ragones, including the $2000 Defendants retained under false pretenses.

Class Action Complaint                    80

352.     Plaintiff Ragones only found this out when he learned that the property was going to be auctioned for nonpayment of taxes. Indeed, Defendants had collected enough money to pay these taxes from the rent and from Plaintiff Ragones but then failed to remit payment to the tax authorities. Plaintiff Ragones insisted that since Defendants had already collected these taxes, then Defendants Isaac Ouazana and Benjamin Ouazana ought to pay the full amount, but they only made a partial payment corresponding to the unpaid taxes, and left unpaid fines and penalties of US$3,415 resulting from their nonpayment of taxes and from additional fines assessed for unabated housing code violations.

353.     As a result, in order to prevent the property from being auctioned at a tax sale, Plaintiff Ragones paid this US$3415, effectively paying for the second time the same conveyance taxes and fees, fines and penalties for 2017-18, which had been collected prior to the closing by the Defendants.

354.     Moreover, since Defendants breached their agreement to complete all renovation work within 4 months in order to rent the property, Plaintiff Ragones stepped in to take charge of the renovations and repairs, which it took almost a year to complete in order to get the property ready for rental.  This caused Plaintiff to sustain 8 months of lost rent beyond the 4 months budgeted for Defendants to complete the renovation.

355.     As a result, it took nearly one year to rent the property. A year after it was rented, Defendant Isaac Ouazana, and through him Defendant WAZ-M, made the false representation to Plaintiff Ragones that the tenant, who received rent subsidies under the federal section 8 program, no longer received her subsidies because she no longer had electricity in her unit.  Defendant then stopped forwarding her rent to Plaintiff Ragones for 3 months, falsely claiming that she was not paying rent, so that Defendant WAZ-M had initiated eviction proceedings. Then Defendants further represented that the rent would no longer be

forthcoming because she had been successfully evicted, and the property had not been re-rented.

356.     Defendants' representations that this tenant's rental subsidy had ended, that she stopped paying rent, and that she had been successfully evicted, were false because approximately 2 weeks after Defendants made the representations, Plaintiff Ragones traveled to Baltimore where he discovered that the same tenant was still living at the property, was still paying rent to Defendants, and evidently had not been evicted.

357.     When confronted, Defendants claimed that it was better not to lose a section 8 contract for 5 years, admitting that there had been no eviction despite their claim otherwise, and their three months failure to remit the tenant's rent to Plaintiff Ragones.

358.     After another 2 weeks had passed, Defendants Isaac Ouazana asked Plaintiff Ragones to pay $1,600, falsely representing that Defendants needed Plaintiff Ragones to pay electrical bills that the tenant had failed to pay, in order to prevent the electricity company from disconnecting service at the property.

359.     This representation too was false because, despite Plaintiff Ragones' refusal to make this additional payment, the tenant's electrical service was not disconnected. Later, Plaintiff discovered that the true reason for Defendant Isaac Ouazana's representation and request for $1,600 was that Defendants Isaac Ouazana, Benjamin Ouazana, and Defendant WAZ-M promised to the tenant to compensate her for certain personal property which Defendants had taken from her months earlier.  Thus, Defendants were essentially trying to deceive Plaintiff Ragones into paying the amount of a settlement which Defendants made with this tenant to resolve claims arising from their misconduct.

360.     Having lost all trust and confidence in Defendants, Plaintiff Ragones canceled the management contract with them for all his properties, with immediate effect.

361.     Plaintiff also discovered subsequently that Defendants Isaac Ouazana, and through him the other Defendants had rented out this property without a use and occupancy permit in place and had done work on the property without any permits, causing Baltimore city inspectors to issue multiple administrative citations and tickets, with the result that the property was administratively stuck in "vacant status."

362.     Plaintiff Ragones lost nearly two additional years in re-permitting the property and an additional US$10,000 to change its "vacant status" and obtain an occupancy permit.

363.     As a direct, proximate and foreseeable result of Defendants' fraud, Plaintiff Ragones purchased this property, based on material representations that Defendants made, which turned out to be false and which caused Plaintiff corresponding damage.  Moreover, Plaintiffs lost the use, possession, and benefit of any and all investment income which were owed or promised to Plaintiffs, and Defendants were unjustly enriched by the same amount.

   *v)  Other properties.*

364.     Defendants implemented the same fraudulent scheme upon Plaintiff Ragones properties which they  Defendants agreed to manage, but which, Defendants instead systematically looted, converting to their own use these properties' income, charging Plaintiff Ragones for fake expenses, otherwise engaging in dishonest acts meant to defraud Plaintiff Ragones, while refusing him access to records and information, and refusing to account for sums entrusted to Defendants.

## VII.  Claims for Relief

### COUNT ONE
Violations of Federal Civil RICO—
Conduct of a RICO Enterprise -- 18 U.S.C. § 1962(c)
(All Defendants)

365.     The foregoing Paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

366.     A RICO claim under § 1962(c), must allege: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the Plaintiff's "business or property" by the conduct constituting the violation. *Davis v. Wilmington Fin. Inc.*, No. PJM-09-1505, 2010 WL 1375363, at *3 (D. Md. Mar. 26, 2010) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

367.     **"Conduct" Element of Plaintiffs' RICO Claim**.  The conduct element of § 1962(c) requires that the Defendant have some part in directing the affairs of the enterprise. Liability is not limited to those with primary responsibility for the enterprise's affairs, nor is a formal position within the enterprise required. In determining whether the conduct element has been satisfied, relevant questions include whether the Defendant "occupied a position in the chain of command," "knowingly implemented [the enterprise's] decisions," or was "indispensable to achieving the enterprise's goal."

368.     Defendant Isaac Ouazana, directly or indirectly, offered all the investments at issue to Plaintiffs and Class Members, speaking for himself and as a member or officer of the entities which Defendants used to perpetrate their fraud.  Defendant Isaac Ouazana, thus, "occupied a position in the chain of command," "knowingly implemented [the enterprise's] decisions," and was "indispensable to achieving the enterprise's goal," embodied in their scheme to defraud out-of-state and foreign passive investors by getting them to invest in properties in Baltimore, and/or to entrust Defendants to manage their real estate, so that Defendants could engage in post-investment looting.

369.      Defendant Benjamin Ouazana also, directly or indirectly, offered all the investments at issue to all Plaintiffs and Class Members, speaking for himself and as a member or officer of the entities which Defendants used to perpetrate their fraud.  Defendant Benjamin Ouazana, thus, "occupied a position in the chain of command," "knowingly implemented [the enterprise's] decisions," and was "indispensable to achieving the enterprise's goal," embodied

Class Action Complaint                              84

in their scheme to defraud out-of-state and foreign passive investors by getting them to invest in properties in Baltimore, and/or to entrust Defendants to manage their real estate, so that Defendants could engage in post-investment looting.

370.  Defendant WAZ-M was a corporate entity through which Defendants Isaac Ouazana and Benjamin Ouazana conducted their management of the properties post investment under the management agreement with the investors.  As such, the knowledge of Defendants Isaac Ouazana and Benjamin Ouazana may be imputed to Defendant WAZ-M, over which they exercised control, so that Defendant WAZ-M "knowingly implemented [the enterprise's] decisions."  Moreover, Defendant WAZ-M was "indispensable to achieving the enterprise's goal," embodied in their scheme to defraud out-of-state investors because it is through Defendant WAZ-M that Defendants Isaac Ouazana and Benjamin Ouazana were able to use their status as managers of the real estate in order to engage in post-investment looting.

371.  Defendant WAZ-B was a corporate entity through which through which Defendants Isaac Ouazana and Benjamin Ouazana conducted their management of the properties post investment under the management agreement with the investors; Defendant WAZ-B was a corporate entity through which Defendants Isaac Ouazana and Benjamin Ouazana offered for sale and sold the properties to Plaintiffs and the Class member investors. As such, the knowledge of Defendants Isaac Ouazana and Benjamin Ouazana may be imputed to Defendant WAZ-B, over which they exercised control, so that Defendant WAZ-B "knowingly implemented [the enterprise's] decisions."  Moreover, Defendant WAZ-B was "indispensable to achieving the enterprise's goal," embodied in their scheme to defraud out-of-state investors because it is through Defendant WAZ-B that Defendants Isaac Ouazana and Benjamin Ouazana were able to offer properties for sale and actually sell them to Plaintiffs and Class Members.

372.     Defendant WAZ-I was a corporate entity through which Defendants Isaac Ouazana and Benjamin Ouazana offered for sale and sold the properties to Plaintiffs and the Class member investors.  As such, the knowledge of Defendants Isaac Ouazana and Benjamin Ouazana may be imputed to Defendant WAZ-I, over which they exercised control, so that Defendant WAZ-I "knowingly implemented [the enterprise's] decisions."  Moreover, Defendant WAZ-I was "indispensable to achieving the enterprise's goal," embodied in their scheme to defraud out-of-state investors because it is through Defendant WAZ-I that Defendants Isaac Ouazana and Benjamin Ouazana were able to offer properties for sale and actually sell them to Plaintiffs and Class Members as part of their RICO scheme.

373.     Defendant I&B was a corporate entity through which Defendants Isaac Ouazana and Benjamin Ouazana owned properties, particularly in the context of partnerships with the Plaintiffs and the Class member investors (e.g. Defendant I&B held the Defendants' 50% interest in the 4004 Oakford Ave. property alongside Plaintiff Layani).  As such, the knowledge of Defendants Isaac Ouazana and Benjamin Ouazana may be imputed to Defendant I&B, over which they exercised control, so that Defendant I&B "knowingly implemented [the enterprise's] decisions."  Moreover, Defendant I&B was "indispensable to achieving the enterprise's goal," embodied in their scheme to defraud out-of-state investors because it is through Defendant I&B that Defendants Isaac Ouazana and Benjamin Ouazana were able to owned properties, particularly in the context of partnerships with the Plaintiffs and the Class member investors as part of their RICO scheme.

374.     Defendant(s) John and Jane Doe(s) are individuals unknown to Plaintiffs at this time who, on information and belief, lent assistance to Defendants Isaac Ouazana and Benjamin Ouazana by acting as their agents in marketing their scheme to investors out-of-state and in foreign countries or lent assistance by helping Defendants implement administrative tasks necessary to perpetrate their fraud on the investors like documenting and recording

transactions that were materially different from what the Defendants represented to the investors. As such, Defendant(s) John and Jane Doe(s) "knowingly implemented [the enterprise's] decisions," and were "indispensable to achieving the enterprise's goal," embodied in Defendants' scheme to defraud out-of-state investors, because without Defendant(s) John and Jane Doe(s), the Ouazana Defendants would not have found their out-of-state investors, or would not have been able to hold closings documenting transactions materially different from those proposed to Plaintiffs and Class Members, nor would the Ouazana Defendants have been able to obtain possession of the investors' funds at those real estate closings.

375.    Defendants John Doe Entities are corporate entities that employed or otherwise were related to the individual John (Jane) Doe Defendants, or otherwise lent assistance to the Ouazana Defendants by acting as their agents in marketing their scheme to out-of-state or foreign investors , or lent assistance by helping Defendants implement administrative tasks necessary to perpetrate their fraud on the investors by documenting and recording transactions that were materially different from what the Defendants represented to the investors As such, Defendant(s) John Doe Entities "knowingly implemented [the enterprise's] decisions," and were "indispensable to achieving the enterprise's goal," embodied in Defendants' scheme to defraud out-of-state investors by getting them to invest in properties in Baltimore, because without Defendants John Doe Entities, Defendants would not have found most of their out-of-state investors, and would not have been able to hold closings documenting transactions materially different from those proposed to Plaintiffs and Class Members, nor would the Ouazana Defendants have been able to obtain possession of the investors' funds at those real estate closings.

376.    **"Enterprise" Element of Plaintiffs' RICO Claims –** A RICO enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §

1961(4). Such an enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. Although an enterprise must have these basic "structural" elements, it "need not have a *hierarchical* structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The association must exist "separate and apart from the pattern of racketeering activity in which it engages." *United States v. Tillett*, 763 F.2d 628, 631 (4th Cir. 1985) (quoting *United States v. Griffin*, 660 F.2d 996, 999 (4th Cir. 1981)).

377.     At all relevant times, each and every one of Defendants Isaac Ouazana, his brother, Defendant Benjamin Ouazana, Defendants WAZ-I, WAZ-M, WAZ-B, and I&B and Defendants JOHN (JANE) DOEs and JOHN DOE ENTITIES were Members of an enterprise in that they were "associated together for a common purpose of engaging in a course of conduct," namely the purpose of furthering Defendants Isaac Ouazana and Benjamin Ouazana's scheme to defraud out-of-state or foreign passive investors by getting these investors to buy properties in Baltimore as directed by Defendants, and to enable Defendants to engage in post-investment looting by becoming managers of the real estate sold to these investors.

378.     As noted above in describing the conduct element of this claim, all Members of the enterprise were related and carried out specific roles in furtherance of the enterprise. Defendants Isaac Ouazana and Benjamin Ouazana directed the enterprise.  Defendants WAZ-I, WAZ-M, WAZ-B, and I&B were the corporate vehicles through which Defendants Isaac and Benjamin perpetrated their fraud.  Defendants JOHN (JANE) DOEs and JOHN DOE ENTITIES furthered the scheme by: (a) marketing, as Defendants' agents or representatives, the Defendant's properties out-of-state and in foreign countries to non-Maryland investors; and (b) enabling Defendants to document conveyances or maintain the appearance of conveyances

Class Action Complaint               88

and to record deeds that these JOHN DOEs and JOHN DOE Entities knew or should have known were fraudulent, as notaries public, title agents and title companies, and by enabling the Ouazana Defendants to obtain control of the Plaintiffs' funds in real estate closings and subsequently while they looted the properties entrusted to Defendants' management.

379.    Finally, Defendants were associated with each other for an extended period of time. They worked together from at least 2014 until the filing of this complaint in 2019. They were each other's preferred go-to contacts for both legitimate and illegitimate business with one another in the intervals between their legal conduct. In short, Defendants worked together for five years or longer as "a continuing unit that function[ed] with [a] common purpose," *Boyle*, 556 U.S. at 946, "to enrich themselves and their businesses, sometimes through legitimate means and sometimes through a pattern of racketeering activity." *Capital Lighting & Supply, LLC v. Wirtz* (D. Md. 2018). Therefore, the association formed by the Defendants was an ongoing organization separate and distinct from the pattern of racketeering activity in which the enterprise engaged.

380.    As a group of related, interconnected individuals and entities with common purpose and relational longevity, all Defendants formed an "association-in-fact" type enterprise.

381.    **"Pattern" Element of Plaintiffs' RICO Claims**.  A pattern is defined as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). To prove a pattern, a Plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

382.    The Fourth Circuit has adopted a "flexible" approach to the pattern inquiry— embracing a case-by-case analysis that "looks to the 'criminal dimension and degree' of the alleged misconduct." *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1988)(noting that

pattern element depends on "all the facts and circumstances of the particular case—with special attention to the context in which the predicate acts occur"). "Factors relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185. No one factor is dispositive, nor is the list exhaustive. *Id*.

383.     The predicate acts include well over one hundred separate instances of wire and mail fraud, many of which are documented in this complaint. *See* ¶¶ 52-364.

384.     The length of time over which these predicate acts were committed is at least five years, starting in 2014 or earlier, and continuing up to the time of filing of this complaint in 2020.  As of the filing of this complaint, Defendants' predicate acts are ongoing and, on information and belief, likely to continue indefinitely because Defendants' efforts to recruit new investors in the United States and abroad have not stopped. Also, Defendants' post-investment looting of properties already under their management is ongoing and unlikely to stop until Defendants are so enjoined.

385.     Plaintiffs know of tens of putative victims and, based on the length of time that Defendants have been in business and the fact that their business model appears to be wholly fraud based, believe that the putative Class plausibly includes more than one hundred Members.

386.     Although they followed the same basic fraudulent steps with all victims, Defendants committed a separate scheme on each one of their investor victims, suggesting that there may be several tens of separate schemes involving multiple properties and victims in this case.

387.     The potential for distinct injuries is proportional to the number of putative victims, which in this case, include several tens of parties, with each having a distinct injury.

Class Action Complaint                                    90

388.     Therefore, the racketeering acts that are the subject of this complaint were "committed in a manner characterizing the Defendant[s] as a person [or persons] who regularly commit[s] such crimes," which in turn means that all the factors relevant to this inquiry are met in this case. *Brandenburg*, 859 F.2d at 1185.

389.     **"Racketeering activity" Element of Plaintiffs' RICO Claims**.  To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961. Defendants' indictable predicate acts consist of multiple instances of mail and wire fraud.  18 U.S.C. § 1961(1)(B) ("racketeering activity" includes "any act which is indictable under ... 18 U.S.C. §1343 (relating to wire fraud)."

390.     The elements of the crime of mail and wire fraud are that the Defendant "(1) used the mails or interstate wire communications in furtherance of (2) a scheme to defraud for which the Defendant acted intentionally, and (3) the scheme "involved a material misrepresentation or concealment of fact." *See* 18 U.S.C. § 1343; *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. Rule 9(b).

391.     Although it is impossible to exhaustively list in this complaint each and every instance of Defendants' massive number of wire fraud instances because that *is* and has been their business model for at least the past 5 years, this Complaint still documents over 190 separate misrepresentations or omissions of material fact which Defendants communicated through the wires to Plaintiffs. *See* ¶¶ 52-364.  The breadth of Defendants' wire fraud will become known only upon full examination of the putative Class Members' factual claims.

392.     In all instances listed below, Defendants (1) used interstate wire communications (typically between Maryland and another state or country) in furtherance of (2) Defendants' scheme to defraud for which they acted intentionally and knowingly, and (3) the scheme involved material misrepresentations and omissions aimed at achieving three broad

objectives in which Defendants were largely successful, namely to: (a) induce non-Maryland-based Plaintiffs and putative Class Members to purchase Baltimore properties offered by Defendants; (b) allow Defendants to become managers of Baltimore properties for out-of-state victims in order to enable Defendants to loot the properties under their care; and (c) hide from victims and make it difficult to detect and remedy the Defendants' continuing fraud.

393.     For purposes of establishing this element, Plaintiffs list <u>49</u> instances of wire fraud involving specific misrepresentations or concealments of material fact directed at the Layani Plaintiffs in respect of the 314 North Hilton St and the 4004 Oakford Ave. properties, and, separately, at Plaintiff Ragones in respect of the 3335 Edmondson Ave. and 4415 Pall Mall Rd. properties.  Other instances alleged in the complaint (¶¶ 52-364) are incorporated by reference. This complaint does not attempt to list and cannot list all instances of wire fraud by the Defendants, which span years of conducting their fraudulent enterprise.

394.     <u>Defendants' misrepresentations or concealment of material facts to the Layani Plaintiffs regarding 314 North Hilton St.</u>.  As described below, the Defendants made at least 13 misrepresentations or concealments of material facts to the Layani Plaintiffs regarding Defendants' sale and management of this property.

395.     *First*, Defendant Isaac Ouazana misrepresented the status of the conveyance of this property, using the international wires, on July 22, 2014, by emailing a deed dated July 18, 2014, that Defendants never recorded, to Plaintiff Britt's representative, nonparty Julien Layani in Paris, France, thereby misleading Plaintiffs. The representation that Defendant WAZ-I had conveyed title to this property on this date in accordance with the emailed deed was false because Maryland land records show that this deed was never recorded by Defendants.

396.     *Second*, all Defendants concealed from Plaintiffs that the deed dated July 18, 2014, which Defendant Isaac Ouazana emailed Julien Layani on July 22, 2014 was never recorded.  As of the date of this complaint, Defendants have not corrected the material

Class Action Complaint                    92

misrepresentation that Defendant WAZ-I recorded the deed attached to Defendant Isaac Ouazana's July 22, 2014, email, and that they had not completed the conveyance of the ownership of this property to Plaintiffs on or around July 18, 2014.

397. *Third,* Defendants materially misrepresented to the Maryland authorities the terms of the sale agreed with Plaintiffs, to the detriment of Plaintiffs, by recording in the Maryland land records, on March 15, 2015, a sham deed containing a fictitious, made up, sale price of US$21,000, instead of US$44,000 as memorialized in the July 21, 2014 WAZ-I "invoice", and reflected in the July 18, 2014 sham deed that Defendant Isaac Ouazana emailed to the Layani Plaintiffs but never recorded.

398. *Fourth*, all Defendants concealed from Plaintiffs that Defendant WAZ-I recorded on March 15, 2015, another sham deed other than the July 18, 2014, deed that Defendant Isaac Ouazana emailed to Plaintiffs on July 22, 2014.

399. *Fifth,* all Defendants concealed from Plaintiffs that they had misrepresented material terms of the sale by reporting a fictitious lower price of $21,000 in the sham deed that Defendant WAZ-I eventually recorded on March 15, 2015.

400. *Sixth,* Defendants concealed from Plaintiffs that Defendant WAZ-I fraudulently avoided payment of all recordation taxes and fees by reporting the fictitious lower sale price of $21,000 to the Maryland authorities on the sham deed.  Defendants were assisted in this fraud by one or more John and Jane Doe and John Doe Entity Defendants who performed or assisted in the real estate closing.

401. *Seventh*, all Defendants concealed from Plaintiffs that Defendants retained for themselves, without Plaintiff's knowledge or permission, the totality of the recordation taxes and fees prepaid by Plaintiff Britt on July 7, 2014, which Defendants collected from Plaintiffs as part of the $55,000 payment for this property. In Baltimore City, the first $22,000 of the conveyance price is exempt for owner-occupied property as to State recordation tax, and if said

Class Action Complaint          93

price is less than $250,000, then as to City transfer tax as well.  If no recordation taxes are paid, an affidavit is required. Because Defendants never provided Plaintiff a closing file for the conveyance of this property, Plaintiffs believe that Defendants filed a false affidavit that the property was owner-occupied (false because this is an investment property that is not owner-occupied) and that the price was less than $22,000 (false because the price was $44,000, not $21,000) in order to avoid paying all recordation taxes and fees.

402.     *Eighth*, Defendants misrepresented to the Layani Plaintiffs' representative, Julien Layani in Paris, in WhatsApp chats and telephone conversations between July 2014 and March 2015, the completion status of repairs included in the "package price" that Defendants were required to make.  Defendants then falsely represented that they were entitled to reimbursement from Plaintiffs of US$3,173 for work allegedly done by the Defendants and by third-party service providers, which Plaintiffs paid, believing Defendants' false representation that invoices from the Defendants and from any third parties existed and would be provided in response to Plaintiffs' repeated demand. These representations are false because, upon inspecting the property, Plaintiffs discovered that these repairs had not been made, and this property received multiple citations for housing code violations that Defendants were required to abate, but had failed to address. Also, Defendants refused to provide requested invoices or any other proof that the renovation or repair work charged to Plaintiffs had been done.

403.     *Ninth*, all Defendants concealed from Plaintiffs that Defendant WAZ-M, Defendant Isaac Ouazana and Defendant Benjamin Ouazana failed to perform or cause to be performed services required under the management agreement, in that they failed to use collected rental income to pay fines levied against this property for uncorrected housing violations, property taxes, and water and sewer bills, causing the property to be listed for tax sale.

Class Action Complaint                    94

404.     *Tenth,* all Defendants concealed from Plaintiffs that the property was listed for tax sale after Defendants failed to make repairs, and then failed to pay fines and taxes from the rental income collected as part of their managerial duties under the management agreement.

405.     *Eleventh*, Defendants concealed from the Layani Plaintiffs the amount of rents unlawfully retained by them before and after termination of the management agreement on or about July 31, 2018, by refusing to account for the amounts collected from this property, and by refusing to turn over rents belonging to the Layani Plaintiffs despite repeated demands.

406.     *Twelfth*, Defendants falsely represented to Plaintiffs that the property was generating no income for at least the months of January, February, March, April, June, and July 2016, while Defendants converted to their own use monthly rents totaling at least US$6900. Plaintiffs learned subsequently that Defendants rented the property and kept the rents for these months.

407.     *Thirteenth*, Defendants falsely represented that they maintained no records of their management of this property in the ordinary course of business, and that the only records they had were shared with Plaintiffs on a cloud-based hard drive from which Defendants were locked out by Plaintiffs.  However, this representation was false because Plaintiffs did not lock-out Defendants from access to any cloud-based hard drive in which Defendants deposited Defendants-prepared files. Moreover, it is implausible that Defendants ran a property management business without making and having to maintain records such as leases, invoices, emails, etc. In the end, Defendants refused to respond to Plaintiffs' requests for access to their business records and simply converted to their own use sums belonging to Plaintiffs.

408.     Defendants' material misrepresentations or concealment of facts to the Layani Plaintiffs regarding the 4004 Oakford Ave. property. As described below, the Defendants made at least 15 misrepresentations or concealments of material facts to the Layani Plaintiffs regarding Defendants' sale and management of this property.

409.     *First*, the Ouazana Defendants' representations to Plaintiffs Gerard Layani in Israel and nonparty Julien Layani in Paris, made first via email on December 14, 2014, and repeated or left uncorrected during the period of December 2014 through January 7, 2015, that the property was available for sale in a "contractor bankruptcy foreclosure" was false because a deed dated January 12, 2015 and recorded January 28, 2015 in the Maryland land records, shows that Defendant WAZ-I acquired this property not in a foreclosure but directly from its then owner, nonparty Northstar Realty Management Inc.

410.     *Second*, the Ouazana Defendants' representations to Plaintiffs Gerard Layani in Israel and nonparty Julien Layani in Paris, made first via email on December 14, 2014, and repeated or left uncorrected during the period of December 2014 through January 7, 2015, that when they offered this property for sale to Plaintiffs, it had a "foreclosure price" of US$143,000 was false because the aforementioned January 12, 2015 deed recorded in the Maryland land records shows that Defendant WAZ-I paid $90,000 for it, not US$143,000.

411.     *Third*, the Ouazana Defendants' representations to Plaintiffs Gerard Layani in Israel and nonparty Julien Layani in Paris, made first via email on December 14, 2014, and repeated or left uncorrected during the period of December 2014 through January 7, 2015, that Defendants' finder's fee was $3000, was false because the true purchase price of the property to the Ouazana Defendants was $90,000 and not the represented "foreclosure listing price" of $143,000. Defendants therefore obtained by means of fraud and deceit a commission greater than the US$3000 which they represented to Plaintiffs was the amount of their finder's fee.

412.     *Third*, the Ouazana Defendants' representations to Plaintiffs Gerard Layani in
Israel and nonparty Julien Layani in Paris, made first via email on January 2, 2015, and
repeated or left uncorrected during the period of December 2014 through January 7, 2015, that
the Ouazana Defendants paid $112,500 in cash for their 50% interest in this property was false
because the Ouazana Defendants used false pretenses and deceit to fraudulently induce the
Layani Plaintiffs to wire US$90,000, on January 7, 2015, which was the true purchase price for
100% ownership of this property. On information and belief, the Ouazana Defendants used the
$90,000 wired by the Layani Plaintiffs to pay 100% of the purchase to the property's then
owner, nonparty NorthStar Realty Management Inc. By fraudulently and deceptively
misrepresenting that this property was being conveyed for a "foreclosure listing price" of
US$143,000 at a "contractor bankruptcy foreclosure," when it was in fact sold directly by its
then owner for $90,000, and by providing false repair estimates to Plaintiffs, Defendants
induced the Layani Plaintiffs to unwittingly pay for 100% of the purchase price for this
property, including the Ouazana Defendants' 50% share, which the Ouazana Defendants did
not pay contrary to their false representations on this point.

413.     *Fourth*, the Ouazana Defendants' representations to Plaintiff Gerard Layani in
Israel and nonparty Julien Layani in Paris, made during the period of December 2014 through
January 7, 2015, that the Ouazana Defendants had established a separate bank account for 4004
Oakford Ave. LLC and would transact all business relating to this property through this
account was false because Defendants did not use this bank account to transact the business of
4004 Oakford Ave. LLC. On information and belief, Defendants used a separate bank account
to which Plaintiffs had no access in order to fraudulently conceal from the Layani Plaintiffs the
truth of Defendants' dealings with respect to this property. This account appears to have been
opened by the Ouazanas mainly to deceive the Layani Plaintiffs into sending the $90,000 that
the Ouazanas needed to pay the $90,000 purchase price for the property.

Class Action Complaint                    97

414.     *Fifth*, although Plaintiffs did not discover this for months due to the Defendant's active concealment, Defendants' made the false representation in an email dated July 3, 2018, sent to Julien Layani in France, that Isaac Ouazana and the other Ouazana Defendants were selling "their" 50% interest but not the Layani Plaintiffs' 50% ownership in 4004 Oakford Ave. LLC. This was false because in or about August 22, 2018, without the Layani Plaintiffs' knowledge or permission, Defendant Isaac Ouazana filed amended articles for 4004 Oakford Ave. LLC which list as a new 100% owner, a third party named Laurindo Figueiredo DaCosta, to whom Defendants appear to have sold for an undisclosed price all shares in 4004 Oakford Ave. LLC, including the Layani Plaintiffs' shares, amounting to at least 50% (in fairness, 100%) ownership.  Defendants also retained for themselves any and all proceeds of the sale of the shares of 4004 Oakford Ave. LLC, concealing from Plaintiffs this transaction's occurrence.

415.     *Sixth*, Defendants falsely represented on numerous occasions, initially in an email dated December 14, 2014, and then repeated via WhatsApp chats and telephonic conversations between January 2015 and August 2015 that they were making and then, that they had made the repairs included in the "package price" when in fact, they had not because the amounts shared with Plaintiffs pre-investment appear to have been fictitious numbers whose sole purpose was to induce the Layani Plaintiff to overpay for their 50% interest in this property, in order to effectively subsidize and pay for the Ouazana's 50% share of this property as the Ouazana Defendants did not pay their cash contribution of  $122,500.

416.     *Seventh*, from August 2015 until June 2018, Defendants falsely represented on multiple occasions that they had hired third-party service providers to perform additional maintenance, upkeep and repairs to the property, enabling Defendants to then seek reimbursement from Plaintiffs of US$11,872.30 for work allegedly done by these third-party service providers, which Plaintiffs paid, believing Defendants' false representation that invoices from the third parties existed and would be provided in response Plaintiffs' repeated

demand. These representations about repairs completed and invoices were false because
Defendants failed to provide any of the requested third-party invoices or other proof that the
renovation or repair work had been done.

417.     *Eighth*, Defendants falsely represented to Plaintiffs that the property was
generating no income for at least the months of December 2015, January, February, March,
April, May, June, and July 2016, July, August, September, October, November, and December
2017, and January, February, March, and May 2018, while Defendants converted to their own
use monthly rents totaling at least US$7077. Plaintiffs learned subsequently that Defendants
rented the property and kept the rents for these months.

418.     *Ninth*, Defendants falsely represented that they maintained no records of their
management of this property in the ordinary course of business, and that the only records they
had were shared with Plaintiffs on a cloud-based hard drive from which Defendants were
locked out by Plaintiffs.  However, this representation was false because Plaintiffs did not lock-
out Defendants from access to any cloud-based hard drive in which Defendants deposited
Defendants-prepared files. Moreover, it is implausible that Defendants ran a property
management business without making and having to maintain records such as leases, invoices,
emails, etc. In the end, Defendants refused to respond to Plaintiffs' requests for access to their
business records and, simply converted to their own use sums belonging to Plaintiffs.

419.     *Tenth*, all Defendants concealed from Plaintiffs that Defendant WAZ-M,
Defendant Isaac Ouazana and Defendant Benjamin Ouazana failed to perform or cause to be
performed services required under the management agreement, in that they failed to use
collected rental income to make payments to third-party contractors and they failed to pursue
payment of missing rent amounts from tenants in the landlord-tenant court and through debt
collectors or by dealing directly with the tenants.

420.     *Eleventh*, Defendants concealed from the Layani Plaintiffs that, in June 2018, Defendants Isaac Ouazana sold all shares in 4004 Oakford Ave. LLC, including Plaintiffs' shares, representing 50% of the share capital of the company, without the Plaintiffs' knowledge or consent, and without turning over to Plaintiffs the amount that Defendants collected for the unauthorized sale of Plaintiffs' shares.

421.     *Thirteenth*, Defendants concealed from the Layani Plaintiffs that Defendants unjustly and unlawfully converted to their own use -- and continue to retain -- the proceeds of the sale of all the shares of 4004 Oakford Ave. LLC., including the proceeds of the unauthorized sale of Plaintiffs' shares.

422.     *Fourteenth*, Defendants concealed from the Layani Plaintiffs not just the sale of the shares of 4004 Oakford Ave. LLC but also the amount of the proceeds of the sale.

423.     *Fifteenth*, Defendants concealed from the Layani Plaintiffs the amount of rents that Defendants unjustly and unlawfully continue to retain and convert to their own use from the operation of this property until the time of their unauthorized sale, which rental income properly belongs to Plaintiffs, and Defendants refuse to account for the funds that they unlawfully retain in violation of Plaintiffs' rights despite repeated demand for turning over these funds to Plaintiffs and providing an accounting for the sums kept by Defendants.

424.     Defendants' material misrepresentations or concealment of facts to Plaintiff Ragones, in respect of the 3335 Edmondson Ave property.  As described below, the Defendants made at least 12 misrepresentations or concealments of material facts to Plaintiff Ragones regarding Defendants' sale and management of this property.

425.     *First*, Defendant Isaac Ouazana made a false material representation to Plaintiff Ragones, at the time of his investment proposal of July 2016, in face-to-face conversations that occurred in Baltimore, to the effect that Defendants Isaac Ouazana, and through him, the other Defendants, would promptly arrange for a real estate closing documenting Plaintiff Ragones'

50%-ownership interest in the property after collecting his payment of US$2,500. This was false because after Plaintiff Ragones made the investment, Defendants never arranged for a real estate closing documenting Plaintiff Ragones' interest in this property. As seen below, Defendants sold this property to a third party while concealing this fact from Plaintiff Ragones.

426.      *Second* Defendant Isaac Ouazana made a false material representation to Plaintiff Ragones, at the time of his investment proposal of July 2016, in face-to-face conversations that occurred in Baltimore, to the effect that Defendants Isaac Ouazana, and through him, the other Defendants, would obtain all necessary permits and complete all renovations, including inspections by the Department of Housing, such that this property, which was a boarded up empty shell, could obtain a use and occupancy permit, be rented, and generate rental income within four months. This was false because Defendants obtained no permits, made no repairs, and did not even record Plaintiff Ragones' interest in this property after he paid Defendants in full for it.

427.      *Third*, in order to conceal from Plaintiff Ragones the existence of his claim, on numerous occasions between July 2016, and August 29, 2017, Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, falsely represented to Plaintiff Ragones, then out-of-state, via the wires, including email, telephone, and WhatsApp voice and text chats, that Defendants Isaac Ouazana, and through him, the other Defendants, could not start the repair and renovation work until they had recorded Mr. Ragones' interest in the property, which they claimed to be in the process of arranging. This was false because Defendants never were in the process of arranging for a real estate closing documenting the conveyance of a 50%-ownership interest to Plaintiff Ragones.

428.      *Fourth*, Defendant Isaac Ouazana then falsely represented to Plaintiff Ragones, initially in July 2016 orally in person, in Baltimore, and subsequently at various times until August 2017, in several interstate telephone calls, that Plaintiff Ragones should wait because

Defendant Isaac Ouazana and the other Ouazana Defendants had finally been able to arrange for a real estate closing documenting the conveyance to Plaintiff Ragones of his 50% ownership interest in the property. This was false because on July 20, 2016, Defendant Isaac Ouazana, with the help of Defendants JOHN DOE or JANE DOE and JOHN DOE ENTITIES, which appear to have included a title company and title agent, caused Defendant WAZ-I to make and record a deed conveying full ownership of this property to third-party Yaakov Krozier, LLC, for the recorded consideration of US$5,000. This transaction was materially different from the one represented to Plaintiff Ragones in that, Defendants Isaac Ouazana, and through him, WAZ-I and the other Defendants, did not transfer any ownership interest in this property to Plaintiff Ragones on July 22, 2016.

429.     *Fifth*, for over a year after the conveyance of July 22, 2016 to third-party Yaakov Krozier, LLC, until at least August 2017, all Defendants hid their fraud by continuing to falsely represent to Plaintiff Ragones that a real estate closing documenting the conveyance to Plaintiff Ragones of his 50% ownership interest in the property had taken place. Defendants Ouazana, and through him Defendant WAZ-I, and the other Defendants, did not disclose to Plaintiff Ragones that, in fact, they had never transferred any ownership interest in this property to Plaintiff Ragones, and had in fact transferred full ownership of this property to third-party Yaakov Krozier LLC.

430.     *Sixth*, to further conceal from Plaintiff Ragones the extent of Defendants' fraud and dishonesty and induce him to not take action on his claim, Defendant Isaac Ouazana entered into a sham written agreement with Plaintiff Ragones on August 29, 2017, which agreement states, in relevant parts, that Plaintiff Ragones and Defendant Isaac Ouazana are partners, with each having 50% ownership in the property. The agreement also states that "[B]oth parties agree that they cannot and will not sell above properties without the signed consent of either party.  They cannot sell their 50% partnership without signed consent and

Class Action Complaint                  102

acknowledgment from each party individually.  If any of the parties bring an offer on any of the properties listed above, the other party will accept offer or each partner can pay out the other partner their 50% share according to the offer in 90 business days grace period."  The material representations contained in the agreement were false and had been false for over a year because the deed conveying full ownership of this property from Defendant WAZ-I to third-party Yaakov Krozier LLC was recorded on July 22, 2016. Furthermore, Defendant Isaac Ouazana knew the representations made in and implied by the agreement were false because he personally signed the deed July 20, 2016 conveying the property to third-party Yaakov Krozier LLC.

431.     *Seventh*, the representation made by Defendant Isaac Ouazana in the August 29, 2017 written agreement to the effect that Plaintiff Ragones, rather than Defendants, would do the renovation, and Defendants would get reimbursed for supplies and materials they claimed to have purchased, was false and intended to conceal from Plaintiff that the property had been conveyed by Defendant WAZ-I to third-party Yaakov Krozier LLC by a recorded on July 22, 2016, as Defendant Isaac Ouazana obviously knew since he personally signed the said deed. This enabled Defendants to prevent Plaintiff Ragones from learning the truth of this conveyance and the fraud perpetrated by the Ouazana Defendants until much later when Plaintiff Ragones heard rumors that Defendant Isaac Ouazana had sold this property, without Plaintiff Ragones' knowledge or permission for US$75,000.

432.     *Eighth*, Defendant Isaac Ouazana made several false representations in a face to face conversation that occurred in or after August 2017, in Baltimore, when Plaintiff Ragones confronted Defendant Isaac Ouazana about rumors of his sale of this property, which included statements to the effect that Defendant Isaac Ouazana had agreed to sell this property to a friend of his because he thought Plaintiff Ragones did not want it, that the sale was not fully consummated, that the property was still in Defendant Isaac Ouazana's possession or control,

and that he would not complete the sale of the property without permission from Plaintiff
Ragones.  Defendant Isaac Ouazana made these false representations to Plaintiff Ragones,
ostensibly to cause him to delay taking action on his claims, as Defendant Isaac Ouazana
concealed from Plaintiff Ragones during this conversation the existence of the deed signed by
Mr. Isaac Ouazana that had been recorded on July 22, 2016, to document a consummated sale
to Mr. Krozier.

433.     *Ninth*, on numerous occasions between July 2016, and August 29, 2017,
Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, falsely represented to Plaintiff
Ragones, then in Israel, via the international wires, including email, telephone, and WhatsApp
voice and text chats, that Defendants Isaac Ouazana, and through him, the other Defendants,
were making all necessary renovations to this property, even though the agreement was that
Plaintiff Ragones would have responsibility for making necessary repairs and the Ouazana
Defendants would obtain all permits. This representation was false and intended to conceal
from Plaintiff Ragones that the property had been sold to another party after having sold a 50%
interest in it to Plaintiff Ragones. This false representation was also designed to conceal from
Plaintiff Ragones his claims with respect to this property, and to enable Defendants to seek
reimbursement from Plaintiff Ragones for Defendants' fictitious expenses with respect to this
property.

434.     *Tenth*, Defendants Isaac Ouazana, and through him, the other Defendants,
concealed until after November 17, 2017, that despite their representations to the contrary, they
had made no repairs so that the property was still in a state of severe disrepair and still lacked a
use and occupancy permit.

435.     *Eleventh,* the Ouazana Defendants also falsely represented on November 7,
2017, via WhatsApp chat, to Plaintiff Ragones, that they had performed necessary renovation
and repairs to the property at a cost of $36,500 to Defendants, and that they required

reimbursement from Plaintiff for this US$36,500. These representations were false because Defendants did not renovate this property, which still was in severe disrepair and without an occupancy permit, and because they did not incur $36,500 in repairs, having provided no proof of any renovation work to Plaintiff Ragones despite repeated demand.  Plaintiff Ragones discovered the falsity of these representations sometime between August 27, 2017 and November 7, 2017, upon inspecting the property, at which time he found the property still boarded up, in shell condition and with no repairs having in fact been done beyond demolition work that he himself had done.

436.    *Twelfth*, Defendants Ouazana, and through him Defendant WAZ-I, and the other Defendants, while they continued to conceal from Plaintiff Ragones their failure to convey his 50% interest to him and their sale of the property without his knowledge of consent, falsely represented that he owed 50% of the property taxes for this property. Defendants sought and collected from Plaintiff Ragones US$2,081 on November 10, 2017 corresponding to his purported share of property taxes for two tax years during which Plaintiff Ragones was not the owner of record. These representations were false because Defendants never recorded the conveyance to Plaintiff Ragones his 50% interest and in fact sold the property to another.

437.    Defendants' material misrepresentations or concealment of facts to Plaintiff Ragones regarding the 4415 Pall Mall Rd. Ave. property.  As described below, the Defendants made at least 7 misrepresentations or concealments of material facts to Plaintiff Ragones regarding Defendants' sale and management of this property.

438.    *First*, in face-to-face conversations between Defendant Isaac Ouazana and Plaintiff Ragones that occurred in Baltimore in or about the month of July 2015, Defendant Isaac Ouazana made the material misrepresentation to Plaintiff Ragones that Defendant Isaac Ouazana, and through him, the other Defendants, owned this property outright and were ready, willing and able to sell it to Plaintiff Ragones. This was false because the Maryland land

records show that the owner of this property was not any of the Defendants, but third-party Jackson Santvil who owned this property pursuant to a deed from Fannie Mae, which was dated September 26, 2014. Third party Jackson Santvil remained the owner until after August 21, 2015, when Plaintiff Ragones paid Defendants full price for this property, believing their false representations that they were selling it to him.

439.     *Second*, in or about the month of July 2015, in face-to-face conversations between Defendant Isaac Ouazana and Plaintiff Ragones that occurred in Baltimore, Defendant Isaac Ouazana made the material misrepresentation to Plaintiff Ragones that Defendants Isaac Ouazana, and through him, the other Defendants, would promptly arrange for a real estate closing documenting Plaintiff Ragones' acquisition of a full ownership interest in the property after collecting his payment. This representation was false because Defendants did not own this property at that time and did not have the authority to speak for its owner, third party Jackson Santvil.

440.     *Third*, Defendant Isaac Ouazana falsely represented to Plaintiff Ragones, using the international wires by emailing him on August 21, 2015, that he and the other Defendants had arranged for a real estate closing documenting Defendants' conveyance to Plaintiff Ragones of a full ownership interest in this and a few other properties and were waiting for his payment, stating in the email: "Confirm reception.  Waiting for deposit of 175k.  Waiting for article of organization of each company with tax ID for.  Title company.  Thank you.  Shabbat shalom."  This was false because Defendants did not own this property on August 21, 2015 and had not arranged to transfer ownership to Plaintiff Ragones, nor did they in fact transfer ownership to Plaintiff Ragones. convey it in a deed recorded four months later on October 1, 2015. Unaware of the falsity of this representation and believing Defendants to be telling the truth, on or about August 21, 2015, Plaintiff Ragones wired in good faith to Defendants US$175,000, which included US$35,000 in payment for the full amount of the purchase price

Class Action Complaint                    106

for this property, including closing costs, with the expectation that renovations would start promptly thereafter, at which point Plaintiff would pay the balance of the agreed $53,000.

441. *Fourth,* on numerous occasions between August 21, 2015, and August 19, 2016, Defendants Isaac Ouazana, Benjamin Ouazana, and WAZ-I, falsely represented to Plaintiff Ragones, then in Las Vegas, Nevada, via the interstate wires, including email, telephone, and WhatsApp voice and text chats, that Defendants, had arranged for a real estate closing documenting truthfully the conveyance of a full ownership interest in the property to Plaintiff Ragones and the terms of this conveyance, for the sale price of $35,000. This was false because Defendants did not truthfully document the conveyance to Plaintiff Ragones of a full ownership interest in the property for either the full package price of $53,000 or the initial payment of $35,000, but instead, the Maryland land records show that a transaction was recorded for the fictitious price of $22,000, which is less than what Plaintiff Ragones paid.

442. *Fifth*, in early August 2016, Defendant Isaac Ouazana made the material misrepresentation to Plaintiff Ragones that he sold this property for US$48,000 to third-party Flextone Capital Investment, LLC. This representation was false because, the Maryland land records show that Defendant Isaac Ouazana recorded a deed on August 25, 2016, conveying ownership of this property to third-party Flexstone Capital Investment LLC for the consideration of US$5000, not $48,000 as represented to Plaintiff Ragones. Moreover, Defendant Isaac Ouazana was not authorized to sell this property at any price.

443. *Sixth,* Defendant Isaac Ouazana made the material misrepresentation on closing documents for the sale of this property that he was authorized to sell it, fraudulently signing on behalf of its owner, RDNA Investments, LLC, documents purporting to convey ownership of this property, including a deed dated August 19, 2016 and recorded August 25, 2016, conveying full ownership of this property to Flexstone Capital Investment LLC for the consideration of US$5,000. This representation was false because he is not a member of RDNA

investment LLC, or otherwise authorized to sign or bind RDNA Investments LLC in any way. Plaintiff Ragones, who is the sole member of RDNA did not authorize Defendant Ouazana to sign on behalf of RDNA Investments. the company to help find a purchaser for it, Defendant Isaac Ouazana, without informing Plaintiff Ragones or obtaining his prior consent to any terms of sale, sold the property, telling Plaintiff Ragones that he had sold it. Moreover, Plaintiff Ragones had not seen or approved the closing documents fraudulently executed by Defendant Ouazana, and did not agree to selling this property for the consideration of US$5000 listed on the deed, which, having paid $53,000 for this property's "full package" price, would not have been acceptable to him had he known about it prior to Defendant Isaac Ouazana's fraud.

444.    *Seventh*, Defendant Isaac Ouazana, and through him, the other Defendants, concealed from Plaintiff Ragones the true terms of the sale of this property, which they obviously did not sell for $5,000 as they fraudulently stated on the deed they recorded in the land records, and simply refused to respond to Plaintiffs' requests for information about this sale and/or for access to their business records and, on information and belief, simply retained and converted to their own use any and all proceeds from the unauthorized sale of this property in an amount that Plaintiff Ragones has not been able to determine. As a result, Plaintiff Ragones sustained damages which include these and other sums that Defendants obtained from him with respect to this investment using deceit.

445.    **Plaintiffs and Class Members were Injured by Reason of a Violation of Section 1962**. Plaintiffs and the Class Members were injured by Defendants' instances of racketeering activities as follows.

446.    The Layani Plaintiffs were injured in their business or property in that, as a result of Defendants' misrepresentations and concealment of material fact, they sustained actual monetary damages to be proven at trial, and believed to exceed $800,000.

447.    Plaintiff Ragones and RDNA Investments LLC were injured in their business or property in that, as a result of Defendants' misrepresentations and concealment of material fact, they sustained actual monetary damages to be proven at trial, and believed to exceed $500,000.

448.    Pursuant to 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from all Defendants, jointly and severally, as well as any other relief authorized by statute.

**COUNT TWO**
Violations of Civil RICO—Conspiracy to Violate
§ 1962(c) of RICO --18 U.S.C. § 1962(d)
(All Defendants)

449.    The foregoing paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

450.    The elements of a claim under section 1962(d) traditionally have been stated to be: (1) knowledge of the general nature of the conspiracy; (2) agreement by the Defendant: (a) to personally commit a violation of sections 1962(a)-(c); (b) to aid or abet a violation; or (c) that another co-conspirator commit a violation; and (3) injury caused by an act in furtherance of the conspiracy. *See United States v. Pryba,* 900 F.2d 748, 760 (4th Cir.), *cert. denied,* 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990).

451.    The elements for establishing aiding and abetting liability are: "(1) that the substantive act [i.e., the commission of two or more predicate acts] has been committed, and (2) that the Defendant alleged to have aided and abetted the act knew of the commission of the act and acted with intent to facilitate it." *See e.g., In re American Honda Motor Co. Dealerships Litig.,* 941 F.Supp. 528, 1996 WL 534796 (D. Md., 1996), *citing Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 270 (3d Cir.1995).

452.    At all relevant times, all Defendants each were "person[s]" pursuant to 18 U.S.C. §§ 1961(3) and 1962(d).

453.    All Defendants formed together an "association-in-fact" type enterprise as defined in 18 U.S.C. § 1961(4).

454.    Each of the Defendants named in this complaint were associated together for the common purpose of marketing and selling to out-of-state and foreign Plaintiffs and Class Members, rental properties in Baltimore, and for the common purpose of enabling Defendants to manage the real properties of the out-of-state Plaintiffs and Class Members, in order to loot these investments, generally mismanaging them, and going so far as to sell the properties without permission and without accounting for the proceeds of these unauthorized sales.

455.    At all times material to this Complaint, the enterprise was an ongoing organization separate and distinct from the pattern of racketeering activity in which the enterprise engaged.

456.    The enterprise was engaged in interstate commerce in that the Defendants, all Maryland residents or entities, offered and sold the real property interests that are the subject of this complaint to non-Maryland parties. To wit: (a) Plaintiff Layani is a citizen and resident of Israel; (b) Plaintiff Ragones is a citizen of Israel who maintains an address in Maryland; and (c) the Class Members are citizens and residents of various countries, including France, Israel, Brazil, and the various states, including Florida and New York.

457.    All Defendants conducted or participated in the conduct of the Enterprises affairs, as alleged in Count One previously.

458.    Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

459.     The conspiracy commenced at least as early as June 24, 2014, and remains ongoing.

460.     The conspiracy's purpose was to defraud Plaintiffs and the Class Members of money, property, and benefits of monetary value by fraudulently depriving Plaintiffs and the Class Members of their interest in real properties sold to them by the Defendants and of their returns from these properties.

461.     Each of the Defendants committed at least one overt act in furtherance of the conspiracy. These acts in furtherance of the conspiracy include, but are not limited to, the acts set forth in paragraphs 32-358, *supra*, and in Count I.

462.     Each and every single one of the Defendants, including the John and Jane Doe Defendants and John Doe Entity Defendants, knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of RICO Defendants was necessary to allow the commission of this pattern of racketeering activity. The Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

463.     Each and every single one of the Defendants knew about and agreed to facilitate the scheme to defraud Plaintiffs and the Class Members of their money, property, and other benefits of monetary value by fraudulently depriving Plaintiffs and the Class Members of their interest in real properties sold to them by the Defendants and of their returns from these properties. It was part of the conspiracy that each and every single of the Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in paragraphs 32-358, *supra*, and in Count I.

464.     As a direct and proximate result of the Defendants' conspiracy, the acts of racketeering activity of the Enterprises, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs and the Class Members have been injured in

their money and property, in an amount to be determined at trial, and believed to exceed 5 million dollars.

465.        Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from all Defendants, jointly and severally, as well as any other relief authorized by statute.

<div align="center">

**COUNT THREE**

Negligence

(All JOHN DOE Entities Defendants)

</div>

466.  Paragraphs 1 through 228 of the Complaint are incorporated by reference and re-alleged as if fully set forth herein.

467.  In Maryland, in order to establish a cause of action for negligence, a Plaintiff must prove: a duty owed to the Plaintiff or to a Class of which the Plaintiff is a part; a breach of that duty; a causal relationship between the breach and the harm; and damages suffered. *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 655, 762 A.2d 582 (2000), *citing Jacques v. First Nat'l Bank*, 307 Md. 527, 531, 515 A.2d 756 (1986).

468.  All John Doe entities Defendants had a duty or obligation recognized by the law, which required them to conform to a certain standard of conduct for the protection of the Plaintiffs and putative Class Members as purchasers of real estate, against unreasonable risks.

469.  All John Doe entities Defendants responsible for the documenting and recording of real estate transactions breached their duty by aiding and abetting the other Defendants' fraud, or at the very least, allowing Defendants to subvert the process of documenting and recording real estate transactions and the conveyance of title to properties which the Defendants purported to sell to or for the Plaintiffs and the putative Class Members.

470.  It is a matter of record that several transactions involving the sale of real property in Baltimore city were not properly and timely recorded.

471.  Also, it is a matter of record that Defendant Isaac Ouazana was able to sell Plaintiffs Ragones and RDNA Investments LLC's interest in the 3335 Edmondson Avenue property, in the 4415 Pall Mall Rd. property, and in the 2802 Hartford Rd. property, without authorization, and without providing the closing agent or any yet unknown John Doe Defendants or John Doe Entity Defendants who effectuated or facilitated these fraudulent transactions, with any documentation establishing that he is a member or otherwise authorized to sign conveyance documents on behalf of RDNA Investments LLC, the limited liability company listed as owner of record for these properties.

472.  It is also a matter of record that Defendant Isaac Ouazana was able to misappropriate and/or sell Plaintiffs Layani and Britt's interest in the 4004 Oakford Avenue property, and in the "1605 Homestead, 2643 Kennedy KD43, 2651 Kennedy KD51" property, without authorization, and without providing the closing agent or any yet unknown John Doe Defendants or John Doe Entity Defendants who effectuated or facilitated these fraudulent transactions, with any documentation establishing that he is a member or otherwise authorized to sign conveyance documents on behalf of the Layani Plaintiffs.

473.  On information and belief, the Ouazana Defendants have engaged in the same unauthorized fraudulent transactions with respect to properties belonging to the Class Members.

474.  Defendant's breach of their duty in allowing Defendants to record or in facilitating transactions that were unauthorized or that were materially different from those agreed upon with Plaintiffs and the putative Class Members or in failing to record transactions promptly and accurately caused the Plaintiffs to suffer harm in their property interests.

475.  All John Doe Defendants or John Doe Entity Defendants engage in the marketing of properties for or on behalf of the Defendants or in effectuating or facilitating unauthorized transactions for the Ouazana Defendants breached their duty by aiding and abetting the other

Defendants' fraud, or at the very least, allowing Defendants to subvert the process of marketing these real estate based investment opportunities by acting as indiscriminate disseminators of investment related information which contained misrepresentations and omissions of material facts that these third parties knew or should have known they were propagating.

476.   It is a matter of record that Defendants Isaac Ouazana and Benjamin Ouazana, disseminated, through various third parties, information about the investment opportunities and the Baltimore real estate underlying these opportunities which contained misrepresentations and omissions of material fact that third parties knew or should have known they were propagating.

477.   As a direct, proximate and foreseeable result of Defendants' disregard for their obligations to register the real property interest conveyances to Plaintiffs, and of Defendants' scheme to defraud Plaintiffs and the Class Members, Plaintiffs and the Class Members invested in Defendants' investment scheme and lost significant investment money when the investments failed, causing Plaintiffs and the Class Members to incur economic and non-economic losses, which would not have occurred but for the actions or omissions of Defendants and of the John Doe entities Defendants.

## COUNT FOUR
Negligent Supervision
(All JOHN DOE Entities Defendants)

478.   The foregoing paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth herein.

479.   In Maryland, the elements of a claim for negligent supervision are typically combined with the elements of claims for negligent hiring and retention. The courts have stated that "[i]n order to prove a cause of action for either negligent hiring or supervision or retention, the Plaintiff must establish that [his] injury was caused by the tortious conduct of [an

employee], that the employer knew or should have known by the exercise of diligence and reasonable care that the [employee] was capable of inflicting harm of some type, that the employer failed to use proper care in selecting, supervising or retaining that employee, and that the employer's breach of its duty was the proximate cause of the Plaintiff's injur[y]." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F.Supp. 720, 751 (D.Md. 1996); *see also Williams v. Cloverleaf Farms Dairy, Inc.,* 78 F.Supp.2d 479, 483 (D.Md. 1999).

480.   Plaintiffs injuries were caused by the tortious conduct of the John Doe Defendants and John Doe Entity Defendants involved in the documentation and recording of property conveyances in that these John Doe Defendants had a duty or obligation recognized by the law, which required them to conform to a certain standard of conduct for the protection of the Plaintiffs and putative Class Members as buyers or sellers of real estate, against unreasonable risks resulting from the Defendants' frauds and unauthorized acts involving conveyances of real properties.

481.   The employers of the John Doe Defendants, knew or should have known by the exercise of diligence and reasonable care that employees of theirs were capable of inflicting harm of some type upon Plaintiffs, particularly so far as these employees were responsible for documenting and recording transactions involving the conveyance of real property interests and in disbursing the proceeds of these transactions to the proper party.

482.   It is a matter of record that in the case of at least four properties belonging to the Plaintiffs, transactions were not properly documented or recorded, and proceeds belonging to Plaintiffs were disbursed to Defendants through the tortious actions of individual title agents who aided Defendants in their fraud.

483.   The title insurance company or the supervisors of the title agents and other individuals failed to use proper care in selecting, supervising or retaining such employee, and that breach of this duty was the proximate cause of Plaintiffs' injuries.

Class Action Complaint                    115

484.    As a direct, proximate and foreseeable result of the foregoing, Plaintiffs incurred economic and non-economic losses, which would not have occurred but for the actions or omissions of the Defendants and of the John Doe Defendants and John Doe Entity Defendants.

<div align="center">

**COUNT FIVE**
Common Law Fraud
(All Defendants)

</div>

485.    The foregoing paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth herein.

486.    Defendants made misrepresentations and concealments of material facts, as set forth above in paragraphs 32-358, *supra*, and in Count I.

487.    These misrepresentations and concealments of material facts were purportedly made for the purpose of inducing the Plaintiffs and the Class Members to: (a) purchase properties that Defendants were offering for sale; (b) invest jointly with Defendants in properties; (c) enable Defendants to manage the properties for the benefit of the Plaintiffs or of the Class Members; or (d) conceal from the Plaintiffs or the Class Members the existence of their claims or induce them to delay taking actions on their claims, if they discovered Defendants' frauds.

488.    Defendants made the false representations and concealments of material facts described in paragraphs 32-358, *supra*, and in Count I, with the intention of defrauding the Plaintiffs and Class Members and inducing them to rely on these misrepresentations to their detriment as described above.

489.    The Plaintiffs justifiably relied upon the aforesaid representations of Defendants, and accordingly: (a) purchased properties that Defendants were offering for sale; (b) invested jointly with Defendants in properties; and (c) enabled Defendants to manage the properties for the benefit of the Plaintiffs or of the Class Members.

490.    To the extent Defendants concealed material facts about their frauds from the Plaintiffs or the Class Members, the Plaintiffs and Class Members remained unaware of the existence of their claims and/or were induced to delay taking legal actions on their claims if they discovered Defendants' frauds.

491.    As a result of the aforesaid fraud by Defendants, Plaintiffs and Class Members lost significant investment money as set forth herein, as well as the benefit of the ownership and enjoyment of the underlying real properties and of the income generated by them.

**COUNT SIX**
Constructive Fraud
(All Defendants)

492.    The foregoing paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth herein.

493.    Defendants represented to the Plaintiffs and Class Members that Defendants would expend their efforts in order to fulfill the Plaintiffs' profit expectations from buying the properties offered by Defendants and allowing the Defendants to manage these properties.

494.    Under the terms of the agreements to sell the properties offered by Defendants, Defendants accepted substantial funding from the Plaintiffs and the Class Members, and Defendants agreed to manage these properties, typically in exchange for substantial management fees, in return for which Defendants would perform certain duties, described herein, to manage the underlying rental property, perform renovations and maintenance, undertake all administrative tasks reasonably expected of them and provide regular reports of the financial performance of the operation of the rental properties at issue to Plaintiffs and Class Members.

495.    The Plaintiffs reasonably placed their confidence in Defendants to perform as agreed pursuant to Plaintiffs' investment in the real properties offered by Defendants,

particularly concerning the operation and management of the properties sold to Plaintiffs and Class Members.

496.     The relationship created between the parties was one of special trust and confidence and fiduciary in nature.

497.     Upon information and belief, however, Defendants did not give sufficient time and attention to the duties they accepted under their agreements with the Plaintiffs and the Class Members, and accordingly failed to properly arrange for the purchase or sale of the properties in the manner agreed upon, and failed to manage the rental real properties.

498.     Upon information and belief, Defendants intermingled funds intended for the benefit and use of the properties being managed and belonging to the Plaintiffs and the Class Members with Defendants' own personal accounts and/or diverted Plaintiffs and Class Members' funds and ownership of their properties for Defendants' own use.

499.     In the manner aforesaid, Defendants breached their fiduciary duties to the Plaintiffs and Class Members intentionally, or with reckless disregard for the Plaintiffs' and Class Members' rights, willfully and contrary to the best interests of the Plaintiffs and Class Members.

500.     As a result of the aforesaid acts by Defendants, Plaintiffs and Class Members lost significant investment money as set forth herein, as well as the benefit of the ownership and enjoyment of the properties they bought and entrusted to Defendants' management.

## COUNT SEVEN
### Breach of Contract
(All Defendants)

501.     The foregoing paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth herein.

502.    Plaintiffs and Class Members, on one hand, and Defendants, on the other hand, were parties to valid and enforceable contracts, that is, the contracts to purchase the properties offered by Defendants, and the contracts to manage the properties sold (the "contracts").

503.    Plaintiffs and Class Members complied with and performed or substantially performed their obligations under the aforesaid contracts, and to the extent that they were forced to stop performing certain obligations, their further performance was excused by Defendants' breaches of the contracts and the non-occurrence of conditions precedent to their further performance.

504.    Defendants, in the manner set forth above, failed to perform pursuant to the contracts, and in so doing breached said contracts.

505.    Defendants' breaches of the Investment Contract were material in nature.

506.    The breach of the contracts by Defendants was not caused by any act of the Plaintiffs and Class Members who, at all times, performed their contractual duties as required by said Contracts.

507.    All conditions required for Defendants' performance under the Contracts had occurred.

508.    Defendants, unfairly and in bad faith, deprived Plaintiffs and Class Members of their right to receive the benefits of the contracts, by failing to confer and convey upon the Plaintiffs and Class Members their ownership interest in the investment properties Defendants offered them for sale, or by failing to do so on agreed terms, and by misappropriating for Defendants exclusively the ownership or enjoyment of title in and income from said properties.

509.    Defendants also failed to inform and actively concealed from Plaintiffs that they had engaged in such misappropriations and in the numerous other frauds described above.

510.    As a direct, proximate and foreseeable result of Defendants' breach of the contracts, Plaintiffs lost money and sustained additional injury and economic and non-economic losses.

## COUNT EIGHT
Conversion
(All Defendants)

511.    The foregoing paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth herein.

512.    Upon misappropriating all or part of the Plaintiffs and Class Members' investment funds, the Plaintiffs' and Class Members' rightful interest in and to the properties Defendants claimed to have sold them, and of any income obtained from these properties, Defendants exerted ownership or dominion over Plaintiffs' funds and property, which were intended for a particular purpose, and which were to be segregated from Defendants' funds.  Defendants neither accounted for nor returned such funds or property as of the filing of this Complaint.

513.    Defendants' continued exertion of ownership or dominion over Plaintiffs' and Class Members' funds and properties was in denial of, or inconsistent with, Plaintiffs' and Class Members' rights to these funds and properties.

514.    As a result, Plaintiffs and Class Members sustained substantial economic injury and loss which would not have occurred but for the actions of Defendants.

515.    As a direct and proximate result of these and other dishonest acts by Defendants, the Plaintiffs and Class Members were deprived of the value of the items converted by Defendants. The exact amount of damages sustained by Plaintiffs will be proven at trial.

## COUNT NINE
Unjust Enrichment
(All Defendants)

516.    The foregoing paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth herein.

517.    As a result of Defendants' wrongful acts and omissions described above, of Defendants' misappropriation of the Plaintiffs' and Class Members' investment funds and properties, and of Defendants' refusal to account and to give Plaintiffs and Class Members what is owed them and that which they rightfully own, Defendants where enriched unjustly.

518.    Defendants' enrichment was at the expense of Plaintiffs and Class Members because Defendants knowingly, unjustly and unlawfully took Plaintiffs' and Class Members' funds and property, without registering and recognizing the Plaintiffs' and Class Members' interest in and to the properties purportedly sold to them, without giving the Plaintiffs and Class Members their rightful income therefrom, and without accounting for the Plaintiffs' and Class Members' income from the operation of the properties for which they had paid.

519.    Defendants also knowingly concealed their acts and omissions from Plaintiffs and Class Members, in order to enable Defendants to continue to pursue, illegally, and in violation of existing statutes and of their agreements with the Plaintiffs and Class Members, the ownership and use of the properties without giving the Plaintiffs and Class Members their due.

520.    As a direct and proximate result of these and other dishonest acts by Defendants, Plaintiffs and Class Members were deprived of the use, enjoyment, ownership, income and value of their funds and properties and sustained economic damages in an amount to be proven at trial.

521.    Under the circumstances, it would be unjust and inequitable for Defendants to be permitted to retain the benefits of the money paid to them by Plaintiffs and Class Members.

## COUNT TEN
### Accounting
### (All Defendants)

522.    The foregoing paragraphs of this Complaint are incorporated by reference and re-alleged as if fully set forth herein.

Class Action Complaint                    121

523.    While Defendants' misappropriation of the Plaintiffs' and Class Members' funds and interests in the properties can be remedied at law by ordering their restitution, Defendants' misappropriation of income and other proceeds from the operation of the Investment Property have no adequate remedy at law due to the Defendants' concealment thereof from the Plaintiffs and Class Members.

524.    This concealment by Defendants was in breach of their fiduciary duties as general partners or Members in partnerships where the Plaintiffs were limited partners or Members with limited access to information about the performance of the investment and the management thereof by Defendants or as managers entrusted by absent investors to manage investment properties that Defendants touted as safe investments appropriate for investors looking for steady passive income from the rental of properties under the Defendants' care.

525.    Plaintiffs and Class Members made repeated demands to Defendants to open their books and records, sending such requests by email and reiterating them orally on numerous occasions to Defendants in general, and to Defendants Isaac Ouazana and Benjamin Ouazana in particular, but Defendants have refused to provide such access to the books and records.

526.    Plaintiffs and Class Members have a real need to obtain the financial and managerial information about their properties' performance while in Defendants' managerial control because Defendants have been hiding this information from Plaintiffs and Class Members, while making numerous claims to explain the absence of information and revenue being shared with the Plaintiffs and Class Members.

527.    The claims made by Defendants in refusing to share information appear to be part and parcel of an elaborate scheme to hide information from the Plaintiffs and Class Members, indicating that Defendants have engaged in efforts, including but not limited to complex or fraudulent accounting practices, to hide the true nature and amounts of the revenues and losses generated by the Investment Property.

528.   Therefore, Plaintiffs and Class Members are entitled to and hereby seek an accounting of the use of their investment funds, the proceeds of their investments and of the management of their properties by Defendants, with a view to ascertain their true financial performance and determine how much money is owed the Plaintiffs and Class Members from the operation of said properties.

### VIII.  Prayer for Relief

WHEREFORE, Plaintiffs and the Class Members respectfully request that the Court:

        (a) Award Plaintiffs and the Class Members such equitable injunctive and ancillary relief as may be necessary to avert the likelihood of Plaintiffs' irreparable injury or prohibit the illicit conduct described herein during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, s temporary restraining orders and preliminary injunctions;

        (b) Order that an accounting be performed under the supervision of this Court of the dealings of the Defendants in their management and operation of the Plaintiffs and the Class Members' properties;

        (c) Award Plaintiffs and the Class Members a declaratory judgment;

        (d) Order all Defendants herein to cease and desist from directly or indirectly violating 18 U.S.C. § 1964 (RICO);

        (e) Enter judgment against all Defendants, jointly and severally, in an amount equal to three times the amount of damages each Plaintiff and Class Member has sustained because of the Defendants' actions, plus a civil penalty for each violation of 18 U.S.C. § 1964;

(f)  Order the restitution to Plaintiffs and to the Class Members of all money, property, and benefits which Defendants unlawfully defrauded and deprived Plaintiffs of;

(g)  Order impression of a constructive trust over properties claimed by Plaintiffs and the Class Members that is held or managed by Defendants in order to prevent any sale or disposition or further misappropriation of any revenue resulting from such Properties' operation;

(h)  Award reasonable Attorney's fees and costs to Plaintiffs and Class Members;

(i)  Award damages from Defendants in an amount to be proven at trial;

(j)  Award interest and costs of this action accruing from the time of the investment until the time of judgment, and

(k)  Award such other and further relief as the Court deems just and proper.


Respectfully submitted,

//s// Jamil Zouaoui
Jamil Zouaoui, Esq. (DC Bar 431952)
MIZENE, PLLC
4626 Wisconsin Avenue, N.W., Suite 300
Washington, D.C. 20016
Tel: (202) 670-0529
Email:  jzouaoui@mizene.us
*Counsel for Plaintiffs*

## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

<div style="margin-left:40%">

//s// Jamil Zouaoui
Jamil Zouaoui, Esq. **
MIZENE, PLLC
4626 Wisconsin Avenue, N.W., Suite 300
Washington, D.C. 20016
Tel: (202) 670-0529
Email:  jzouaoui@mizene.us
*Counsel for Plaintiffs*

</div>