THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GERARD LAYANI, et al.
    *Plaintiffs*,

v.

ISAAC OUAZANA, et al.,
    *Defendants*.

Civil Action No. ELH-20-420

**MEMORANDUM OPINION**

This putative class action concerns an alleged scheme to defraud investors in rental properties in Baltimore. Plaintiffs Gerard Layani; Britt Investment Baltimore LLC; Yehuda Ragones; and RDNA Investments, LLC filed a "Class Action Complaint for Damages and Injunctive Relief." ECF 1 (the "Complaint"). They sued multiple defendants: Isaac Ouazana; Benjamin Ouazana; I&B Capital Investments LLC; WAZ-Brothers, LLC; WAZ Investments, LLC; WAZ-Management, LLC; and "John and Jane Doe(s) and John Doe Entities" (collectively, the "Doe Defendants"). *Id.* ¶¶ 10-20. Plaintiffs allege that over a period of years, defendants "implemented a scheme to defraud passive investors in and owners of Baltimore real estate of money, property, and benefits of monetary value through false pretenses and representations." *Id.* ¶ 38.

According to the Complaint, "Defendants' scheme to defraud can be broadly divided into two types: (a) Fraud in Marketing/Selling the Baltimore real estate; and (b) Property-Management-related Looting, Concealment, and Related Fraud." *Id.* ¶ 39. As to the first type, plaintiffs allege that defendants induced investors to purchase interests in Baltimore rental properties and to contract with defendants to manage the properties. *Id.* ¶ 40. But, defendants allegedly misrepresented key information about the properties, such as the value and quality of the property

and the identity of the seller. *Id.* ¶¶ 40-43. With respect to the second category of fraud, plaintiffs assert that defendants' "deception" took "numerous forms," and generally involved "hiding or misrepresenting information about the operation and the condition of the properties under their control." *Id.* ¶ 46. Among other things, defendants allegedly withheld rental income and charged plaintiffs for repairs that were never performed. *Id.* ¶¶ 79, 104, 162, 187, 213, 236, 265.

The Complaint, which is 125 pages in length, contains ten counts and concerns twelve properties. Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Count One), as well as conspiracy to engage in conduct prohibited by RICO, in violation of § 1962(d) (Count Two). In addition, plaintiffs bring eight claims arising under Maryland law, as follows: Negligence (Count Three); Negligent Supervision (Count Four); Common Law Fraud (Count Five); Constructive Fraud (Count Six); Breach of Contract (Count Seven); Conversion (Count Eight); Unjust Enrichment (Count Nine); and Accounting (Count Ten). *Id.* at 83-121. Counts Three and Four are lodged only against the Doe Defendants. *Id.* at 112, 114. All other claims are lodged against all defendants. *Id.* at 83-121.

Plaintiffs assert all counts on behalf of themselves and a putative class. *Id.* ¶ 26. The Complaint defines the putative class "as all persons who," *id.* ¶ 27:

> a. Purchased a full or fractional interest in properties sold directly or indirectly by Defendants, and whom, within four years before the filing of this action, Defendants misled or defrauded, or attempted to mislead or defraud, irrespective of whether they were in fact misled or defrauded; or

> b. Entered into a written or implied property management services agreement with Defendants, and whom, within four years before the filing of this action, Defendants misled or defrauded, or attempted to mislead or defraud, irrespective of whether they were in fact misled or defrauded.

According to plaintiffs, the Court has subject matter jurisdiction based on the RICO claims (Counts One and Two), pursuant to 28 U.S.C. §§ 1331, 1337. *Id.* ¶ 21.[1]  And, they assert that the Court "is vested with supplemental jurisdiction" as to the claims arising under State law (Counts Three to Ten), pursuant to 28 U.S.C. § 1367. *Id.* ¶ 22.  Alternatively, plaintiffs assert that the Court has jurisdiction over all claims pursuant to 28 U.S.C. § 1332(d). *Id.* ¶ 23.  Although the Complaint does not invoke the Class Action Fairness Act ("CAFA") by name, it cites the pertinent statutory provision, § 1332(d), and states that the elements of the provision are satisfied. *Id.* ¶ 23.

Defendants have moved to dismiss the Complaint (ECF 18), supported by a memorandum of law (ECF 19) (collectively, the "Motion to Dismiss" or the "Motion").  They rely on Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 9(b).  And, they seek dismissal of the class action allegations pursuant to Fed. R. Civ. P. 23.

As to Rule 12(b)(1), which concerns subject matter jurisdiction, defendants argue that this Court lacks jurisdiction under §1331 because plaintiffs' RICO claims fail under Rule 12(b)(6) and Rule 9(b), for various reasons.  *See* ECF 19.  Moreover, defendants mount "a pre-discovery challenge to class certification," pursuant to Rule 23. *Id.* at 39.  In their view, because plaintiffs have failed plausibly to allege a class, CAFA jurisdiction is also lacking. *Id.* at 39-40, 44.  And, according to defendants, plaintiffs cannot claim diversity jurisdiction under § 1332(a). *Id.* at 45.

---

[1] Section 1331 pertains to "federal question" jurisdiction.  Section 1337 of 28 U.S.C. provides, in relevant part: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies . . . ."  Although plaintiffs invoke § 1337, they offer no explanation of its applicability here.  Nor do the defendants address the issue.  In any event, even if § 1337 applies, it "provides no additional grant of jurisdiction beyond that provided in 28 U.S.C. § 1331." *Dutcher v. Matheson*, 733 F.3d 980, 985 n.4 (10th Cir. 2013) (citing, *inter alia*, 13D Wright & Miller et al., Federal Practice & Procedure § 3574 (3d ed., April 2013 update)).

Plaintiffs' corrected opposition is docketed at ECF 24 and is supported by seven exhibits. ECF 24-1 to ECF 24-7.  Defendants have replied. ECF 26.

Plaintiffs have moved for leave to file a surreply (ECF 27, the "Surreply Motion").  It is supported by a proposed surreply (ECF 27-2) and exhibits.  Defendants' opposition is docketed at ECF 28.  And, plaintiffs have replied.  ECF 29.  In addition, plaintiffs have filed a "Motion For Entry of Order Pursuant To The Court's Inherent Authority To Sanction Defendants' Witness Tampering And Other Bad Faith Tactics To Gain A Litigation Advantage." ECF 30 (the "Sanctions Motion").  Defendants oppose the Sanctions Motion.  ECF 32.  Plaintiffs have replied. ECF 33.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant defendants' Motion to Dismiss, without prejudice; deny plaintiffs' Surreply Motion; and deny plaintiffs' Sanctions Motion, without prejudice.

## I. Factual Background[2]

The Complaint (ECF 1) was filed on February 19, 2020.  It sets forth an extensive summary of the alleged real estate fraud scheme.  It also addresses each of the twelve properties implicated in defendants' alleged scheme.

---

[2] At this juncture, I must assume the truth of the facts alleged in the suit, as discussed, *infra*. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). The Court may consider documents attached to the Complaint or the Motion, "so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

I recite the facts in a manner generally consistent with the structure of the Complaint, to the extent feasible.  But, the Complaint is not a model of clarity and there is considerable redundancy.  A "party should seek to frame his allegations as directly as possible; redundancy and verbosity are to be strictly avoided."  5 Wright & Miller, Federal Practice and Procedure § 1281 (3d. ed. 2020).  Moreover, the Complaint contains improper legal arguments, replete with citations to case law.  *See Matthew B. v. Pleasant Valley Sch. Dist.*, No. 3:17-CV-2380, 2018 WL 4924013, at *3 (M.D. Pa. Oct. 10, 2018) (directing plaintiff's counsel to "refrain in the future" from including "legal arguments or conclusions," including citations to legal authority, in a pleading); *Belanger v. BNY Mellon Asset Mgmt., LLC*, 307 F.R.D. 55, 58 (D. Mass. 2015) ("A pleading is

Plaintiff Gerard Layani is a citizen of Israel.  ECF 1, ¶ 10.  He is the sole member of Britt Investment Baltimore LLC ("Britt"), a limited liability company with its principal place of business in Baltimore.  *Id*. ¶ 11.  Britt was "set up by Plaintiff Layani for the purpose of investing in the real estate ventures sold by Defendants."  *Id.*  I shall refer to Britt and Layani collectively as the "Layani Plaintiffs."[3]

Ragones is also a citizen of Israel and "maintains a U.S. address" in Baltimore.  *Id.* ¶ 12.  He is the sole member of RDNA Investments, LLC ("RDNA"), a limited liability company with a principal place of business in Baltimore.  *Id.* ¶ 13.

Isaac Ouazana and Benjamin Ouazana are brothers and residents of Baltimore.  *Id.*  ¶¶ 14, 15, 270.  I shall refer to them collectively as the "Ouazanas," "Ouazana Brothers," or "Brothers," and individually as I. Ouazana and B. Ouazana.  The related corporate defendants are I&B Capital Investments LLC ("I&B"); WAZ-Brothers, LLC ("WAZ-B"); WAZ Investments, LLC ("WAZ-

---

not an appropriate vehicle for aggregating masses of evidence or advancing premature legal arguments."); *Martinez v. Pittsford Cent. Sch. Dist.*, No. 04-CV-6229T, 2005 WL 643416, at *1 (W.D.N.Y. Mar. 18, 2005) (stating that "legal argument, legal citation, evidentiary pleadings, and conclusory allegations" rendered the complaint "difficult to comprehend, and virtually impossible to answer").

I note other issues with the Complaint, *infra*.

[3] The Complaint refers repeatedly to the "Layani Plaintiffs" without defining the term. *See, e.g.*, ECF 1, ¶¶ 52-54*,* 71, 78, 80-83, 85.  From context, it appears that the term refers to Gerard Layani and Britt, the limited liability company whose sole member is Gerard Layani.  The term does not appear to include Julien Layani, a non-party who resides in France.  *Id.* ¶ 52.  Julien Layani is alleged to have acted as "representative" of the Layani Plaintiffs in several of the transactions at issue.

The Complaint does not clearly distinguish between actions taken by Gerard Layani in an individual capacity and those taken by his limited liability company.  When reciting allegations that clearly implicate an individual, I shall refer only to Layani.  When reciting other allegations, I shall adopt plaintiffs' convention and refer to the "Layani Plaintiffs."

I");[4] and WAZ-management, LLC ("WAZ-M").  These entites have their principal places of business in Baltimore.  *Id.* ¶¶ 16-19.[5]

Layani was involved with eight of the properties referenced in the Complaint.  Ragones was involved with the other four.  The suit gives "Notice of Lis Pendens" as to some of the properties.  *See id.* ¶¶ 1-6.  Throughout the Complaint, plaintiffs reference defendants' use of "international wires" and "interstate wires," including "email, telephone, and WhatsApp voice and text chats," to facilitate the fraud scheme.  *See, e.g., id.* ¶¶ 55, 63, 85, 90, 109, 116, 142, 167, 193, 219, 256, 278.

In the section of the Complaint titled "*Fraud in the Marketing/Selling the Baltimore Real Estate,*" plaintiffs allege, *id.* ¶ 40:

> . . . Defendants, acting directly or indirectly, deliberately used false pretenses and representations to attract passive investors located outside Maryland and, in many instances, outside the United states, for the purpose of inducing them to purchase full or fractional interests in rental real properties located in Baltimore, with Defendants offering to furnish the efforts required to fulfill the investors' profit expectation from the real property interest acquired in exchange for a management fee pursuant to a written or implicit management contract with Defendants.[]

According to plaintiffs, defendants deliberately misrepresented the value, characteristics, and quality of the real properties.  *Id.* ¶ 41.  Further, plaintiffs assert, *id.* ¶ 42:

> In most instances, Defendants offered to sell the properties to the Plaintiffs and the Class Members, in ready to rent condition, fully compliant with the housing code and having passed all necessary inspections, for a "package price" that included: (a) the sale price for the conveyed interest in the real property, including all transfer taxes and charges; (b) an upfront charge by Defendants for any repair and renovation of the properties; (c) an upfront charge for property taxes for the first

---

[4] The Complaint contains multiple spellings for this entity: "WAZ-Investments, LLC"; "WAZ Investments, LLC," and "WAZ Investments LLC."  *Compare* ECF 1 at 1 (case caption) *with id.* ¶¶ 4, 7, 18.

[5] Throughout the Complaint, plaintiffs describe actions taken by "Defendants."  But, in most instances, the context suggests that plaintiffs are referring to some or all of the Ouazanas and the corporate defendants associated with them, and not to the Doe Defendants.

year of ownership; and (d) an upfront charge for insurance for the first year of ownership.

"[T]ypically," the investors did not attend the "closing[s]" for "the conveyance of the full or fractional interest in the real property," because they "trust[ed] Defendants fully." *Id.* ¶ 44.  At the closings, the Ouazanas allegedly "conspired with" the John Doe Defendants, who include "title agents and title companies," by "falsifying documents . . . in order to help hide from investors that the transactions closed differed materially from the investment terms agreed with the investors. . . ." *Id.*

According to plaintiffs, there were discrepancies between the agreed-upon sale prices for the properties and the "fictitious" prices reported by defendants to the tax authorities.  *Id.*  The property records "lower[ed] Plaintiffs' tax basis" and thus "expose[d] Plaintiffs to having to pay higher conveyance taxes than they should when they sell" the properties.  *Id.* ¶¶ 69, 92, 117, 177, 226; *see id.* ¶ 203.  In other instances, defendants did not own the property they had agreed to sell to the investors, or did not transfer ownership to the buyer, or resold the properties without "the knowledge or permission of the investors."  *Id.* ¶ 44.

As indicated, plaintiffs also claim that defendants defrauded plaintiffs and the passive investors with whom they partnered through "property-management-related fraud."  *Id.* ¶ 45.  Defendants supposedly "use[d] their position of trust as managers of the properties under the written or implicit management agreements . . . ."  *Id.*  This type of fraud took "numerous forms."  *Id.* ¶ 46.  For instance, defendants "hid[] or misrepresent[ed] information about the operation and the condition of the properties under their control . . . ."  *Id.*  They also "hid[] rental income" and "claim[ed] false charges" for services that were never rendered, repairs that were never performed, and "property taxes, utilities, and insurance that Defendants then failed to pay . . . ."  *Id.* ¶ 48.

In sum, plaintiffs allege, *id.* ¶ 51:

[T]he Ouazana Defendants [we]re able to defraud the Plaintiffs and putative Class Members of money, property, and benefits of monetary value, including investment principal and rental income, and to conceal for years that Defendants d[id] not perform management services as agreed, and in many instances that they allow[ed] underlying properties to deteriorate, incur fines for code violations, and often wind up listed for tax sale.

In addition, the Complaint states that a "related lawsuit" was initiated in State court and was dismissed by consent, without prejudice, on October 17, 2019.  ECF 1, ¶ 53.[6]  More recently, correspondence submitted by both sides indicates that some of the parties here are presently involved in other litigation in the Circuit Court for Baltimore City.  *See* ECF 34, ECF 36, ECF 37.  In particular, in 2020 I. Ouazana and WAZ-M brought suit against Ragones and a third party, Kandy, LLC, with respect to two properties that are not at issue in this case.  ECF 34; ECF 37.  The case is docketed in the Circuit Court as Case No. 24-C-20-003634 CN.  *See*, *e.g.*, ECF 34.

I turn to review the allegations as to the various properties referenced in the Complaint.

### A.  The Layani Properties

### 1. 314 North Hilton Street ("Property 1")

On June 24, 2014, Simon Jonathan Dahan, a non-party "representative" of the Ouazana Brothers and WAZ-I, emailed Julien Layani, a "representative" of the Layani Plaintiffs, about a business deal.  ECF 1, ¶ 54.  Dahan "offer[ed] an investment" in 314 North Hilton Street ("Property 1"), along with "a management agreement with Defendants to expend the efforts necessary to fulfill Plaintiffs' profit expectation in exchange," for a fee of "'8 percents' [sic]."  *Id.*  During the

---

[6] The Complaint does not say anything else about the suit.  But, plaintiffs have submitted an exhibit to their opposition, consisting of a copy of a filing from a case identified as *Gerard Layani, et al. v. Isaac Ouazana, et al.,* Circuit Court for Baltimore City, Case No. 24-C-19-000100.  ECF 24-6.  A review of the docket in that case shows that on January 9, 2019, Layani and Britt filed suit against I. Ouazana, "Waz Brothers LLC," and "Waz Management LLC."  According to ECF 24-6, the parties entered a  "(Consented) Stipulation of Dismissal Without Prejudice To Refile."  It has a docket stamp of Oct. 17, 2019.  *Id.* at 2.

ensuing two weeks, the Ouazanas and Layani had multiple conversations about the business deal. *Id.* ¶ 56. Plaintiffs claim that the Ouazanas "falsely represented that they owned [Property 1] and that it did or could generate a 22% rate of return on investment after expenses based on monthly rent estimates of US$1,050 to US$1,150." *Id.* ¶ 56. Yet, plaintiffs also assert that the Ouazanas indicated that WAZ-I was the property owner and had bought it for $44,000. *Id.* ¶¶ 60, 61.

On July 7, 2014, the Layani Plaintiffs agreed to pay a $55,000 "'package price'" for Property I, "which included all renovation work," and transferred that sum to Waz Properties Inc.,[7] as directed by the Ouazanas. *Id.* ¶ 57. Then, WAZ-I, through the Ouazanas, sent an invoice to Britt on July 21, 2014, indicating that WAZ-I was selling the property for $44,000 and a $3,000 "commission." *Id.* ¶ 59. The following day, I. Ouazana emailed Julien Layani "a falsified deed dated July 18, 2014, representing that on that date, Defendant WAZ-I had conveyed title to this property to Plaintiff Britt for the sale price of $44,000." *Id.* ¶ 63. However, Maryland property records indicate that WAZ-I acquired Property 1 on July 25, 2014, and paid only $13,650 for it. *Id.* ¶¶ 60, 61.

Plaintiffs also allege that "Defendants . . . did not record a deed until . . . March 4, 2015." *Id.* ¶ 65. And, the recorded deed "differed materially from the one emailed to Plaintiff." *Id.* It listed a sale price of $21,000, rather than $44,000, as represented to plaintiffs in July 2014. *Id.* Plaintiffs allege, *id.* ¶ 69:

> Defendants falsely reported . . . a fictitious lower price of $21,000, in order to avoid paying transfer taxes altogether since this lower amount is below the threshold for paying conveyance taxes, and lowering Plaintiffs' tax basis in this property, which exposes Plaintiffs to having to pay higher conveyance taxes than they should when they sell this property. Also, this enabled Defendants to fraudulently keep the "2014 taxes properties" that they charged Plaintiffs in the July 21, 2014, invoice.

---

[7] Waz Properties Inc. is not named as a defendant in the suit.

### 2.  726 North Hilton Street ("Property 2")

On September 1, 2014, B. Ouazana and WAZ-I, through Dahan, solicited the Layani Plaintiffs to buy a property located at 726 North Hilton Street in Baltimore ("Property 2").  *Id.* ¶ 84.  B. Ouazana represented via email: "'I have a good FORECLOSURE deal for you in Baltimore, new in the market for 55000 included work… Rent estimate 1100 to 1200 dollars… Also I put you the website [sic] of the appraisal of the house that's Baltimore city estimate this house for 64200 dollars.'" *Id.* ¶ 86 (capitalization and ellipses in Complaint).  Defendants also proposed to manage the property in exchange for a management fee of "'8 percents.' [sic]." *Id.* ¶ 84.  Discussions transpired over the following four days, during which the Ouazana Brothers represented that WAZ-I owned Property 2.  *Id.* ¶ 87.

On September 5, 2014, the Layani Plaintiffs transferred $55,000 to Waz Properties Inc., as directed by defendants.  *Id.* ¶ 88.  That sum was the agreed-upon "'package price'" that included the cost of "a full renovation."  *Id.*  On November 3, 2014, I. Ouazana emailed Julien Layani a deed with that date.  *Id.* ¶ 90.  It showed that the seller was Munitrust REO, not WAZ-I, and the sale price was $16,000, not the $55,000 that had been paid.  *Id.*  Thus, defendants concealed the true terms of the deal for two months before transmitting the deed.  *Id.* ¶ 91.

In addition, "Maryland land records show that Defendants . . . falsely reported . . . a fictitious lower price of $16,000. . . ." *Id.* ¶ 92.  That enabled defendants to avoid payment of transfer taxes and to "fraudulently keep conveyance taxes they collected from Plaintiff as part of the $55,000 price." *Id.*  And, defendants lowered "Plaintiffs' tax basis in this property." *Id.*

### 3.  4004 Oakford Avenue ("Property 3")

On December 14, 2014, the Ouazana Brothers and I&B, through Dahan, offered the Layani Plaintiffs a fifty-percent ownership interest in  a four-unit multifamily building at 4004 Oakford

Avenue in Baltimore ("Property 3") for the sum of $112,500.  *Id.* ¶ 141. The Brothers were to retain the other fifty-percent interest.  *Id.*  The defendants also agreed to manage the property, "without fee."  *Id.*

The Brothers and I & B, through Dahan, represented that Property 3 "was a 'contractor bankruptcy foreclosure' with a 'foreclosure listing price'" of $143,000.  *Id.* ¶ 143.  They also represented that $222,000 "was the true price of acquisition of this property," based on the anticipated costs of "repairs and renovations" as well as "closing fees and recording expenses." *Id.*  And, with the addition of a $3,000 "finders' or investment fee," the full "'package price'" for Property 3 came to $225,000.  *Id.*

The Ouazanas advised the Layani Plaintiffs on December 22, 2014, that they had "established a new entity, 4004 Oakford Ave. LLC, for the purpose of holding this property."  *Id.* ¶ 144.  On January 2, 2015, I. Ouazana proposed over email an "operating agreement" by which Britt would own "50% of the share capital" in 4004 Oakford Ave. LLC and I&B would own "the other 50%."  *Id.* ¶ 145.  The agreement called for both investors to make an "initial contribution" of $112,500.  *Id.*  The Layani Plaintiffs transferred that sum "to Defendants" on January 7, 2015. *Id.* ¶ 146.

However, "[a]ccording to a deed dated January 12, 2015, and recorded on January 28, 2015 in the Maryland land records, Defendant WAZ-I acquired this property not in a foreclosure but directly from its then owner, nonparty Northstar Realty Management Inc."  *Id.* ¶ 147.  Moreover, the deed shows that WAZ-I purchased the property for $90,000, not $143,000.  *Id.* ¶ 148.

In addition, on August 22, 2018, I. Ouazana "filed amended articles for 4004 Oakford Ave. LLC," without the knowledge or permission of the Layani Plaintiffs.  *Id.* ¶ 152.  The amended articles "list[ed] as a new 100% owner, a third party named Laurindo Figueiredo Dacosta, to whom

Defendants appear to have sold for an undisclosed price all shares in 4004 Oakford Ave. LLC, including the Layani Plaintiffs' shares." *Id.*  Plaintiffs assert: "Defendants unjustly and unlawfully converted to their own use—and continue to retain—the proceeds of the sale of all the shares of 4004 Oakford Ave. LLC., including the proceeds of the unauthorized sale of Plaintiffs' shares." *Id.* ¶ 164; *see also id.* ¶ 152.

### 4. 3905 W. Forest Park Ave ("Property 4")

In January 2015, B. Ouazana and WAZ-I, through Dahan, contacted the Layani Plaintiffs about a four-unit multi family building located at 3905 West Forest Park Avenue in Baltimore ("Property 4"). *Id.*  ¶ 108.  I. Ouazana represented that the "'[f]oreclosure listing price'" was $70,000, and that there would be "renovations costs and other expenses," warranting a sale price of $170,000. *Id.* ¶ 111.  The Ouazanas also indicated that WAZ-I owned the property and that the property contained four rental units, each with two bedrooms.  *Id.* ¶¶ 113, 114.

On April 23, 2015, the Layani Plaintiffs transferred the agreed-upon package price of $170,000 to Waz Properties Inc., as directed by the Ouazanas.  *Id.* ¶ 112.  On June 11, 2015, I. Ouazana emailed Julien Layani a "falsified deed dated June 4, 2015," which stated that "Defendant WAZ-I had conveyed title to this property to Plaintiff Britt for the sale price of $145,000."  *Id.* ¶ 116.  However, Maryland property records contain a second recorded deed to the property, which shows that WAZ-I purchased the property for $30,000 on June 17, 2015, after WAZ-I ostensibly conveyed title to the property to Britt.  *Id.* ¶¶ 115-17.

In addition, Property 4 did not contain four rental units, as defendants had represented.  *Id.* ¶¶ 114, 133.  During a "site visit" in March 2018, the Layani Plaintiffs discovered that Property 4 is actually a single-family building.  *Id.* ¶ 133.  They also discovered at that time that the property

was being rented to "a business operating an assisted living facility on the entire premises without Plaintiffs' knowledge or permission, and without proper insurance or business licenses." *Id.* ¶ 135.

### 5.  626 E. 35th Street ("Property 5")

On February 3, 2015, I. Ouazana, through Dahan, contacted the Layani Plaintiffs about an investment opportunity at 626 E. 35th Street in Baltimore ("Property 5"), described "as a single unit rental property (a rowhouse)." *Id.* ¶ 167.  Conversations about the investment opportunity transpired over the following two months. *Id.* ¶ 169.  The Ouazanas and I&B claimed that WAZ-I had purchased Property 5 at auction for $45,000. *Id.*  ¶¶ 169, 170. They offered to sell the property for a "package" price of $73,000, which accounted for "settlement fees and recording expenses," "needed repairs and permits," and "Waz Investment Fees." *Id.* ¶ 171; *see also id.* ¶ 167. Moreover, defendants represented that Property 5 would generate a "'cash on cash return' of 14.73% after expenses based on monthly rent of US$1,250 and gross yearly income of US$15,000." *Id.* ¶ 169.  In addition, the transaction was "coupled with a management agreement" by which defendants were to manage Property 5 for a fee of 8%. *Id.* ¶ 167.

The parties agreed to a sale price of $68,000. *Id.* ¶ 172.  On March 26, 2015, the Layani Plaintiffs transferred that sum to third party Waz Properties Inc. *Id.*

However, defendants misrepresented their ownership of Property 5; they did not own it in February 2015. *Id.* ¶ 173.  A deed to Property 5, recorded on April 15, 2015, showed that I&B, not WAZ-I, purchased the property at auction on April 10, 2015. *Id.* ¶¶ 173-75.  And, I&B paid $25,000, not $45,000, as represented. *Id.* ¶¶ 174, 175.

### 6.  805 N. Lakewood Avenue ("Property 6")

On April 19, 2015, I. Ouazana, through Dahan, contacted the Layani Plaintiffs about investing $55,000 in a "joint enterprise" as to "a single unit rental property (a rowhouse)" located

at 805 N. Lakewood Avenue in Baltimore ("Property 6"). *Id.* ¶ 192.  Defendants were to manage Property 6 for their standard fee of "8 percent." *Id.*  Defendants represented that WAZ-I purchased Property 6 at auction for $24,000, and that the property would generate $12,600 in annual rental income. *Id.* ¶¶ 194-96.  On April 23, 2015, the Layani Plaintiffs transferred $52,000 to defendants. *Id.* ¶ 197.

However, a deed to the property, recorded on June 17, 2015, indicated that on June 4, 2015, WAZ-I purchased Property 6 for just $5,000. *Id.* ¶¶ 199, 200.  I. Ouazana emailed a deed to Julien Layani on June 11, 2015.  *Id.* ¶ 202.  It indicated that WAZ-I conveyed title to Property 6 to Britt on June 4, 2015, for a price of $5,000.  *Id.*

### 7.  2649 Marbourne Ave. ("Property 7")

On July 23, 2015, I. Ouazana, through Dahan, offered the Layani Plaintiffs an investment in a single unit rental property at 2649 Marbourne Avenue in Baltimore ("Property 7").  *Id.* ¶ 218. Over the following week, the Ouazana Brothers represented that  they had purchased the property at auction for $35,000.  *Id.* ¶ 220.  But, plaintiffs also claim that defendants represented that WAZ-I owned the property.  *Id.* ¶ 222.

Defendants offered a package price of $60,000 for Property 7, along with a management fee of "8 percent."  *Id.* ¶ 218.  On July 30, 2015, the Layani Plaintiffs paid defendants the "negotiated" sum of $58,000 for Property 7.  *Id.* ¶ 221.

However, land records showed that I&B, not WAZ-I or the Brothers, owned Property 7. *Id.* ¶ 222.  A deed to the property, recorded on August 11, 2015, indicated that I&B purchased Property 7 on August 11, 2015, *i.e.*, after it was sold to the Layani Plaintiffs, and paid $30,000, not $35,000, as represented.  *Id.* ¶¶ 222, 223.

### 8.  1605 Homestead, 2643 Kennedy KD43, 2651 Kennedy KD51 ("Property 8")

In October 2016, I. Ouazana offered the Layani Plaintiffs an investment opportunity in a twenty-six-unit rental property spanning three buildings, described as "1605 Homestead, 2643 Kennedy – KD43, and 2651 Kennedy – KD51" (collectively, "Property 8"). *Id.* ¶ 241.  Essentially, the offer entailed the Layani Plaintiffs becoming a fifty-percent owner of Property 8 and advancing a $300,000 down payment. *Id.* ¶¶ 240-44.  The Brothers were to manage the property "in exchange for a management fee of 5%." *Id.* ¶ 241.

A contract was executed "by all parties" on January 10, 2017. *Id.* ¶ 242.  Under the contract, the purchase price for the property was about $1.2 million, to be financed with a loan of $878,000 to WAZ-B. *Id.* ¶ 244.  Plaintiffs were to fund the full $300,000 down payment. *Id.*  Of that amount, $137,500 was a loan to defendants. *Id.* ¶ 246.  I. Ouazana claimed a credit against the $300,000 for half of the $25,000 he claimed to have advanced for acquisition costs. *Id.* ¶¶ 245, 246.  The contract also provided that a new limited liability company, called "Homestead 613 LLC," would become the owner of Property 8. *Id.* ¶ 243.  Homestead 613 LLC would be owned in equal parts by WAZ-B and Britt. *Id.* ¶¶ 243, 256; *see id.* ¶ 244.

Sometime in late January 2015, the Layani Plaintiffs wired $300,000 to I. Ouazana's personal bank account, as required by the contract. *Id.* ¶ 251.  However, Homestead 613 LLC was never created. *Id.* ¶ 256.  And, "as late as June 6, 2019, Defendants engaged in various transactions which they recorded in the Maryland land records, purporting to unlawfully establish Defendants' 100% ownership of this property through entities under their full control . . . without Plaintiff's knowledge or permission." *Id.* ¶ 258.  Plaintiffs allege: "Defendants unjustly and unlawfully converted to their own use -- and continue to retain -- the Plaintiffs' ownership shares in this property." *Id.* ¶ 266.

15

### 9. Property Management

According to the Layani Plaintiffs, the defendants "falsely represented that they were diligently managing all of the Plaintiffs' properties . . . which included making payments [in] good faith to third-party contractors and pursuing payment of missing rent amounts from tenants in the landlord-tenant court and through debt collectors." *Id.* ¶ 77; *see id.* ¶¶ 101, 128, 160, 185, 211, 234, 263. Defendants allegedly "exploited the Layani Plaintiffs' trust and inability to easily check the Defendants' false representations in Baltimore, owing to Plaintiffs residing in France and Israel." *Id.* ¶ 58; *see also id.* ¶¶ 10, 11, 52, 94, 122, 179, 205, 228, 253. Among other things, defendants allegedly "retained and converted to their own use missing rent amounts and amounts after charging Plaintiffs for what appeared to be fictitious repairs that Defendants made up." *Id.* ¶ 79; *see id.* ¶¶ 104, 162, 187, 213, 236, 265.

In particular, defendants sought reimbursement from plaintiffs for the cost of putative repairs for which they provided no documentation: $3,173 for Property 1, *id.* ¶¶ 74; $1,815.80 for Property 2, *id.* ¶ 98; $11,872 for Property 3, *id.* ¶ 157; $5,385 for Property 4, *id.* ¶ 126; $3,491.25 for Property 5, *id.* ¶ 182; $2,470.25 for Property 6, *id.* ¶ 208; $1773.9 for Property 7, *id.* ¶ 231; and $11,872.30 for Property 8, *id.* ¶ 260. Further, defendants allegedly withheld rental income, including the following: $6,900 for Property 1, *id.* ¶ 76; $7,252 for Property 2, *id.* ¶ 100; $7,077 for Property 3, *id.* ¶ 159; $24,957 for Property 4, *id.* ¶ 137; $15,938 for Property 5, *id.* ¶ 184; $675 for Property 7, *id.* ¶ 233; and an unspecified amount for Property 8, *id.* ¶ 262. And, the Ouazanas denied Layani access to property management records. *Id.* ¶¶ 129, 161, 186, 235, 264.

On July 31, 2018, the Layani Plaintiffs, "frustrated with Defendants' refusal to provide transparency in their management of Plaintiff's properties, . . . terminated all their management agreements with Defendants." *Id.* ¶ 80. But, defendants "continued collecting the Layani

Plaintiffs' rents" from various properties and "refused to account for the amounts unlawfully retained. . . ."  *Id.* ¶ 81; *see id.* ¶ 189.

In October 2018, I. Ouazana informed Julien Layani "that Plaintiff Britt had been sued in its capacity as owner of a property Defendants sold Plaintiffs."  *Id.*  ¶ 53.  The Complaint does not specify which property was implicated in that suit.  But, the Complaint alleges that in October 2018, the Layani Plaintiffs learned that defendants had allowed various properties to "fall into severe disrepair," had "failed to respond to official code violation notices," had "failed to pay assessed fines," and caused "property to be listed for tax sale."  *Id.* ¶ 82; *see id.* ¶¶ 106, 139, 190, 216, 239.

### B. The Ragones Properties

The Complaint asserts that "the Ouazana Defendants implemented their fraudulent scheme upon Plaintiff Ragones, then based in Las Vegas, by using false pretenses and representations to attract and induce him and Plaintiff RDNA to invest in 6 rental real properties located in Baltimore . . . ."  *Id.* ¶ 269.  However, the Complaint only identifies four such properties.  The allegations as to the four properties are set forth, *infra*.

In addition, plaintiffs allege, *id.* ¶ 270:

Defendants actively concealed their acts and omissions from Plaintiff Ragones until August 29, 2017, when Plaintiff Ragones first heard rumors leading him to discover by happenstance that Defendant Isaac Ouazana and the other Ouazana Defendants had sold a property that was jointly owned with Plaintiff Ragones, without his knowledge and permission. Upon learning this information, Plaintiff Ragones started making inquiries about the other investment opportunities that Defendants sold him and visiting each of the many properties that he bought from or through Defendants, discovering only then, the extent of the fraud conducted by [the Ouazanas].

17

After losing "all trust and confidence in Defendants," Ragones "canceled the management contract with them for all his properties." *Id.* ¶ 360.[8]

### 1. 4415 Pall Mall Avenue ("Property 9") & 2802 Harford Road ("Property 10")

In July 2015, I. Ouazana solicited Ragones to invest in rental units in Baltimore that Ragones would own and that defendants would manage. *Id.* ¶¶ 296, 315. Both are single-family units. *Id.* One is located at 4415 Pall Mall Avenue ("Property 9"). *Id.* ¶ 296. The other is located at 2802 Harford Road ("Property 10"). *Id.* ¶ 315.

Although Ragones was "based" in Las Vegas, Nevada at the time, he met with I. Ouazana in Baltimore. *Id.* ¶¶ 269, 297, 316. I. Ouazana represented that he and "the other Defendants[] owned" Property 9 and Property 10 "outright," and that they "were ready, willing and able to sell [the properties] to Plaintiff Ragones." *Id.* ¶¶ 297, 316. Further, he stated that the price for each was $35,000, *id.* ¶¶ 301, 318, with the "full package price" for each property in the sum of $53,000. *Id.* ¶¶ 296, 311, 315, 306, 320.

I. Ouazana requested a "deposit" of $175,000. *Id.* ¶¶ 299, 317. It is not entirely clear what that sum represented, but it appears to pertain to several properties. *Id.* ¶¶ 299, 317. In any event, on August 21, 2015, Ragones wired $175,000 to the Ouazanas. *Id.* ¶¶ 301, 318.

Maryland land records indicate that at the time, a third party, Jackson Santvil, owned Property 9, contrary to defendants' representations. *Id.* ¶¶ 298, 306. A deed to Property 9, recorded on October 1, 2015, indicates that the property was conveyed to Ragones's investment entity, RDNA, by Santvil for the "fictitious price" of $22,000, not $53,000. *Id.* ¶ 306. A deed to Property 10, recorded on September 16, 2015, indicates that the property was conveyed to RDNA

---

[8] Ragones "attempted to resolve [his] claims against Defendants under Rabbinical Supervision in Beit Din, prior to instituting these proceedings." *Id.* ¶ 34. But, "Defendants refused to appear . . . ." *Id.* "Beit Din" or "Bais Din" means "Rabbinical Court." *See* ECF 24-7.

by I&B, an entity controlled by the Ouazanas, for the "fictitious price" of $21,000, not $53,000. *Id.* ¶ 320.

In early August 2016, Ragones decided to sell Property 9 and asked I. Ouazana "to help find a purchaser for it." *Id.* ¶ 307. Shortly thereafter, I. Ouazana sold Property 9 to a third party without informing Ragones. *Id.* ¶ 308. And, when I. Ouazana subsequently told Ragones of the sale, he claimed he sold Property 9 for $48,000. *Id.* ¶ 308. However, a recorded deed to the property indicates that the sale price was $5,000. *Id.* ¶ 309.

As to Property 10, from August 2015 to March 2016, I. Ouazana represented to Ragones that defendants were having repairs performed. *Id.* ¶ 324. During that time, Ragones also received one putative "rent payment." *Id.* ¶ 328. However, Ragones visited the property in March 2016 and "discovered for the first time that the property was still boarded up, not in rentable condition, that no repairs had in fact been completed and that no tenant lived or had lived in this property during the time that Plaintiff Ragones owned it." *Id.* Indeed, the property was "in a state of severe disrepair." *Id.* ¶ 325.

Ragones asked I. Ouazana to "find a buyer" for Property 10. *Id.* ¶ 329. Shortly thereafter, I. Ouazana informed Ragones that the property had been sold for $48,000, without prior consultation with Ragones. *Id.* ¶ 330. But, a deed to the property, dated March 23, 2016, indicates that the sale price was $62,000. *Id.* ¶ 331. Defendants "appear to have benefited from the help of" John Doe Defendants, who "performed the real estate closing" and "arranged to forward the sale proceeds" to I. Ouazana, "and not to the actual seller, RDNA. . . ." *Id.* ¶ 334.

### 2. 1109 Lyndhurst Street ("Property 11")

In July 2015, I. Ouazana offered Ragones an opportunity to purchase a single-unit rental property located in Baltimore at 1109 Lyndhurst Street ("Property 11"). *Id.* ¶ 337. Ragones

"transferred to Defendants . . . the agreed acquisition price of $35,000," plus $18,000 for renovations. *Id.* ¶¶ 338, 341. The Ouazanas and WAZ-I represented to Ragones that the property had been conveyed to him. *Id.* ¶ 345. However, for almost twenty-two months, defendants concealed that they had not transferred the title, as agreed. *Id.*¶ 346. Thereafter, Ragones learned "through other means" that I. Ouazana "recorded a deed dated June 19, 2016," which falsely "reported a sale price" of $5,000, rather than the $35,000 actually paid. *Id.* ¶ 348.

At some point in 2017, Ragones "discover[ed]" various misrepresentations "by accident," including that defendants did not transfer the title, as agreed. *Id.* ¶ 346. Moreover, the building was vacant, lacked a use and occupancy permit, and required "extensive renovations." *Id.* ¶ 340. Ragones confronted the defendants, who "finally documented the conveyance as demanded, representing to [Ragones] that the documentation . . . reflected the agreed terms of the sale of the property." *Id.* ¶ 347. But, the Ouazanas did not provide Ragones with the documentation, and the representations were allegedly false. *Id.* ¶ 348.

As to the management of Property 11, plaintiffs assert various acts of wrongdoing. However, it is not entirely clear from the Complaint when the alleged acts or events occurred.

According to plaintiffs, the Ouazanas and "the other Defendants" withheld $2,000 in rental income, ostensibly to pay property taxes, but did not remit the money for taxes. *Id.* ¶ 349. Defendants also made false representations that the property was being rented. *Id.* ¶¶ 349, 355-57. In addition, they "left unpaid fines and penalties of US$3,415 resulting from their nonpayment of taxes and from additional fines assessed for unabated housing code violations." *Id.* ¶ 352; *see id.* at ¶¶ 350, 351.

Thereafter, Ragones learned that defendants had rented the property "without a use and occupancy permit in place and had done work on the property without any permits," which led to

"multiple administrative citations and tickets" and an administrative designation of "'vacant status.'" *Id.* ¶ 361.   Ragones expended $10,000 "to change its 'vacant status' and obtain an occupancy permit." *Id.* ¶ 362.

### 3.   3335 Edmondson Ave. ("Property 12")

In July 2016, I. Ouazana offered Ragones "an introductory deal" to acquire a fifty-percent interest in a single-unit rental property at 3335 Edmondson Avenue in Baltimore ("Property 12"), for the sum of $2,500.   *Id.* ¶ 271.   I. Ouazana was to own the other 50%.   *Id.*   And, Property 12 would be managed by the defendants for a fee.   *Id.*   Ragones and I. Ouazana met in Baltimore to discuss the transaction.   *See id.* ¶¶ 272, 273.   Defendants were to obtain all permits and complete renovations so that the property would generate rental income in four months.   *Id.* ¶ 273.   Shortly thereafter, Ragones paid the Ouazanas $2,500.   *Id.* ¶ 274.

However, despite representations to the contrary, *id.* ¶ 278, defendants never "convey[ed] to Plaintiff Ragones . . . a 50% ownership interest in the property."   *Id.* ¶ 279.   Further, plaintiffs allege, *id.*:

> [O]n July 20, 2016, Defendant Isaac Ouazana, with the help of Defendants JOHN DOE or JANE DOE and JOHN DOE ENTITIES, which appear to have included a title company and title agent, caused Defendant WAZ-I to make and record a deed conveying full ownership of this property to third-party Yaakov Krozier, LLC, for the recorded consideration of US$5,000. . . .

I. Ouazana "personally signed the deed" on July 20, 2016, conveying the property from WAZ-I to Krozier.   *Id.* ¶ 282.   But, defendants concealed the transfer of Property 12 to a third party.   *Id.* ¶ 280.

On August 29, 2017, I. Ouazana executed a written agreement that stated that Ragones and I. Ouazana "'each ha[d] 50% ownership in this property,'" and that the property cannot be sold without either owner's consent.   *Id.* ¶ 281.   The agreement specified: "'If any of the parties bring

an offer on any of the properties listed above, the other party will accept offer [sic] or each partner can pay out the other partner their 50% share according to the offer in 90 business days grace period [sic].'"  *Id.*  In addition, the agreement stated that Ragones, rather than defendants, was responsible for the renovation of Property 12, and that I. Ouazana was to be reimbursed for his expenditures for materials as well as renovations that had already been performed on the property. *Id.* ¶ 283.

According to plaintiffs, the August 2017 agreement was inconsistent with defendants' prior conduct as to Property 12.  As noted, I. Ouazana conveyed to a third party a deed to Property 12, recorded on July 22, 2016. *Id.* ¶ 282; *see id.* ¶¶ 280, 285.  And, between 2016 and 2017, defendants repeatedly "hid[] their failure to make agreed repairs and to document the conveyance" to Ragones of his 50% interest.  *Id.*  ¶ 277; *see id.* ¶¶ 278, 280, 286, 287.

At some point, "Ragones heard rumors" that I. Ouazana "had sold [Property 12]" for $75,000, without Ragones's "knowledge or permission."  *Id.* ¶ 284.  Ragones then confronted I. Ouazana about the unauthorized sale.  *Id.* ¶ 285.  The Complaint does not specify when the confrontation occurred.  At first, I. Ouazana told Ragones that "he had sold [Property 12] to a friend . . . because he thought that Plaintiff Ragones did not want it."  *Id.*  But, I. Ouazana then said that Property 12 "was still in [his] possession . . . and that he would not sell [it] without permission from" Ragones.  *Id.*  I. Ouazana did not reveal that Property 12 had already been conveyed to Krozier.  *Id.*

Sometime "between August 27, 2017 and November 7, 2017," Ragones visited and inspected Property 12.  *Id.* ¶ 289.  He "found the property was still boarded up, in shell condition and that no repairs had in fact been done beyond demolition work that he himself had done."  *Id.* Ragones "repeatedly asked Defendants to produce copies of invoices from third parties," but

defendants never did so.  *Id.* ¶ 290; *see id.* ¶ 291.  And, on November 7, 2017, the "Ouazana Defendants" told Ragones that they had completed "$36,500 worth of  renovations," for which they sought reimbursement.  *Id.* ¶ 289; *see id.* ¶ 288.  Nevertheless, in November 2017, Ragones paid defendants $2,081, supposedly for his share of property taxes, even though he was not the owner.  *Id.* ¶ 293.

Ragones "sustained damages" as to Property 12.  *Id.* ¶ 294.  The damages included, *inter alia*, the "sums that Defendants obtained from him with respect to this investment," *id.*, and the loss of "ownership, use, possession, and benefit" of Property 12.  *Id.* ¶ 295.

Additional facts are included, *infra*.

## II.  The Surreply Motion

Local Rule 105.2(a) provides that a party is not permitted to file a surreply without permission of the court.  Although the filing of a surreply "is within the Court's discretion, *see* Local Rule 105.2(a) . . . they are generally disfavored."  *EEOC v. Freeman*, 961 F.Supp.2d 783, 801 (D. Md. 2013), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see also, e.g., Chubb & Son v. C & C Complete Servs., LLC*, 919 F.Supp.2d 666, 679 (D. Md. 2013).  However, a surreply may be permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's reply.  *Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F.Supp.3d 519, 529 (D. Md. 2014) (quotations and citations omitted).  Conversely, a surreply is generally not permitted where the reply is merely responsive to an issue raised in the opposition.  *See Khoury v. Meserve*, 268 F.Supp.2d 600, 605-06 (D. Md. 2003).

Plaintiffs advance three primary arguments in support of their Surreply Motion.  First, they assert that in defendants' reply, defendants characterize the RICO claims and class claims as

fabrications.  ECF 27 at 2.  And, according to plaintiffs, defendants suggest that plaintiffs bring those claims in bad faith.  *Id.*  In my view, defendants do not argue bad faith or suggest any wrongdoing by plaintiffs (or plaintiffs' counsel) that might raise colorable claims under Fed. R. Civ. P. 11.  Although defendants' reply might adopt an expressive (and aggressive) tone at points, it does not present new legal arguments that warrant a surreply.

Nor do I discern a basis for granting the Surreply Motion on the ground that defendants made "incorrect legal arguments" in their reply.  Although the proposed surreply expresses strong disagreement with various legal arguments made by defendants in their reply, *see* ECF 27-3, those arguments are natural extensions of contentions made in the Motion to Dismiss and in plaintiff's opposition.

In addition, plaintiffs take issue with defendants' response to the exhibits submitted by plaintiffs with their opposition.  As noted, plaintiffs appended seven exhibits with their opposition. ECF 24-1 to ECF 24-7.  In defendants' reply, they assert that plaintiffs improperly presented "new facts" that were not set forth in the Complaint's factual allegations.  ECF 26 at 10.  In plaintiffs' view, a surreply is necessary to respond to that contention.  *See* ECF 27 at 2.

I discuss, *infra*, the circumstances in which a court may consider exhibits appended to a complaint, a motion to dismiss, or a brief submitted in opposition to a motion to dismiss.  As I explain, I may consider some of the exhibits submitted by plaintiffs, but not others.  However, plaintiffs do not discuss the rules that are pertinent to that analysis.  Rather, they contend that the Court may properly consider all of the exhibits, pursuant to the principle articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

In particular, plaintiffs draw on the following statement: "[O]nce a claim has been stated adequately, it may be supported by any set of facts consistent with the allegations in the

complaint." *Id.* at 546.  Plaintiffs misunderstand this statement: it does not permit a court freely

to consider any and all exhibits submitted with briefing on a motion to dismiss.  The rules that

govern whether a court may consider such exhibits are discussed, *infra*.

Accordingly, I shall deny plaintiffs' Surreply Motion.

### III.  The Sanctions Motion

Plaintiffs seek a Court order to rectify what they characterize as "Defendants' ongoing

campaign of witness tampering."  ECF 30 at 4.  The alleged campaign of misconduct is primarily

directed at Phillipe Lerner, identified by plaintiffs as a "key witness" in this case.  *Id.*  According

to plaintiffs, the Ouazanas have taken assorted actions to intimidate and/or bring disrepute to

Lerner, in an effort to cause him to "stop providing information about Defendants' fraud."  *Id.*

Such actions include aggressively confronting Lerner at work; pressuring a rabbi to expel Learner

from his synagogue and to brand him as a "'mossar'";[9] harassing Lerner's wife in a supermarket;

and posting "fake reviews online" about Lerner's bookkeeping business and compelling others to

post such reviews, with the aim of harming Lerner's livelihood.  *Id.*; *see id.* at 9.  In plaintiffs'

view, the Court's intervention is needed because defendants "refuse to stop or even acknowledge

their misconduct, and are instead doubling down on their bad faith tactics . . . ."  *Id.* at 5.

In support, plaintiffs have submitted nine exhibits: Lerner's affidavit (ECF 30-1); the

affidavit of Rabbi Yossef Zvi Weiss, the rabbi of the Jewish congregation to which Lerner belongs

(ECF 30-2); screenshots of reviews of Lerner's business posted on the internet (ECF 30-3, ECF

30-4); the affidavit of Samuel Curtis Hill, a former tenant of "WAZ Management" (ECF 30-5 at

---

[9]  Plaintiffs assert that "mossar" is a "derogatory Hebrew word combining the meanings of 'snitch' and traitor, and which refers to Jewish persons who report, outside the Jewish community, the misconduct of other Jewish persons."  ECF 30 at 4.

2); and copies of correspondence between plaintiff's counsel and defense counsel from July 2020 (ECF 30-6 to ECF 30-9).

In his affidavit, Lerner avers that he "became involved in trying to right the many wrongs occasioned by the defendants by providing to the plaintiffs in this case information about what [he] had witnessed that the Defendants did as part of their fraud." ECF 30-1, ¶ 6. He asserts: "Defendants have engaged in a systematic campaign to intimidate me in order to get me to stop." *Id.*

According to Lerner, this campaign began after the State-court action was filed in early 2019, and before this suit was filed. *Id.* ¶ 7. I. Ouazana appeared at Lerner's office, creating a disturbance, and screamed at Lerner that he "had no right to get involved in matters involving the Ouazanas" and demanded that Lerner "stop providing information" about the Ouazanas' "practices." *Id.* In November 2019, the Ouazanas confronted Rabbi Weiss and demanded Lerner's expulsion from the synagogue. *Id.* ¶ 8. Lerner avers that the Brothers continued their intimidation tactics with Rabbi Weiss after this suit was filed. *See id.* ¶ 9. Rabbi Weiss's averments are consistent with those of Lerner. *See* ECF 30-2.

Further, Lerner avers that the Ouazanas' harassment and threats did not end with Rabbi Weiss. B. Ouazana and Ruben Ouazana, another brother, allegedly harassed Lerner's wife at a kosher supermarket, "shouting insults and gesturing towards her, making her uncomfortable and fearful." *Id.* ¶ 11; *see id.* ¶ 13.

The Brothers are also allegedly responsible for the posting of "several fake negative reviews" of Mr. Lerner's bookkeeping business on "Google Reviews, a website read by prospective clients where former clients post reviews about local businesses." *Id.* ¶ 13; *see id.* ¶¶ 2-3. Lerner avers: "The fake review posted under the name of Jack Vaz was likely posted by Isaac

OUAZANA, as he commonly uses the a.k.a. Jack instead of Isaac, and often substitutes one or more letters in his last name, having used the spelling Wazana instead of Ouazana, and shortened his name to Waz for many purposes . . . and substituted the letter V in Vaz for the W he otherwise uses in Waz." *Id.*   ¶ 15.

Another "fake review" was allegedly "posted under the name Latoya Mcleod [sic]." *Id.* ¶ 16. According to Lerner, Latoya McLeod "is a business tenant in one of the buildings operated by the Ouazana defendants, and has no connection" to Lerner's company. *Id.*[10]  Lerner contacted McLeod, who informed him by text message: "'Yes somebody asked to use my phone maybe they day [sic] did this but I don't know you guys.'" *Id.* But, McLeod "refused to identify who asked to use her phone and also refused to remove her review." *Id.* And, Lerner references other reviews for which he believes defendants are responsible. *See id.* ¶¶ 17, 20.

In addition, Lerner avers that the Ouazanas "now claim . . . that [he] posted fake reviews about Mr. Isaac OUAZANA's wife." *Id.* ¶ 19. He disputes the contention, stating: "I did no such thing and will willingly testify to this fact under oath." *Id.* However, ECF 30-9 shows that on July 30, 2020, defense counsel emailed plaintiff's counsel copies of what defense counsel represented were negative reviews of the dental practice of I. Ouazana's wife, which were posted by Lerner. *Id.* at 2.

Hill describes an encounter with I. Ouazana on July 13, 2020. *See* ECF 30-5. Hill's "former landlord" was "WAZ Management," of which I. Ouazana is the "owner or manager." *Id.* ¶ 1. According to Hill, I. Ouazana asked whether Hill "was still happy living in [his] apartment." *Id.* ¶ 2. Hill said: "[W]hile I was generally happy, I needed to have some repairs done to my apartment, which repairs I had requested since at least 2017 . . . ." *Id.* ¶ 4. In response, I. Ouazana

---

[10] The spellings "Mcleod" and "McLeod" both appear in ECF 30-1, ¶ 16.

told Hill "to post a negative review about the new property manager, Mr. Philippe Lerner and his accounting firm PL Consulting, and that this would cause these repairs to be completed in less than 30 days." *Id*. ¶ 5.   However, Hill learned that neither Lerner nor his bookkeeping business were involved with the management of Hill's apartment.  *Id.* ¶ 6.

As noted, ECF 30-6 to ECF 30-9 contains copies of emails exchanged between counsel. The details of the correspondence need not be recounted in full.  Essentially, it appears that on July 14, 2020, plaintiff's counsel informed defense counsel about some of the factual allegations underlying the Sanctions Motion and asked defendants to cease their alleged misconduct.  *See* ECF 30-6 at 2.   Ten days later, plaintiffs' counsel repeated the request.   ECF 30-7 at 2. A flurry of correspondence followed.  *See* ECF 30-8; ECF 30-9.

On the basis of these contentions, plaintiffs ask the Court to "invoke its inherent authority to sanction Defendants' ongoing crusade to suppress the truth, which now involves witness tampering" and is allegedly intended "to gain a litigation advantage."  *Id.* at 12.  They seek an order requiring defendants to: "(a) reimburse Plaintiffs' legal fees and costs; (b) remove fake reviews Defendants posted or caused others to post about Mr. Lerner; and (c) cease all misconduct, including harassment of witnesses and parties." *Id.* at 5.  The Sanctions Motion is not based upon statute or the Federal Rules of Civil Procedure.  Nor do plaintiffs seek to have defendants held in contempt for failure to comply with a court order.  *See Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 267 (4th Cir. 2019).

Defendants "deny the factual allegations that form the basis for Plaintiffs' motion."  ECF 32 at 3.  But, they do not focus on contesting the particulars of any of the assertions or averments raised in plaintiffs' Sanctions Motion or the accompanying exhibits.  In their view, properly

addressing plaintiffs' "'he said, he said' allegations would, at a minimum, require a lengthy evidentiary hearing." *Id.* at 2 n.1.

Instead, defendants primarily challenge plaintiffs' legal arguments, contending that the authority cited by plaintiffs "does not support the imposition of sanctions" for the alleged misconduct. *Id.* at 3. In short, defendants argue that plaintiffs have failed to explain "how Mr. Lerner qualifies as a witness in this case," *id.* at 8, and that plaintiffs have failed to cite any apposite cases. *Id.* at 3-7. In addition, defendants assert that the timing of the Sanctions Motion is suspect and intended to keep this suit "on life support." *Id.* at 10. Finally, defendants add that if Lerner, a non-party to this action, desires a remedy for harassment or defamatory online posts, he should directly initiate legal action himself. *Id.*

A court has the inherent power to order sanctions, so as "to preserve the integrity of the judicial process," *In re Jemsek Clinic, P.A.*, 850 F.3d 150, 157 (4th Cir. 2017), and "to punish bad-faith conduct intended to delay or disrupt the course of litigation or to impede enforcement of a court order." *Govindaraj*, 931 F.3d at 267; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991); *Buffington v. Baltimore Cty.*, 913 F.2d 113, 132 n.15 (4th Cir. 1990). A "court acting under its inherent authority may impose sanctions for any 'conduct utterly inconsistent with the orderly administration of justice.'" *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 375 (4th Cir. 2013) (quoting *United States v. Nat'l Med. Enters., Inc.*, 792 F.2d 906, 912 (9th Cir. 1986)). When so acting, a court "must consider the whole of the case in choosing the appropriate sanction." *Projects Mgmt. Co.*, 734 F.3d at 375.

Courts possess the inherent power to assess attorney's fees, "even though the so-called 'American Rule' prohibits fee shifting in most cases." *Chambers*, 501 U.S. at 45. Of relevance here, "a court may assess attorney's fees when a party has 'acted in bad faith, vexatiously,

wantonly, or for oppressive reasons.'" *Id.* at 45-46 (cleaned up) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)); *see also Akira Techs., Inc. v. Conceptant, Inc.*, 773 F. App'x 122, 125 (4th Cir. 2019) (per curiam) (same); *Am. Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 321 (4th Cir. 2003) (citing *Chambers*).   Under this principle, the assessment of attorney's fees may be warranted "if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,'" or "when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'"   *Chambers*, 501 U.S. at 46 (citations omitted).

In *Goodyear Tire & Rubber Co. v. Haeger*, ___ U.S. ___, 137 S. Ct. 1178, 1186 (2017), the Supreme Court clarified that a sanction assessing attorney's fees for bad faith or like conduct "must be compensatory rather than punitive in nature."   The Court explained: "In other words, the fee award may go no further than to redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior."   *Id.* (citation omitted).   To order a fee award as punishment rather than compensation, "a court would need to provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof."   *Id.*; *see also Lu v. United States*, 921 F.3d 850, 860-62 (9th Cir. 2019) (discussing and applying *Goodyear*); *Mulugeta v. Ademachew*, 1:17-CV-649, 2019 WL 7945712, at *2-3 (E.D. Va. Nov. 6, 2019) (same).   Even when such a standard of proof is satisfied, the moving party may recover "'only the portion of his fees that he would not have paid but for' the misconduct."   *Goodyear*, 137 S. Ct. 1178, 1187 (quoting *Fox v. Vice*, 563 U.S. 826, 836 (2011)).

Notably, the Supreme Court has cautioned: "Because of their very potency, inherent powers must be exercised with restraint and discretion."   *Chambers*, 501 U.S. at 44.   The Seventh Circuit has elaborated on that instruction.   In *Zapata Hermanos Sucesores, S.A. v. Hearthside*

*Baking Co., Inc.*, 313 F.3d 385, 390 (7th Cir. 2002), Judge Posner, writing for the Court, stated (brackets added):

> The inherent authority of federal courts to punish misconduct before them is not a grant of authority to do good, rectify shortcomings of the common law . . . or undermine the American rule on the award of attorneys' fees to the prevailing party in the absence of statute. . . .  [I]t is a residual authority, to be exercised sparingly, to punish misconduct (1) occurring in the litigation itself, not in the events giving rise to the litigation (for then the punishment would be a product of substantive law—designed, for example, to deter breaches of contract), and (2) not adequately dealt with by other rules, most pertinently here Rules 11 and 37 of the Federal Rules of Civil Procedure, which [the defendant] has not been accused of violating.

In light of the case law discussed above, it is clear that plaintiffs have not shown that they are entitled to recover attorney's fees.  They do not assert that defendants have committed fraud on the Court or failed to comply with a Court order.  Even if the affidavits submitted by plaintiffs demonstrate that defendants have engaged in bad faith, vexatious, wanton, or oppressive conduct, plaintiffs have not demonstrated a causal connection between defendants' misconduct and specific expenditures of attorney's fees, as required by *Goodyear*, 137 S. Ct. 1178, 1187.

As noted, plaintiffs also ask the Court to order defendants to remove fake reviews about Lerner's business, posted by defendants, or which defendants induced others to post, and to discontinue harassing "witnesses and parties."  ECF 30 at 5.  Plaintiffs do not identify any cases in which a court sanctioned misconduct analogous to the sort alleged here.  Nor do they cite any cases in which a court fashioned equitable sanctions similar to those requested by plaintiffs, pursuant to the court's inherent powers.  But, that is perhaps unsurprising.  After all, inherent powers are to be "exercised sparingly." *Zapata Hermanos Sucesores*, 313 F.3d at 390.

Plaintiffs characterize Lerner as a "witness," as mentioned.  ECF 30 at 4.  And, they describe defendants' conduct as "witness tampering." *Id.*  But, plaintiffs seem reluctant to explain the nature of Lerner's connection to this suit; they fail to explain to how Lerner qualifies as a witness or how he is relevant to the allegations in the suit. *See* ECF 32 at 7-8.

In particular, defendants note that Lerner's name does not appear anywhere in the Complaint. *See id.* at 8. And, defense counsel asked plaintiff's counsel by email to "'describe Mr. Lerner's 'connection with this case.'" *Id.* (quoting correspondence of July 25, 2020, as shown in ECF 30-8 at 4). But, the question went unanswered. *See* ECF 32 at 8; ECF 30-8 at 3-4.

In plaintiffs' reply, they remain rather tight-lipped about the nature of Mr. Lerner's connection to this case or of the pertinent knowledge that he possesses. Instead, they insist that defendants would not be targeting Lerner if he did not possess information that might be helpful to defendants' opponents in litigation. *See* ECF 33 at 8-10.

To be sure, plaintiffs present assertions of conduct by defendants that are of concern to the Court. Lerner has averred that he possesses information about defendants' "fraud," and that he has provided plaintiffs with that information. ECF 30-1, ¶ 6. The affidavits from Lerner, Rabbi Weiss, and Hill indicate a persistent and pernicious effort by the Ouazanas to harass, threaten, or intimidate Lerner for sharing information with plaintiffs about defendants' business practices. Defendants are not entitled to harass, intimidate, or threaten Lerner in an effort to keep him from sharing information with plaintiffs about defendants' business practices.

However, apart from the request for attorney's fees, plaintiffs essentially ask the Court to enjoin defendants from "engag[ing] in any *further* misconduct in this case." ECF 30 at 18 (emphasis added). To qualify for a preliminary injunction under Fed. R. Civ. P. 65, a plaintiff must demonstrate that he is "likely to suffer irreparable harm in the absence of preliminary relief." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 979 F.3d 219, 226 (4th Cir.), *reh'g en banc granted*, 831 F. App'x 662 (4th Cir. 2020). That requirement does not necessarily apply here because plaintiffs do not seek a preliminary injunction pursuant to Rule 65.

Nevertheless, the underlying principle is relevant.  Plaintiffs seek a form of equitable relief. At a minimum, they ought to have thoroughly described and explained the harm for which they seek redress.  *See* Rule 65(d)(1)(C) (mandating that every injunction and restraining order must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required").  Instead, plaintiffs insist on characterizing Lerner as a witness while going to lengths to *avoid* clarifying the nature of his connection to the suit.  Without more information, I cannot ascertain the import of the alleged misconduct as it relates to this case.

Even if plaintiffs had been more forthcoming, it is not clear that a sanction is warranted. As noted, in *Zapata Hermanos Sucesores, S.A.*, 313 F.3d at 390, the Seventh Circuit cautioned that a court should not draw on its inherent authority to sanction misconduct "in the events giving rise to the litigation . . . ."  *Id.*  In Lerner's affidavit, Lerner avers that the Ouazanas began harassing him in "early 2019" and sought his expulsion from the synagogue in late November 2019.  This conduct occurred before suit was filed in February 2020.  ECF 30-1, ¶¶ 7, 8.  Although Lerner avers that the Ouazanas continued their campaign of intimidation and harassment, he does not explicitly address when other specific incidents occurred.  *See id.* at 4-6.  Thus, plaintiffs' evidence does not clearly establish that specific acts of misconduct occurred after suit was filed.

Plaintiffs also ask the Court to order defendants to remove the allegedly fake online reviews about Lerner's business.  In this regard, plaintiffs seek remediation for past harms suffered by Lerner, not plaintiffs.  If Mr. Lerner desires a remedy for any harms caused by those reviews, he must pursue such a remedy for himself.

Therefore, although the averments are troubling, I shall deny the Sanctions Motion, without prejudice.[11]

## IV. Legal Standards

### A. Rule 12(b)(1)

Fed. R. Civ. P. 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. *See Khoury v. Meserve*, 628 F. Supp. 2d 600, 606 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004).   Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Demetres v. E. W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3); *see also Trazell v. Arlington Cty.*, 811 F. App'x 857, 857 (4th Cir. 2020) (per curiam); *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 196 (4th Cir. 2008).  The court may properly grant a motion to dismiss for lack of subject matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction."  *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005) (citing *Crosten v. Kamauf*, 932 F. Supp. 676, 679 (D. Md. 1996)).

"[B]efore a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court."  *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  In *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014), the Fourth Circuit observed: "Fundamental to our federal system is the principle that '[f]ederal courts are courts of limited jurisdiction.'" (quoting *Kokkonen v. Guardian*

---

[11] I make no ruling at this juncture as to whether, at a trial, plaintiffs would be entitled to adduce evidence of the defendants' alleged inappropriate conduct.

*Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)) (alteration in *Hanna*); *see United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir.), *cert. denied*, 558 U.S. 875 (2009).  Thus, a federal district court may only adjudicate a case if it possesses the "power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2007).  Indeed, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed." *Hanna*, 750, F.3d at 432.

Notably, a federal court has "an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).  If a party seeks to proceed in federal court, it "must allege and, when challenged, must demonstrate the federal court's jurisdiction over the matter." *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008).  And, pursuant to Fed. R. Civ. P. 12(h)(3), "the court must dismiss the action" if it determines that the court lacks subject matter jurisdiction. *See also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006).  This is because "jurisdiction goes to the very power of the court to act." *Ellenburg*, 519 F.3d at 196.

Further, "[a] court is to presume ... that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper." *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (emphasis in *Poole*) (citing *Kokkonen*, 511 U.S. at 377).  Moreover, "[s]ubject matter jurisdiction cannot be forfeited or waived, and can be raised by a party, or by the court sua sponte, at any time prior to final judgment." *In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010); *see also McCulloch v. Vélez*, 364 F.3d 1, 5 (1st Cir. 2004) ("It is black-letter law that a federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction."); *Snead v. Board of Educ. of Prince George's County*, 815 F. Supp. 2d 889, 893-94 (D. Md. 2011).

Congress has conferred jurisdiction on the federal courts in several ways. To provide a federal forum for plaintiffs who seek to vindicate federal rights, Congress has conferred on the district courts original jurisdiction over civil actions that arise under the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 1331; *see also Exxon Mobil Corp.,* 545 U.S. at 552; *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012); *see also* U.S. Constitution Art. III, § 2 ("The Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made ..."). This is sometimes called federal question jurisdiction.

In addition, "Congress ... has granted district courts original jurisdiction in civil actions between citizens of different States, between U.S. citizens and foreign citizens, or by foreign states against U.S. citizens," so long as the amount in controversy exceeds $75,000. *Exxon Mobil Corp.,* 545 U.S. at 552; *see* 28 U.S.C. § 1332(a). Article III, § 2 of the Constitution permits a federal court to decide "Controversies ... between Citizens of different States." *Navy Federal Credit Union v. Ltd. Financial Services LP*, 972 F.3d 344, 352 (4th Cir. 2020). Diversity jurisdiction "requires complete diversity among parties, meaning that the citizenship of *every* plaintiff must be different from the citizenship of *every* defendant." *Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) (emphasis added); *see Strawbridge v. Curtiss,* 7 U.S. 267 (1806).

Of relevance here, CAFA grants subject matter jurisdiction to district courts over class actions in which the aggregate number of members of the plaintiff class is 100 or more, any member of the plaintiff class is a citizen of a state different from any defendant, and the aggregate amount in controversy exceeds $5 million.  *See* 28 U.S.C. § 1332(d)(2)(A), (5)(B).

Under the "well-pleaded complaint" rule, facts showing the existence of subject matter jurisdiction "must be affirmatively alleged in the complaint." *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178 (1936)). Moreover, the "burden of establishing subject matter jurisdiction is on ... the party asserting jurisdiction." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); *accord Hertz*, 599 U.S. at 95; *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true.'" *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted) (alteration in original); *see also Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *accord Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 524 (D. Md. 2014). In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192. "Generally . . . the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't Of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Evans*, 166 F.3d at 647.

Defendants do not specify whether they bring a facial challenge or a factual challenge. But, they clearly state that, for purposes of their Motion, they take "the facts pled in Plaintiffs'

37

Complaint as true." ECF 19 at 18 n.1. Accordingly, I will construe the Motion to Dismiss as a facial challenge to jurisdiction.

### B. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy

38

Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts."  *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the

factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243); *see Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (citation omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th

40

Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218

(2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may

consider documents beyond the complaint without converting the motion to dismiss to one for

summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may properly consider documents that are "explicitly incorporated into the

complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166

(citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir.

2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg*

*v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n*

*v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004);

*Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true,

the district court should consider the nature of the document and why the plaintiff attached it."

*Goines*, 822 F.3d at 167.  "When the plaintiff attaches or incorporates a document upon which his

claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents

of the document, crediting the document over conflicting allegations in the complaint is proper."

*Id.*  Conversely, "where the plaintiff attaches or incorporates a document for purposes other than

the truthfulness of the document, it is inappropriate to treat the contents of that document as true."

*Id.*

Moreover, "a court may properly take judicial notice of 'matters of public record' and other

information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*,

791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007);

*Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Plaintiffs did not append any exhibits to the Complaint.  But, they included seven exhibits with their opposition to the Motion to Dismiss.  *See* ECF 24-1 to ECF 24-7.

The exhibits at ECF 24-1, ECF 24-3, and ECF 24-4 contain records of communications, primarily emails, that plaintiffs' counsel received from non-parties concerning their ostensible dealings with defendants.  According to plaintiffs, ECF 24-5 contains records of communications between plaintiffs' counsel and previous counsel for defendants from July 2019, before this action was initiated.  *See* ECF 24-5 at 60.  In ECF 24-2, plaintiffs submit a copy of a news article published about the filing of the Complaint.  *See* Edward Ericson Jr., *Investors Sue Baltimore Real Estate Company for Racketeering*, COURTHOUSE NEWS SERVICE (Feb. 19, 2020), https://www.courthousenews.com/investors-sue-baltimore-real-estate-company-for-racketeering/.  And, ECF 24-7 contains correspondence to the Court from Rabbi Yosef Rosenfeld, Administrator of the Baltimore Bait Din.  The correspondence, dated June 9, 2020, states that Ragones brought a claim in the Baltimore Bait Din against the Ouazanas.  *Id.*  In addition, the letter states that ten other "claimants" also brought claims against "Waz Management" and the Ouazana Brothers.  *Id.*

Five of the exhibits are not integral to the Complaint or to plaintiffs' claims.  Therefore, in resolving the Motion, I shall not consider ECF 24-1, ECF 24-3, ECF 24-4, ECF 24-5, or ECF 24-7.

ECF 24-6 contains a copy of the "(Consented) Stipulation Of Dismissal Without Prejudice To Refile" from the previous State-court litigation referenced in the Complaint.  *See* ECF 1, ¶ 53; ECF 24 at 65.  I may take judicial notice of the stipulation, pursuant to Fed. R. Evid. 201.  Likewise, I may take judicial notice of the news article submitted in ECF 24-2.  However, taking judicial notice of the article does not entail accepting the truth of its content.

## C. Rule 9(b)

Fed. R. Civ. P. 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Rule 9(b).  *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that an MCPA claim that "sounds in fraud[] is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Under the rule, a claim that sounds in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  *United States ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citation omitted); *see Fessler v. Int'l Business Machines Corp.*, 959 F.3d 146 (4th Cir. 2020).  In other words, Rule 9(b) requires the plaintiff to

plead "the who, what, when, where, and how of the alleged fraud" before the parties can proceed to discovery. *United States ex rel. Wilson v. Kellogg Brown & Root*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted).

> Rule 9(b) serves several salutary purposes:
>
> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

## IV.  Federal Question Jurisdiction

### A. RICO Claims

Defendants urge dismissal of the RICO claims, contending that plaintiffs have failed to plead allegations in support of the existence of a pattern of racketeering activity or of a RICO enterprise.  ECF 19 at 23-31.  Defendants also contend that plaintiffs' claims are barred by RICO's four-year statute of limitations, and that plaintiffs "[i]mpermissibly [r]ely on [s]ecurities [v]iolations," contrary to 18 U.S.C. § 1964(c).  *Id.* at 31-37.  Plaintiffs oppose the Motion to Dismiss at each step of the RICO analysis.  ECF 24 at 35-46.

### 1. RICO Generally

Congress enacted the Racketeer Influenced and Corrupt Organizations law as Title IX of the Organized Crime Control Act of 1970, Pub. L. No. 91–452, 84 Stat. 922 (1970), 18 U.S.C. §§ 1961-1968.  *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997).  Under 18 U.S.C. § 1962, it is unlawful, *inter alia*, for any person employed by or associated with any enterprise to conduct or participate in the "enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).

RICO is not limited to criminal cases.  In addition to criminal penalties, Congress "granted a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of' the RICO provisions."  *ESAB Grp.*, 126 F.3d at 626 (citing 18 U.S.C. § 1964(c)).

A civil RICO action "'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'"  *U.S. Airline Pilots Ass'n v. Awappa, LLC,* 615 F.3d 312, 317 (4th Cir. 2010) (citation omitted); *see, e.g.*, *Lewis v. Maryland*, PWG-17-1636, 2018 WL 1425977, at *5 (D. Md. Mar. 22, 2018); *Bailey v. Atlantic Auto. Corp.*, 992 F. Supp. 2d 560, 578 (D. Md. 2014).  But, the Fourth Circuit "will not lightly permit ordinary business contract or

fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988).

To plead a civil RICO claim, the plaintiff must allege "'1) conduct [causing injury to business or property] 2) of an enterprise 3) through a pattern 4) of racketeering activity.'" *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)); *see Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (citing 18 U.S.C. §§ 1962, 1964); *see also Bhari Info. Tech. Sys. Private Ltd. v. Sriram*, 984 F. Supp. 2d 498, 503 (D. Md. 2013); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 842 (D. Md. 2013); *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 472 (D. Md. 2012).

A prevailing plaintiff in a civil RICO action is entitled to treble damages, costs, and attorney's fees. *Friedler v. Cole*, CCB-04-1983, 2005 WL 465089, at *7 (D. Md. Feb. 28, 2005). The Supreme Court has characterized RICO's civil penalties as "'drastic.'" *Awappa*, 615 F.3d at 317 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989)); *see* 18 U.S.C. § 1964(c)).

Congress has directed that the statute "be liberally construed to effectuate its remedial purposes." Pub. L. 91–452, § 904(a), 84 Stat. 941, 947. But, "Congress contemplated that only a party engaging in widespread fraud would be subject to" the "serious consequences" available under the RICO statute, such as treble damages. *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989). And, courts have recognized the "need to limit [RICO's] severe penalties to offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." *Friedler*, 2005 WL 465089, at *7.

The Fourth Circuit has noted the "distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *El-Shamari*, 217 F.3d at 238.  It has admonished that courts must

> exercise caution "to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted."

*Awappa*, 615 F.3d at 317 (quoting *Menasco, Inc.*, 886 F.2d at 683) (ellipsis in *Awappa*).

In other words, RICO "'is reserved for conduct whose scope and persistence pose a special threat to social well-being.'" *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008) (quoting *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 551 (4th Cir.2001)), *aff'd*, 353 F. App'x 864 (4th Cir. 2009).  It applies to "'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *Menasco, Inc.*, 886 F.2d at 684 (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)).

In order to analyze the adequacy of a RICO claim, it is important to understand RICO's terms and concepts.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  *See, e.g.*, *Boyle*, 556 U.S. at 944; *Kimberlin v. Nat'l Bloggers Club*, GJH-13-3059, 2015 WL 1242763, at *3 (D. Md. Mar. 17, 2015).  In *Mitchell Tracey*, 935 F. Supp. 2d at 842, the court explained:

> An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009).  "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett*, 763 F.2d 628, 631 n.2 (4th Cir. 1985).

Because "'an enterprise includes any union or group of individuals associated in fact,'" RICO extends to "'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 944 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)).   And, a RICO enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Boyle*, 556 U.S. at 948; *see United States v. Pinson*, 860 F.3d 152, 162 (4th Cir. 2017) (stating that a RICO enterprise "need not have a rigid structure…..").   However, "'[v]ague allegations of a RICO enterprise . . . lacking any distinct existence and structure' will not survive dismissal." *Mitchell Tracey*, 935 F. Supp. 2d at 843 (citation omitted; modifications in *Mitchell Tracey*).

Notably, "an association-in-fact enterprise must have at least three structural features." *Boyle*, 556 U.S. at 946.   These include "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.*; *accord Pinson*, 860 F.3d at 161.

"Racketeering activity" is defined in § 1961(1)(B) to include a laundry list of "indictable" acts, such as mail fraud, wire fraud, and financial institution fraud.   However, "RICO is not 'aimed at the isolated offender.'"   *Zepkin*, 812 F.2d at 155 (quoting *Sedima*, 473 U.S. at 496 n.14). Therefore, "[t]he pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." *Lipin Enters. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).   Although "two acts are necessary, they may not be sufficient." *Sedima*, 473 U.S. at 496 n.14.

To prove a pattern, a plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of *continued* criminal activity." *H.J. Inc.*, 492 U.S. at 239 (first emphasis in original; second emphasis added).  Judge Chasanow has reiterated: "To allege a pattern of racketeering activity, a plaintiff must present facts making it plausible, rather than possible, that: (1) at least two predicate acts occurred within ten years of each other; (2) the predicate acts were related; and (3) the acts 'amount to or pose a threat of continued criminal activity.'" *Swarey v. Desert Capital REIT, Inc.*, DKC-11-3615, 2012 WL 4208057, at *12 (D. Md. Sept. 20, 2012) (quoting *H.J. Inc.*, 482 U.S. at 239).

Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted).  And, the enterprise's actions must affect interstate commerce. *Sterling v. Ourisman Chevrolet of Bowie, Inc.* 943 F. Supp. 2d 577, 587-88 (D. Md. 2013).

Moreover, a pattern of racketeering activity must also involve *continued* criminal activity. *H.J. Inc.*, 492 U.S. at 239.  The Fourth Circuit has adopted a "flexible" approach to the "continuity" requirement. *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1989), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996).  Courts utilize a "case-by-case analysis, *Capital Lighting and Supply, LLC v. Wirtz*, JKB-17-3765, 2018 WL 3970469, at *6 (D. Md. Aug. 20, 2018), and consider "the 'criminal dimension and degree' of the alleged misconduct." *HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987) (citation omitted); *see Zepkin*, 812 F.2d at 155 ("[N]o mechanical test can determine the existence of a RICO pattern."); *Brandenburg*, 859 F.2d at 1185 (noting that continuity depends on "all the facts and circumstances of the particular case—with special attention to the context in which the predicate acts occur").

"'Continuity' is both a closed – and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241.  The Fourth Circuit explained in *Menasco*, 886 F.2d at 683-84:

> Continuity . . . refers to a closed period of *repeated* conduct, or to past conduct that by its nature projects into the future with a threat of *repetition*. To satisfy the continuity element, a plaintiff must show that the predicates themselves amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity. Significantly, [p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Thus, predicate acts must be part of a prolonged criminal endeavor.

(Internal quotation marks, citations, and parentheticals omitted; alteration and emphasis in original).

As to continuity, "[f]acts relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185.

Where a fraud claim is asserted as the predicate act for a civil RICO violation, Rule 9(b)'s particularity requirement applies.  *See, e.g.*, *Lewis*, 2018 WL 1425977, at *5 (applying heightened pleading standard to claims under RICO); *Healy v. BWW Law Grp., LLC*, PWG-15-3688, 2017 WL 281997, at *6 (D. Md. Jan. 23, 2017) (same); *Kimberlin v. Hunton & Williams LLP*, GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mr. 29, 2016) (applying Fed. R. Civ. P. 9(b) to RICO claim based on mail or wire fraud), *aff'd*, 671 F. App'x 127 (4th Cir. 2016); *Bailey*, 992 F. Supp. 2d at 584 ("A plaintiff must plead circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity pursuant to Fed. R. Civ. P. 9(b).") (citations and quotation marks omitted); *Sriram*, 984 F. Supp. 2d at 505.

## 2. Securities Fraud

Section 1964(c) of 18 U.S.C. gives rise to a private cause of action under RICO.  However, the statute specifies "that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." *Id.*  According to defendants, plaintiffs allege conduct by defendants that falls under § 1964's exclusion of claims pertaining to "fraud in the purchase or sale of securities."  *See* ECF 19 at 31-33.  Defendants point to ¶ 40, n.2 of the Complaint, which states:

> Maryland law views as "securities" any investment schemes combining the sale of an interest in real property with a management agreement with the seller to expend the efforts necessary to fulfill the Plaintiffs' profit expectation.  It is a matter of record that Defendants have not registered these securities with the Maryland Securities Division within the Office of the Attorney General. *See MD Code, Corporations and Associations, § 11-501(1)*.  Plaintiffs reserve the right to seek leave to amend this complaint, as warranted, with any proper state or federal securities claims.

In defendants' view, the footnote quoted above constitutes grounds to dismiss Counts One and Two.  Without offering analysis of how courts have construed § 1964(c), defendants assume that "conduct that would have been actionable as fraud in the purchase or sale of securities" encompasses securities law as defined under Maryland law.  Although defendants cite numerous cases in which courts applied the statutory bar, none of those cases relied on State laws concerning securities fraud.

Multiple federal appellate courts have explained that the pertinent language in § 1964(c) references *federal* securities law.  "Actions for fraud in the purchase or sale of securities are controlled by section 10b of the Securities Exchange Act of 1934."  *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir. 2010); *see also Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 334 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 2674 (2020) ("By its terms, the bar in § 1964(c) . . . requires asking whether the fraud . . . alleged . . . would be actionable under the

securities laws, in particular under section 10(b) [of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b)], and [SEC] Rule 10b-5 [17 C.F.R. § 240.10b-5]) (brackets added); *Bixler v. Foster*, 596 F.3d 751, 759–60 (10th Cir. 2010) (providing a similar construction); *Affco Investments 2001, LLC v. Proskauer Rose, LLP*, 625 F.3d 185, 189–90 (5th Cir. 2010) (same).

Defendants do not contend that plaintiffs have alleged misconduct that is actionable under federal securities laws.  Therefore, I reject the contention that Count One and Count Two are barred by the exclusionary clause of § 1964(c).

### 3. Limitations

"The statute of limitations on private civil RICO claims is four years, beginning on the date the plaintiff 'discovered, or should have discovered, the injury.'"  *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 476 (4th Cir. 2015) (quoting *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 266 (4th Cir. 2001)).  A cause of action accrues when the plaintiff "has actual or constructive knowledge of his or her claim." *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020).  Under the so-called discovery rule, accrual cannot occur until the plaintiff has, or should have, "possession of the critical facts that he has been hurt and who has inflicted the injury." *United States v. Kubrick*, 444 U.S. 111, 122 (1979); *see also*, *e.g.*, *Nassim v. Md. House of Corr.*, 64 F.3d 951 (4th Cir. 1995) (en banc); *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010), *aff'd*, 495 F. App'x 350 (4th Cir. 2012).

The application of the injury discovery rule is generally fact-sensitive.  *See*, *e.g.*, *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011) ("While determining inquiry notice often presents questions of fact more appropriate for a trier of fact, 'nonetheless the test is an objective one and dismissal is appropriate when the facts from which knowledge may be

imputed are clear from the pleadings.'") (citation omitted), *aff'd*, 699 F.3d 141 (2d Cir. 2012); *Wilson v. Parisi*, 549 F. Supp. 2d 637, 656 (M.D. Pa. 2008) ("An analysis of the injury discovery rule is extremely fact-specific."); *see also, e.g.*, *Richardson v. Cella*, 1 F. Supp. 3d 484, 495 (E.D. La. 2014); *Tanaka v. First Hawaiian Bank*, 104 F. Supp. 2d 1243, 1248-49 (D. Haw. 2000).

Defendants are of the view that Counts One and Two are time-barred because plaintiffs' RICO claims accrued in November 2014, more than five years before this suit was filed.  The gist of the argument is that the claims accrued in November 2014 because, according to the Complaint, at that time "Plaintiffs" learned of defendants' alleged misconduct as to Property 2.  ECF 19 at 36. Therefore, defendants insist that, under the doctrine of inquiry notice, which applies to RICO claims, the claims accrued by November 2014.  *Id.*

Defendants begin with ¶¶ 90 and 91 of the Complaint.  *See* ECF 19 at 35.  There, plaintiffs allege that on November 3, 2014, I. Ouazana emailed to Julien Layani a copy of the deed to Property 2, "bearing' the date of November 3, 2014.  ECF 1, ¶ 90.  The deed reflected that the seller was Munitrust REO, not WAZ-I, and that the recorded sale price was $16,000, not $55,000, "as represented."  *Id.*  Further, plaintiffs allege that between September 1, 2014 and November 3, 2014, defendants "concealed" that "the terms of the transaction" were "materially different from those represented to and agreed by Plaintiffs . . . ."  *Id.* ¶ 91.

Thus, according to defendants, plaintiffs' own allegations establish that as of November 2014, plaintiffs "were on notice that the Defendants . . . (i) misrepresented themselves as the true owners of the property when it was sold to Plaintiffs; (ii) misrepresented the actual sale price of the property; and (iii) used the money that was advanced by Plaintiffs to purchase property that the Defendants did not own at the time they entered into a management agreement regarding the property."  ECF 19 at 36.  Further, defendants assert that under the doctrine of inquiry notice, the

discovery in November 2014 qualified as a "'storm warning[]' . . . sufficient to put Plaintiffs on inquiry notice as to every transaction commenced with defendants . . . ." *Id.* (quoting *Mathews v. Kidder, Peabody & Co. Inc.*, 260 F.3d 239, 252 (2001)).

Moreover, defendants underscore that, according to the Complaint, Ragones learned of defendants' misrepresentations as to Property 10 in March 2016.  Plaintiffs allege that in March 2016 Ragones visited Property 10 and found it to be "boarded up, not in rentable condition," and "that no repairs had in fact been completed and that no tenant lived or had lived in this property during the time that Plaintiff Ragones owned it." ECF 1, ¶ 328.  According to defendants, this discovery "further confirmed" plaintiffs' knowledge of defendants' misconduct.  ECF 19 at 36.

Curiously, defendants do not attempt to explain how, under their theory, the Layani Plaintiffs' knowledge about misconduct in the context of Property 2 put Ragones on notice of any wrongdoing.  The Complaint does not identify any link between the Layani Plaintiffs and Ragones, save that they were each involved with the defendants during an overlapping time period. Clearly, the allegations do not support defendants' sweeping contention that Ragones's RICO claims accrued in November 2014, given that his dealings with defendants began in July 2015.

The only pertinent allegations concerning Ragones that defendants identify are those concerning Ragones's site visit to Property 10 in March 2016.  *See* ECF 19.  The Complaint does not provide a specific date for that site visit.  *See* ECF 1, ¶ 328.  But, even if it occurred on March 1, 2016, and Ragones's RICO cause of action accrued on that date, his RICO claims are nevertheless timely.  Plaintiffs filed suit on February 19, 2020.  That was close to the four-year mark, but prior to the expiration of the limitations clock.  ECF 1.  The RICO claims of Ragones and RDNA are timely.

The timeliness of the RICO cause of action for the Layani Plaintiffs is thornier.  To be sure, ¶¶ 90 and 91 of the Complaint indicate that in November 2014, the Layani Plaintiffs learned of defendants' misrepresentations concerning key aspects of their purchase of Property 2.  In plaintiffs' opposition, they insist that they did not gain knowledge of injury at that time, despite the fact that the deed to Property 2 reflected a different seller and sale price than had been expected based on the defendants' representations.  ECF 24 at 63.  Plaintiffs assert, *id.*:

> The deed correctly listed Layani's holding company Britt Investments Baltimore, LLC as the new property owner, which is what Layani focused on rather than other incorrect information that, in and of itself, seemed peripheral. . . . [T]he deed did not signify to him that he sustained an injury at all: he expected a deed made out to his holding company and he received a deed made out to his holding company.

The argument of plaintiffs conveniently characterizes the information as "peripheral." ECF 24 at 63.  However, plaintiffs have clearly alleged that defendants' scheme involving real estate transactions entailed the  deliberate misrepresentation as to the owner, value, characteristics, and quality of the properties.  *See*, *e.g.*, ECF 1, ¶ 41.

In particular, plaintiffs allege that the discrepancies between the agreed-upon purchase price for Property 2 and the price reflected in property records "lower[ed] Plaintiffs' tax basis," and thus "expose[d] Plaintiffs to having to pay higher conveyance taxes than they should when they sell" the property.  *Id.* ¶ 92.  In other words, plaintiffs clearly allege that defendants' misconduct as to the purchase of Property 2 caused them injury.  And, of significance here, ¶¶ 90 and 91 of the Complaint indicate that by November 2014, the Layani Plaintiffs learned about such misrepresentations as to Property 2.  That notice puts the suit beyond limitations, at least as to Property 2.

Defendants also contend that Layani's discovery of issues regarding Property 2 put him on notice of all of defendants' alleged misconduct.  They are of the view that when Layani received the deed to Property 2, and realized that it differed from the representations about the property on

which he supposedly relied, Layani either was on notice of the entire alleged scheme or incurred a duty to investigate. In other words, defendants characterize the revelation as to Property 2 as inseparable from the entirety of the alleged misconduct, even though the bulk of the alleged fraudulent activity had not yet occurred. They rely primarily on *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148-53 (2d Cir. 2012), in which the Second Circuit ruled that the plaintiff's RICO claims were time-barred under RICO's injury discovery rule.

There, the plaintiff, William Koch, purchased wine purportedly "linked" to Thomas Jefferson and bottled in 1787. *Id.* at 145. In 2000, Koch had samples of the wine tested to determine its age. *Id.* at 147. In October 2000, Koch received a report that cast doubt on the wine's authenticity. *Id.* The But, Koch did not take any additional action to "conduct a reasonably diligent investigation" into the wine until 2005. *Id.* at 153.

The court set forth a "detailed description of when inquiry notice occurs," under Second Circuit precedent. It said, *id.*at 151 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005)):

> Inquiry notice—often called "storm warnings" in the securities context—gives rise to a duty of inquiry "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." In such circumstances, the imputation of knowledge will be timed in one of two ways: (i) "[i]f the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose"; and (ii) if some inquiry is made, "we will impute knowledge of what an investor in the exercise of reasonable diligence[ ] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud."

Of relevance here, the court stated that this description of inquiry notice "applies equally in RICO cases." *Id.* Applying this law, the court determined that "inquiry notice had been triggered" as of 2000, when Koch received the report as to the wine's authenticity. *Id.*at 153. In particular, the court reasoned that the report, along with other clues, "would suggest to a reasonably

intelligent person that the wine was not authentic." *Id.*  Accordingly, "the duty to inquire" arose

upon receipt of the report—more than four years before Koch acted on that duty.  *Id.*

Unlike this case, *Koch* involved allegations of fraud and misrepresentation at a single

moment in time—when the plaintiff purchased the wine.  In contrast, the Layani Plaintiffs engaged

in dealings with the defendants as to eight separate properties over a period of four years, from

2014 to 2018.  Moreover, plaintiffs have alleged misconduct involving real estate transactions as

well as misconduct in the management of the properties, which I have described, *supra*.

Given that the Complaint organizes many of the facts by property, it is intuitive to focus

on the wrongdoing as to each property as a separate injury.  Several circuits apply the so-called

separate accrual rule to RICO claims.  The Supreme Court observed in *Klehr v. A.O. Smith Corp.*,

521 U.S. 179, 190 (1997) (brackets added):

> [S]ome Circuits have adopted a "separate accrual" rule in civil RICO cases, under
> which the commission of a separable, new predicate act within a 4–year limitations
> period permits a plaintiff to recover for the additional damages caused by that act.
> But . . . the plaintiff cannot use an independent, new predicate act as a bootstrap to
> recover for injuries caused by other earlier predicate acts that took place outside the
> limitations period.

To my knowledge, the Fourth Circuit has not adopted the separate accrual rule, even when

squarely presented with opportunity to do so.  For example, in *Cherrey v. Diaz*, 991 F.2d 787, at

*3 (4th Cir. 1993 Apr. 16, 1993) (per curiam) (unpublished table opinion), the Court stated: "The

[plaintiffs] urge us to adopt and apply the 'rule of separate accrual,' a doctrine which creates a

separate civil RICO action for each new and independent injury suffered by a plaintiff. . . .  We

find it unnecessary to adopt the rule."  *See also CSX Transp., Inc. v. Gilkison*, 406 F. App'x 723,

730 n.3 (4th Cir. 2010) (per curiam) (finding it unnecessary to address appellant's "argument

regarding the separate accrual rule" in light of the Court's resolution of the limitations question);

*Detrick v. Panalpina, Inc.*, 108 F.3d 529, 539 n.18 (4th Cir. 1997) (noting that the Second Circuit

has adopted "a rule of separate accrual," without elaborating on the rule or relying on it). Accordingly, it would seem that a property-by-property application of the injury discovery rule is not expressly authorized under existing Fourth Circuit case law.

On the other hand, the cases cited above also reveal that the Fourth Circuit has never expressly rejected the rule of separate accrual. And, those cases did not involve an opportunity to evaluate the potential application of the rule to facts similar to those here.

In this case, plaintiffs allege injuries arising out of several separate and distinct purchases of real property between July 2014 and July 2015. Certainly, the Layani Plaintiffs' discovery in November 2014 of falsehood in defendants' representations as to Property 2 should have alerted them to the possibility of duplicity in the earlier transaction involving Property 1. But, the exchanges that led to the transactions involving Properties 3 through 8 had not commenced as of November 2014. As alleged in the Complaint, each of those transactions entailed its own terms, negotiations, and price, even if they also had some shared characteristics. *Compare Cherrey*, 991 F.2d at *3 (indicating that plaintiffs purchased multiple properties from defendants at a single closing).

Moreover, the Complaint clearly alleges two distinct "types" of fraud within the overall scheme: "Marketing/Selling type of fraud; and (b) Property Management type of Fraud." ECF 1, ¶ 9. Among other things, the alleged property management fraud involved withholding rental income and charging plaintiffs for repairs to the properties that were never actually performed. *Id.* ¶¶ 79, 104, 162, 187, 213, 236, 265. And, in October 2018 the Layani Plaintiffs learned that defendants had allowed the properties to remain in or fall into disrepair and become subject to tax sales, among other things. *See id.* ¶¶ 53, 82, 106, 139, 190, 216, 239. Defendants do not even

attempt to explain how the Layani Plaintiffs' discovery of injury in November 2014 as to Property 2 put them on notice of a scheme to defraud with respect to property management.

The doctrine of continuous breach might, by analogy, inform the limitations analysis here. "The Maryland Court of Appeals has long accepted that certain covenants imposing ongoing negative obligations are covenants *de die in diem* and can be breached continuously, or on a daily basis." *Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 556 (4th Cir. 2015) (citing *Kaliopulus v. Lumm,* 155 Md. 30, 141 A. 440 (1928). Under that doctrine, "where a contract provides for continuing performance over a period of time, each successive breach of that obligation begins the running of the statute of limitations anew, with the result being that accrual occurs continuously and a plaintiff may assert claims for damages occurring within the statutory period of limitations." *Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Elec. Co.,* 79 Md. App. 461, 475, 558 A.2d 419, 426 (1989). At this juncture, however, it would be premature to apply the principles of continuous breach to the facts before me.

The Complaint raises questions of fact as to whether discovery of impropriety with Property 2 alerted the Layani Plaintiffs to the possibility of future misconduct. At this stage, the allegations leave "'room for a reasonable difference of opinion'" on the issue. *Carter v. Curators of Univ. of Missouri*, No. 4:18-00426-CV-RK, 2019 WL 1394386, at *2 (W.D. Mo. Mar. 27, 2019) (quoting *Hope v. Klabal*, 457 F.3d 784, 790 (8th Cir. 2006)). Accordingly, I am not prepared to conclude solely on the basis of the Complaint that the RICO claims as to Properties 3 through 8 are time-barred as a matter of law.

Nor do I conclude at this stage that the injury arising from each transaction was necessarily "new and independent." *Bingham v. Zolt*, 66 F.3d 553, 561 (2d Cir. 1995). Of course, pertinent evidence could surface in discovery. And, my ruling would not foreclose a jury from finding that

a reasonable person in the shoes of the Layani Plaintiffs would have sought to investigate any representations made by defendants as to transactions that occurred after November 2014. *See Koch*, 785 F. Supp. 2d at 114; *Wilson*, 549 F. Supp. 2d at 656.[12]

As to the RICO claims, however, the claims of Layani and Britt are time-barred to the extent that they pertain to Property 1 and Property 2 and are based on allegations of racketeering activity characterized in the Complaint as the "Marketing/Selling type of fraud." ECF 1, ¶ 9. But, the RICO claims of Layani and Britt are not barred by limitations insofar as they are based on allegations of racketeering activity that is characterized in the Complaint as "Property Management type of Fraud." *Id.* And, because plaintiffs claim that they did not discover other fraud until October 2018, as alleged in the Complaint, *see* ECF 1, ¶¶ 53, 82, 106, 139, 190, 216, 239, the limitations bar is limited to Property 1 and Property 2. The limitations clock did not begin to run in November 2014 as to events that had not yet occurred.

### 4. Enterprise

Paragraphs 376 to 380 of the Complaint are under the heading "Enterprise Element of Plaintiffs' RICO Claims." Plaintiffs assert that "Defendants were associated with each other for an extended period of time." ECF 1, ¶ 379. Further, plaintiffs allege, *id.*, ¶¶ 377, 378 (emphasis added):

> 377.   At all relevant times, each and every one of Defendants Isaac Ouazana, his brother, Defendant Benjamin Ouazana, Defendants WAZ-I, WAZ-M, WAZ-B, and I&B and Defendants JOHN (JANE) DOEs and JOHN DOE ENTITIES were

---

[12] The fact that plaintiffs continued to do business with defendants after November 2014, despite their knowledge of prior fraudulent misconduct by defendants, might be relevant to the State-law tort claims. For example, in Maryland contributory negligence is a complete defense to a negligence claim. *See Berkenfeld v. Lenet*, 921 F.3d 148, 153 (4th Cir. 2019) (stating that "contributory negligence operates as a complete bar to recovery") (citing *Union Mem'l Hosp. v. Dorsey*, 125 Md. App. 275, 281, 724 A.2d 1272, 1275 (1999)); *see also Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 690, 69 A.3d 1149, 1155 (2013); *Kassama v. Magat*, 136 Md. App. 637, 657 767 A.2d 348, 359 (2001), *aff'd*, 368 Md. 113, 792 A.2d 1102 (2002).

Members of an enterprise in that they were "associated together for a common purpose of engaging in a course of conduct," namely the purpose of furthering Defendants Isaac Ouazana and Benjamin Ouazana's scheme to defraud out-of-state or foreign passive investors by getting these investors to buy properties in Baltimore as directed by Defendants, and to enable Defendants to engage in post-investment looting by becoming managers of the real estate sold to these investors.

378. . . . [A]ll Members of the enterprise were related and carried out specific roles in furtherance of the enterprise. *Defendants Isaac Ouazana and Benjamin Ouazana directed the enterprise.* Defendants WAZ-I, WAZ-M, WAZ-B, and I&B *were the corporate vehicles* through which Defendants Isaac and Benjamin perpetrated their fraud. *Defendants JOHN (JANE) DOEs and JOHN DOE ENTITIES furthered the scheme* by: (a) marketing, as Defendants' agents or representatives, the Defendant's [sic] properties out-of-state and in foreign countries to non-Maryland investors; and (b) enabling Defendants to document conveyances or maintain the appearance of conveyances and to record deeds that these JOHN DOEs and JOHN DOE Entities knew or should have known were fraudulent, as notaries public, title agents and title companies, and by enabling the Ouazana Defendants to obtain control of the Plaintiffs' funds in real estate closings and subsequently while they looted the properties entrusted to Defendants' management.

As noted, to plead a civil RICO claim, a plaintiff must allege "'an enterprise.'" *Morley*, 888 F.2d at 1009 (citation omitted).  To do so, a plaintiff must allege: "(1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity 'separate and apart from the pattern of activity in which it engages.'" *Mitchell Tracey*, 935 F. Supp. 2d at 842 (citation omitted).  A plaintiff may rely on the theory of an associated-in-fact enterprise. *Id.*  Such an enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

Of relevance here, the Supreme Court has explained: "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions,* 533 U.S. at 161; *see also Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 588 (D. Md. 2014) ("There must be a 'person,' alleged to have violated Section 1962(c) and to be

liable to the claimant for damages, who is separate and distinct from the 'enterprise,' or tool, through which the RICO violation occurred.") (citing *Busby v Crown Supply, Inc.,* 896 F.2d 833, 840–41 (1990)).  Under 18 U.S.C § 1961(3), a "'person' can be an individual or corporate entity." *Chambers*, 43 F. Supp. 3d at 588.  And, as noted, § 1961(4) defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

Defendants argue that plaintiffs have not plausibly alleged an enterprise under RICO.  ECF 19 at 28-31.  In particular, they contend that plaintiffs' allegations of a RICO enterprise are inconsistent with the rule that a RICO defendant "cannot be both the defendant 'person' and the 'enterprise.'"  *Id.* at 28 (quoting *Cedric Kushner Promotions v. King*, 533 U.S. 158, 164 (2001)).  According to defendants, plaintiffs' allegations of an associated-in-fact enterprise fail to "plead around the person/enterprise distinction."  ECF 19 at 29.  In their view, plaintiffs have alleged that defendants engaged in misconduct in the course of carrying out their "normal business operations" as managers of "Plaintiffs' real estate investments," which does not fall within the meaning of "enterprise" under RICO.  *Id.* at 31.

In contending that plaintiffs have not satisfied RICO's distinctness requirement, defendants draw on *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 343-45 (2d Cir. 1994).  ECF 19 at 30.  There, the plaintiff alleged that the defendant, a bank, and two individual officers of the bank, "participated in the affairs of an association-in-fact enterprise."  *Riverwoods Chappaqua Corp.*, 30 F.3d at 341.  The court acknowledged that RICO's "distinctness requirement . . . . does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself."  *Id.* at 344.  "Nevertheless," the court explained that, "by alleging a RICO enterprise

that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented." *Id.* Under that rule, the Second Circuit reasoned that RICO's enterprise element was not satisfied because the plaintiff's enterprise theory merely involved bank employees "carrying out the business of that bank." *Id.*

*Riverwoods Chappaqua Corp.* does not advance defendants' position. For one, the Second Circuit relied on an interpretation of § 1962(c) that the Supreme Court later held to be erroneous. *See Cedric Kushner Promotions,* 533 U.S. at 161; *see also Kelco Constr., Inc. v. Spray in Place Sols., LLC,* No. 18-CV-5925(SJF)(SIL), 2019 WL 4467916, at \*7 (E.D.N.Y. Sept. 18, 2019) (noting the effect of *Cedric Kushner Promotions*). The Supreme Court explained that a RICO plaintiff may allege "circumstances in which a corporate employee . . . conducts the corporation's affairs in a RICO-forbidden way" without running afoul of the statute's "'distinctness' principle.'" *Cedric Kushner Promotions,* 533 U.S. at 163.

Here, defendants essentially contend that the Complaint characterizes their "normal business operations" as the basis of a RICO enterprise. ECF 19 at 31. In their view, § 1962(c) is not satisfied by allegations that one or more corporate entities, together with their officers or employees, committed misconduct while engaged in the corporations' usual affairs. *See id.* at 29-30. However, plaintiffs have alleged that the Ouazanas orchestrated an associated-in-fact enterprise involving entities within their control as well as in collaboration with the Doe Defendants.

In other words, plaintiffs do not allege that a single corporation and employees of that corporation formed an associated-in-fact enterprise. Rather, plaintiffs allege that the Ouazana Brothers engaged in conduct forbidden under RICO through the various WAZ entities and I&B,

which served as "corporate vehicles," ECF 1, ¶ 378, and through the participation of the John Doe Defendants, who included "notaries public, title agents and title companies." *Id.*

*Cedric Kushner Promotions*, 533 U.S. at 163, clearly stated that allegations that a corporation is being used in a manner forbidden by RICO—*i.e.*, to enable to or conduct a pattern of racketeering activity—may satisfy § 1962(c)'s enterprise requirement. Therefore, I conclude that plaintiffs' allegations are not inconsistent with the distinctness principle embodied in § 1962(c).

As to the other requirements of a RICO enterprise, plaintiffs have adequately pleaded "an ongoing organization." *Mitchell Tracey*, 935 F. Supp. 2d at 842. They allege that the enterprise was constituted at least as early as June 2014, when Layani began discussing investment opportunities with the Ouazanas, until July 2018, when Layani "terminated" management agreements with defendants. *See, e.g.,* ECF 1, ¶¶ 54, 80. In addition, plaintiffs allege "associates functioning as a continuing unit," *Mitchell Tracey*, 935 F. Supp. 2d at 842: they assert that the Brothers "directed the enterprise," used the WAZ entities and I&B as "vehicles," and collaborated with the John Doe Defendants. ECF 1, ¶ 378. And, plaintiffs allege that the enterprise is "'separate and apart from the pattern of activity in which it engages.'" *Mitchell Tracey*, 935 F. Supp. 2d at 842 (citation omitted).

In *Mitchell Tracey*, the court determined that allegations of unlawful conduct in the sale of title insurance satisfied the "'separate and apart'" prong. *Id.* at 844. The court reasoned: "Such unlawful acts are not conducted in the ordinary course of business."

Here, plaintiffs allege, *inter alia*, that the Ouazanas, in directing the enterprise, misrepresented information about investment properties, including their value, ownership, and condition; engaged in real estate transactions ostensibly on behalf of plaintiffs, yet the terms

diverged from those to which plaintiffs had agreed; misrepresented the condition of rental parties; withheld rental income; and baselessly charged plaintiffs for repairs. By the logic of *Mitchell Tracey*, 935 F. Supp. 2d at 842, such acts satisfy the requirement that the enterprise must be separate and apart from the pattern of activity in which it engages.

Accordingly, I conclude that the allegations are sufficient to plead a RICO enterprise.

### 5. Pattern of Racketeering Activity

To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961. In support of their RICO claim, plaintiffs have alleged multiple predicate acts of racketeering activity, including mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343. *See*, *e.g.*, ECF 1, ¶¶ 389-393.

In order to show mail or wire fraud as a predicate act, a plaintiff must show (1) a scheme to defraud and (2) use of the mails or wires in furtherance of the scheme. 18 U.S.C. §§ 1341, 1343; *Chisolm v. TranSouth Fin. Corp.*, 95 F. 3d 331, 336 (4th Cir. 1996). The elements of the crimes of mail fraud and wire fraud are as follows: (1) use of the mails or interstate wire communications in furtherance of (2) a scheme to defraud for which the defendant acted intentionally, and (3) the scheme "involved a material misrepresentation or concealment of fact." *See* 18 U.S.C. §§ 1341, 1343; *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008).

Plaintiffs must plead fraud claims with particularity. *See* Fed. R. Civ. P. 9(b); *Menasco*, 886 F.2d at 684. This means the Complaint must allege the "time, place, and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby." *Harrison*, 176 F. 3d at 784 (internal citation omitted). "However, '[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which he will have to prepare a defense

at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *Scott v. WFS Fin., Inc.*, No. 2:06cv349, 2007 WL 190237, at *5 (E.D. Va. Jan. 18, 2007) (quoting *Harrison*, 176 F. 3d at 784).

Further, "[w]hile a plaintiff normally must plead specific instances of mail or wire fraud, such a requirement is relaxed where there are 'numerous mailings of standardized documents containing identical false representations.'" *VNA Plus, Inc. v. Apria Healthcare Group, Inc.*, 29 F. Supp. 2d 1253, 1263 (D. Kan. 1998) (quoting *City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 545 (E.D.N.Y. 1987)); *Chambers*, 43 F. Supp. 3d at 598. In these cases, "Rule 9(b) may be satisfied if the complaint sufficiently identifies '[t]he time period involved and the content of the misrepresentations.'" *VNA Plus*, 29 F. Supp. 2d at 1263 (quoting *Hurd v. Monsanto Co.*, 908 F. Supp. 604, 614 (S.D. Ind. 1995)). And, "[t]he mailings or wirings do not have to contain the misrepresentations that defrauded the plaintiff, but merely be in furtherance of the fraudulent, material misrepresentation upon which the plaintiff relied to his detriment and may include mailings and wirings directed at nonparties." *Proctor*, 64 F. Supp. 2d at 473; *see Day v. DB Capital Group, LLC*, DKC-10-1658, 2011 WL 887554, at *10 (D. Md. Mar. 11, 2011); *Schmuck v. United States*, 489 U.S. 705, 710 (1989); *In re Am. Honda Motor Co. Dealerships Litig.*, 941 F. Supp. 528, 546 n.19 (D. Md. 1996).

In addition, to state a RICO claim, a claimant must allege, *inter alia*, a "pattern of racketeering activity." 18 U.S.C. § 1962. The Supreme Court has outlined a two-part test, known as "continuity plus relationship," to determine whether a "pattern of racketeering" exists: "a plaintiff . . . must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 429 U.S. at 239.

Continuity requires either a "closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 429 U.S. at 241.  Closed-ended continuity may be established "by proving a series of related predicates extending over a substantial period of time."  *Id.* at 242; *see Walk v. Baltimore and Ohio R.R.*, 890 F.2d 688, 690 (4th Cir. 1989) ("What constitutes a 'substantial' duration must of course remain a matter for case-by-case determination.").  Whether a pattern reflects continuity that projects into the future "depends on the specific facts of each case."  *H.J. Inc.*, 429 U.S. at 242.  A pattern might qualify if "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or if "the predicate acts or offenses are part of an ongoing entity's regular way of doing business."  *Id.*

Both types of continuity appear to be at issue in this case.  To determine whether a plaintiff has satisfied the continuity requirement, relevant factors to consider include "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185; *see also Friedler*, 2005 WL 465089, at *9 ("[D]etermining whether a pattern exists is a commonsensical, fact-specific inquiry, not a mechanical one determined solely by the number of predicate acts over a given period of time.").

The Fourth Circuit is "cautious about basing a RICO claim on predicate acts of mail and wire fraud because '[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice.'"  *Al-Abood*, 217 F.3d at 238 (quoting *Anderson v. Found. for Advancement, Educ. and Employment of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998)) (internal quotation marks omitted) (alteration in *Anderson*).  "This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases

67

involving a more serious scope of activity." *Al-Abood*, 217 F.3d at 238; *but see Capital Lighting*, 2018 WL 3970469, at *8 (There is no "per se rule against a RICO claim involving only mail and wire fraud.") (*citing* Al-Abood, 217 F.3d at 238).

Defendants contend that plaintiffs' RICO claims are impermissibly predicated on "garden variety business fraud," which courts "have expressly and consistently refused to allow to be brought as RICO claims."  ECF 19 at 26 (citing, *inter alia*, *Al-Abood*, 217 F.3d at 238; *Flip Mortg. Corp.*, 841 F.2d at 538).  To support their contention, defendants rely primarily on *Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 270 (4th Cir. 2010) (per curiam).  ECF 19 at 27-28.

In *Foster*, real estate investors brought RICO claims against a real estate company and individual defendants, alleging that the defendants "made false statements and/or concealed material facts" about various properties purchased by plaintiffs.  363 F. App'x at 270.  The plaintiffs also alleged that "at least some of these alleged fraudulent acts were conducted through interstate communication via the mail and wire, and were perpetrated on 'hundreds' of other out-of-state clients."  *Id.* at 271.

The Fourth Circuit summarily rejected the argument that the alleged misconduct constituted predicate acts under RICO.  The Court stated, *id.* at 274 (brackets in original):

> The case at bar is such an instance of "garden-variety fraud."  Essentially, Plaintiffs allege that Defendants misrepresented their efforts to market for-sale properties, misrepresented or failed to disclose material facts about specific properties, and breached their fiduciary duties.  These are quintessential state law claims, not a "scheme[ ] whose scope and persistence set [it] above the routine." *HMK Corp. v. Walsey,* 828 F.2d 1071, 1074 (4th Cir.1987).

The Court reasoned that its conclusion was "bolstered by the fact that Plaintiffs failed to plead with particularity that any other persons were similarly harmed by defendants' alleged fraud, and

thus failed to show 'a distinct threat of long-term racketeering activity.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242).

Plaintiffs do not confront defendants' argument head-on.  Rather, plaintiffs focus almost entirely on the pattern element, without particular regard for whether the alleged pattern of activity entailed predicate acts that fall within the statute's sweep.  *See* ECF 24 at 36-41.

*Foster*, 363 F. App'x 269, on which defendants rely, certainly involved facts that were somewhat similar to the facts here.  The alleged racketeering activity in *Foster* concerned fraudulent misrepresentations with regard to real estate transactions, as do many of the allegations here.  *See* ECF 1, ¶ 40; *see generally* Factual Background, *supra*.  In addition, the *Foster* plaintiffs were three real estate investors who dealt with the defendants over "a period of approximately three years." *Foster*, 363 F. App'x at 270.  Here, plaintiffs are also investors in real estate, who separately engaged in dealings and ongoing business relationships with defendants over comparable periods of time: four years in the case of Layani and Britt, and roughly three years in the case of Ragones and RDNA.  Although *Foster* is not a published decision, it is nonetheless persuasive, given the analogous facts.

The pertinent facts here are also similar to *Friedler*, 2005 WL 465089, in which Judge Blake found predicate acts of mail and wire fraud insufficient to satisfy the pattern requirement.  In that case, two individual real estate investors, along with various entities they directed, were "allegedly defrauded of millions of dollars in a series of real estate investments orchestrated" by the defendant.  *Id.* at *10; *see id.* at *1.  The fraud scheme, which occurred over three-plus years and entailed "several predicate acts of mail and wire fraud," was intended to "defraud the plaintiffs of their financial investment in real estate ventures." *Id.* at 10.

After an informative review of case law, Judge Blake reasoned that the claims were not sufficiently "outside the heartland of fraud cases to warrant RICO treatment," notwithstanding the allegations of significant financial losses. *Id.* (quoting *Al-Abood*, 217 F.3d at 238); *see id.* at 10-13. In particular, Judge Blake noted that had "plaintiffs alleged a more widespread scheme . . . then the fraud they suffered would more closely resemble the kind that 'rises above the routine' and 'poses a threat to social-well being.'" *Id.* at 12 (citing *Superior Bank, F.S.B. v. Tandem Nat'l Mortgage, Inc.,* 197 F.Supp.2d 298, 324 (D.Md.2000); *Thomas v. Ross & Hardies,* 9 F.Supp.2d 547, 555 (D.Md.1998)).

To be sure, plaintiffs have alleged misconduct of considerable "scope and persistence." *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008), *aff'd*, 353 F. App'x 864 (4th Cir. 2009). As to persistence, the Complaint indicates that defendants victimized each plaintiff for at least three years through various misrepresentations as to real estate transactions and management of investment properties. But, plaintiffs do not adequately explain how the alleged conduct "'rises above the routine' and 'poses a threat to social-well being.'" *Friedler*, 2005 WL 465089, at *12.

Plaintiffs and defendants were essentially business partners. Plaintiffs were active participants in multiple real estate transactions, in which they repeatedly demonstrated their willingness to let defendants arrange most, if not all, of the logistics. In addition to relying on defendants to facilitate real estate investments, plaintiffs consistently placed their trust in defendants to manage those investments. In other words, plaintiffs were not passive or helpless victims upon whom defendants preyed. Rather, they were participants in a business relationship. That the business relationship was not what it seemed to be, and ultimately caused plaintiffs injury, does not necessarily give rise to a RICO claim. *See Foster*, 363 F. App'x at 274 (characterizing

fraud scheme involving real estate investors as an instance of "garden-variety fraud"); *Al-Abood*, 217 F.3d at 239 (determining that scheme that defrauded plaintiffs, who were friendly with defendants, of millions of dollars over several years, and which involved a real estate investment, did not "involve a scope of unlawful activity that exceeds that found in customary fraud cases"); *Flip Mortgage Corp.*, 841 F.2d at 538 (concluding that a corporate fraud scheme carried out over seven years and involving one victim did not constitute pattern of racketeering activity); *Smith v. Chapman*, No. 3:14-CV-00238-MOC, 2015 WL 5039533, at *11 (W.D.N.C. Aug. 26, 2015) (suggesting that "a dispute between friends-turned-business colleagues over business relationships that, by all accounts, severely soured" implicated garden variety fraud); *see also Gamboa v. Velez*, 457 F.3d 703, 710 (7th Cir. 2006) ("'RICO has not federalized every state common-law cause of action available to remedy business deals gone sour.'") (citation omitted).

Moreover, although plaintiffs allege generally that the alleged fraud extends beyond Layani and Ragones, they do not so with the requisite particularity.  The Complaint states, ECF 1, ¶¶ 384, 385:

> 384.  As of the filing of this complaint, Defendants' predicate acts are ongoing and, on information and belief, likely to continue indefinitely because Defendants' efforts to recruit new investors in the United States and abroad have not stopped.…
>
> 385.  Plaintiffs know of tens of putative victims and, based on the length of time that Defendants have been in business and the fact that their business model appears to be wholly fraud based, believe that the putative Class plausibly includes more than one hundred Members.

Thus, the allegations as to other victims rely solely on the invocation of "information and belief," without any details.  Although plaintiffs claim to "know of tens of putative victims," they provide no clues as to the source of that knowledge or the victims.

As noted, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she

will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784. But, plaintiffs do not allege any prediscovery evidence that supports the allegations regarding the breadth of the alleged scheme.[13]

Nor do plaintiffs sufficiently allege the kind of "additional layer of impact" that might qualify the alleged fraud as racketeering activity. *Starr v. VSL Pharm., Inc.*, ___ F.3d ___, TDC-19-2173, 2020 WL 7694480, at *9 (D. Md. Dec. 28, 2020). In *Starr*, for instance, Judge Chuang determined that such an additional layer of impact obtained where the alleged pattern involved a "multi-year enterprise involving a substantial number of false and misleading marketing and advertising materials disseminated through a nationwide distribution and sales network that victimized numerous individuals across the United States." *Id.* at *9. Further, the scheme preyed on victims whose health conditions rendered them vulnerable to the fraud at issue there, and thus carried "the potential to adversely impact the health of a significant number of individuals." *Id.* Here, there are no allegations of comparably pernicious wrongdoing.

Therefore, I conclude that plaintiffs have not alleged a pattern of racketeering activity under RICO. Accordingly, I shall dismiss Counts One and Two, without prejudice, and with leave to amend.

**B.**

Without RICO claims, plaintiffs cannot avail themselves of federal question jurisdiction, pursuant to 28 U.S.C. § 1331. I turn to address CAFA jurisdiction under § 1332(d).

---

[13]   As noted, the exhibits submitted by plaintiffs with their opposition, containing correspondence from non-parties regarding the Ouazanas, are not integral to the Complaint and cannot be considered in the context of a motion to dismiss.

## V.  CAFA Jurisdiction (Class Claims)

Defendants seek pre-discovery dismissal of the class allegations, pursuant to Rule 12(b)(6) and Rule 23(d)(1)(D).  ECF 19 at 39.  According to defendants, plaintiffs have failed to plead a certifiable class.  *Id.* at 42.

Rule 23(c)(1) provides: "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action."  As a result, "[e]ither plaintiff or defendant may move for a determination of whether the action may be certified under Rule 23(c)(1)."  7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1785 (3d ed. 2018); *see Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 769 (D. Md. 2012) ("A court need not wait until class certification is sought to determine whether a party complies with [Rule] 23.") (brackets added) (citing, *inter alia*, *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011)).  And, of relevance here, Rule 23(d)(1)(D) authorizes the court to require amendment of pleadings "to eliminate allegations about representation of absent persons and that the action proceed accordingly."

In light of these rules, "several circuits, including the Fourth Circuit in an unpublished table decision, have found that Rule 23 permits defendants to file preemptive motions to deny certification before discovery is completed."  *Williams v. Potomac Family Dining Grp. Operating Co., LLC*, GJH-19-1780, 2019 WL 5309628, at *4 (D. Md. Oct. 21, 2019) (collecting cases).  Where, as here, defendants seek pre-discovery dismissal of class allegations, the motion "should be granted when it is clear from the face of the complaint that the plaintiff cannot and could not meet Rule 23's requirements for certification because the plaintiff has 'fail[ed] to properly allege facts sufficient to make out a class' or 'could establish no facts to make out a class.'"  *Id.* (quoting *Bessette v. Avco Fin. Servs., Inc.*, 279 B.R. 442, 449 (D.R.I. 2002)).  In other words, in such

circumstances a court applies the familiar standard embodied in Rule 12(b)(6) to determine whether the pleadings plausibly allege a class.

Rule 23 requires a "two-step" analysis to determine whether a class action may proceed. *Stanley*, 891 F. Supp. 2d at 770.  First, the court must ask whether the putative class satisfies the four elements of Rule 23(a).  *Id.*  "Rule 23(a) requires that the prospective class comply with four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).  If those elements are satisfied, the court must then determine whether the putative class falls within one of the categories identified in Rule 23(b).  *Id.*; *see Stanley*, 891 F. Supp. 2d at 770.

The numerosity requirement does not require plaintiffs to allege "the exact size" of a potential class.  *Stanley*, 891 F. Supp. 2d at 770 (citing *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006)).  According to the Complaint, the putative class includes either "several tens" or more than one hundred members.  ECF 1, ¶¶ 385, 387.  Those allegations should suffice for purposes of numerosity.  *See Stanley*, 891 F. Supp. 2d. at 770.  More important, defendants do not contest numerosity.

Rather, defendants stake their argument on the remaining elements.  *See* ECF 19 at 42-44. Commonality, typicality, and adequacy of representation raise similar considerations and may entail overlapping inquiries.  *See Stanley*, 891 F. Supp. 2d. at 770.

Commonality requires "'questions of law or fact common to the class.'"  *Lloyd v. Gen. Motors Corp.*, 266 F.R.D. 98, 103 (D. Md. 2010) (quoting Rule 23(a)(2)).  In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), the Supreme Court instructed (citation omitted):

> "What matters to class certification . . . is not the raising of common 'questions'—
> even in droves—but rather, the capacity of a class-wide proceeding to generate
> common *answers* apt to drive the resolution of the litigation. Dissimilarities within

the proposed class are what have the potential to impede the generation of common answers."

See also EQT Prod. Co., 764 F.3d at 360 (citing Dukes).

As for typicality, class members' claims "must be fairly encompassed by the class representative's claims." Stanley, 891 F. Supp. 2d at 770 (citing Mitchell-Tracey, 237 F.R.D. at 558). Typicality requires that "'a class representative . . . possess the same interest and suffer the same injury as the class members.'" Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir. 2001) (quoting General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982)).

The remaining requirement, adequacy of representation, is embodied in Rule 23(a)(4). The rule demands that "the representative parties will fairly and adequately protect the interests of the class." Id. Under Rule 23(a)(4), the "inquiry focuses on 'whether the absent class members, who will be bound by the result, are protected by a vigorous and competent prosecution of the case by someone that shares their interests.'" Stanley, 891. F. Supp. 3d at 770 (quoting Mitchell-Tracey, 237 F.R.D. at 558).

As noted, the Complaint defines the putative class "as all persons who," ECF 1, ¶ 27:

a. Purchased a full or fractional interest in properties sold directly or indirectly by Defendants, and whom, within four years before the filing of this action, Defendants misled or defrauded, or attempted to mislead or defraud, irrespective of whether they were in fact misled or defrauded; or

b. Entered into a written or implied property management services agreement with Defendants, and whom, within four years before the filing of this action, Defendants misled or defrauded, or attempted to mislead or defraud, irrespective of whether they were in fact misled or defrauded.

Defendants do not specify whether the proposed class fails to satisfy Rule 23(a) or Rule 23(b). Accordingly, I construe their argument, which appears directed toward commonality and typicality, to focus only on deficiencies under Rule 23(a). See ECF 19 at 41-43.

The gist of defendants' argument is that the putative class is fundamentally predicated on allegations of fraud, which are generally ill suited for class actions because they involve highly fact-sensitive analyses. *See id.* In their view, it is not only Count Five (Common Law Fraud) and Count Six (Constructive Fraud) that are unsuitable for class certification. *Id.* at 42. Rather, they appear to argue that none of the State law claims is suitable for certification because all of the claims essentially rely on allegations of fraudulent misrepresentation, which raise individualized questions regarding both reliance and damages. *See id.*

Defendants lead with a citation to *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998). There, the district court certified a class of franchisees in a suit against a franchisor. *Id.* at 334. The Fourth Circuit reversed the district court's class certification, ruling that the class failed to satisfy the commonality and typicality prerequisites of Rule 23(a). *Id.*

The Court explained why certification was inappropriate for the class claims sounding in contract, fraud, and negligent misrepresentation. Certification as to the franchisees' breach of contract claim was improper because the franchisees had "multiple different contracts" with the franchisor. *Id.* at 340. Under Rule 23(a), it was impermissible to "amalgamate multiple contract actions into one." *Id.*

As to the franchisees' fraud and tort claims, the Court identified two principal deficiencies for purposes of the commonality and typicality inquiries. First, those claims were "built . . . on the shifting evidentiary sands of individualized representations . . . ." *Id.* at 340-41. Although the plaintiffs proffered "standardized documents or other documents," at trial they "relied heavily on audiotapes" of oral exchanges in which representations were made. The Court drew on the Seventh Circuit's teaching that "'claims based substantially on oral rather than written communications are inappropriate for treatment as class actions unless the communications are shown to be

76

standardized.'"  *Id.* at 341 (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 n. 17 (7th Cir. 1993)).  And, although the franchisees adduced some documents produced by the franchisor, there was "no evidence that all franchisees received, read, and relied on the same literature."  *Broussard*, 155 F.3d at 341.

Second, the fraud and negligent misrepresentation claims "were not readily susceptible to class-wide proof" because they turned on questions of reasonable reliance.  *Id.*  The Court observed that under North Carolina law, which governed the claims, "'reliance is an essential element of both fraud and negligent misrepresentation.'"  *Id.* (quoting *Helms v. Holland*, 124 N.C.App. 629, 478 S.E.2d 513, 517 (1996)).  And, questions of reasonable reliance give rise to a "fact-intensive inquiry."  *Broussard*, 155 F.3d at 341.  The Court reasoned that "'proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on those statements to his detriment' are not susceptible to class-wide treatment."  *Id.* at 342 (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998)); *see also Gariety v. Grant Thornton, LLP,* 368 F.3d 356, 362 (4th Cir.2004) (cautioning that "proof of reliance is generally individualized to each plaintiff allegedly defrauded, [meaning that] fraud and negligent misrepresentation claims are not readily susceptible to class action treatment, precluding certification of such actions as a class action").

*Broussard* is highly pertinent to the Rule 23(a) issues here.  Count Seven, which lodges a claim for breach of contract, is clearly inappropriate for class treatment under *Broussard*'s logic. Plaintiffs do not allege that defendants entered into standardized written contracts with all members of the putative class.  In fact, the Complaint does not specify whether the various contracts executed between defendants and the class representatives contained any degree of uniformity.  Plaintiffs allege virtually nothing about the terms of those agreements.  And, the

definition of the putative class includes members who entered into "written or implied property management services agreement" with defendants, ECF 1, ¶ 27, which on its face reflects the heterogeneity of agreements and business practices employed by defendants.

Rather than proceed claim by claim on the rest of the counts arising under State law, it suffices to apply *Broussard*'s guidance to the definition of the putative class. The putative class consists of members who, among other things, were "misled or defrauded" by defendants, or persons defendants "attempted to mislead or defraud, irrespective of whether they" were successful in their attempt. ECF 1, ¶ 27.

As pleaded, all class claims would turn on underlying questions of fraud. Thus, proof on a class-wide basis would require inquiry into the "shifting evidentiary sands of individualized representations." *Broussard*, 155 F.3d at 341. Moreover, reliance is an element of fraud in Maryland. *See Kantsevoy v. LumenR LLC*, 301 F. Supp. 3d 577, 601 (D. Md. 2018) (citing *Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994)). Certifying the proposed class would necessarily give rise to a highly individualized, fact-intensive inquiry on most, if not all, of the claims—so much so as to render class-wide treatment inappropriate under Rule 23(a).

In plaintiffs' opposition, they urge the Court to allow them to proceed to jurisdictional discovery, asserting that such discovery is necessary "to sustain the class allegations, particularly about the repetition of Defendants['] fraud system on all putative class members." ECF 24 at 71. Plaintiffs also contend that "class treatment is appropriate" where the allegedly fraudulent communications "'are shown to be standardized.'" ECF 24 at 72 (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1249 (2d. Cir. 2002)). Although plaintiffs assert that the Complaint evinces "systematized and standardized fraud acts"— a single "recipe"—they do not cite any particular allegations in support.

In my view, plaintiffs have gone to great lengths to allege various details of their dealings with each of the twelve properties at issue.  But, they have not alleged that the contents of defendants' representations to Layani and Ragones, respectively, were standardized.  Even if they had, proceeding on a class-wide basis would nevertheless necessitate individualized, fact-intensive inquiries as to reliance.  Under the circumstances alleged here, I am not persuaded that a "'a class-wide proceeding'" would "'generate common *answers* apt to drive the resolution of the litigation.'"  *Dukes*, 564 U.S. at 350 (citation omitted).

For the reasons stated above, I conclude that, as pleaded, the proposed class does not satisfy Rule 23(a)'s commonality or typicality prerequisites.  Accordingly, I need not address whether the proposed class meets the requirements of CAFA, embodied in 28 U.S.C. § 1332(d)(2).  I shall grant defendants' motion to dismiss the class claims, without prejudice.

## VI.  Supplemental Jurisdiction

Plaintiffs have asserted state law claims in Counts Three through Ten.  Plaintiffs do not seek to rely on diversity as a basis for jurisdiction as to those claims.  Nor could they; there is no complete diversity among the parties.  *See Cent. W. Va. Energy Co., Inc.*, 636 F.3d at 103.

Notwithstanding the absence of federal question jurisdiction, diversity jurisdiction, or jurisdiction pursuant to CAFA, the Court must consider 28 U.S.C. § 1367(a), by which a district court is authorized to resolve state law claims under the grant of supplemental jurisdiction.  Notably, pursuant to § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."

The Fourth Circuit has recognized that under § 1367(c)(3), "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have

been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106 (4th Cir. 1995); *see also ESAB Group, Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012) ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including . . . where the court dismisses the claims over which it has original jurisdiction."); *Hinson v. Northwest Fin. S. Carolina, Inc.*, 239 F.3d 611, 616 (4th Cir. 2001) (stating that, "under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met"); *Ramsay v. Sawyer Property Management of Maryland, LLC,* 948 F.Supp.2d 525, 537 (D. Md. 2013) (declining to exercise supplemental jurisdiction over plaintiff's state law claims after dismissing FDCPA claims); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F.Supp.2d 479, 500 (D. Md. 2005) ("Because the court will dismiss the claims over which it has original jurisdiction, the court will decline to exercise supplemental jurisdiction over the remaining state law claims.").

When exercising this discretion, the Supreme Court has instructed federal courts to "consider and weigh . . . the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over . . . pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). The Court has said: "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

Pursuant to 28 U.S.C. § 1367(c), and the factors set forth in *Carnegie–Mellon*, 484 U.S. at 350, I decline to exercise supplemental jurisdiction over the eight State law claims in the

Complaint, at least at this juncture.  Although this case has been pending in this Court since February 2020, it has not progressed beyond the motion to dismiss stage.  In the absence of subject matter jurisdiction, there is no reason for Counts Three through Ten to be heard in federal court, rather than in a Maryland State court, which is well equipped to address State law claims.  *See, e.g.*, *Medina v. L & M Const., Inc.*, RWT–14–00329, 2014 WL 1658874, at *2 (D. Md. Apr. 23, 2014) ("Finally, as a matter of comity, this Court will remand Medina's state law claims back to state court, as '[n]eedless decisions of state law [by federal courts] should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'") (alteration in *Medina*) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. at 726); *see also* 13D Wright & Miller, Federal Practice and Procedure § 3567.3 n. 72 (3d ed. 2020) (collecting cases).

Assuming that there is no original jurisdiction, plaintiffs may file their State-law claims in a Maryland court within thirty days following the entry of an Order of dismissal.  As Judge William D. Quarles, Jr. explained in *Johnson v. Frederik Memorial Hosp., Inc.*, WDQ-12-2312, 2013 WL 2149762, at *7 n.26 (D. Md. May 15, 2013):

> 28 U.S.C. § 1367(d) provides that, "[t]he period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."  *Accord* Md. Rule 2–101(b) ("[I]f an action is filed in a United States District Court or a court of another state within the period of limitations prescribed by Maryland law and that court enters an order of dismissal . . . because the court declines to exercise jurisdiction . . . an action filed in a circuit court within 30 days after the entry of the order of dismissal shall be treated as timely filed in this State.").

## VII. Conclusion

For the foregoing reasons, I shall deny plaintiffs' Surreply Motion (ECF 27); deny plaintiffs' Sanctions Motion (ECF 30), without prejudice; and grant defendants' Motion to Dismiss (ECF 18, ECF 19), without prejudice, and with leave to  file an amended complaint by April 2,

2021.  If plaintiffs fail to do so, I will direct the Clerk to close the case.  At that point, dismissal would be without prejudice to plaintiffs' rights to file suit in State court within thirty days following the entry of an order of dismissal, pursuant to 28 U.S.C. § 1367(d).

An Order follows, consistent with this Memorandum Opinion.


Date: March 3, 2021                            _____/s/_____
                                               Ellen L. Hollander
                                               United States District Judge