IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **GERARD LAYANI,** *et al.*, | |
| Plaintiffs, | |
| v. | Civil Case No. 20-00420-SAG |
| **ISAAC OUAZANA,** *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiffs, Gerard Layani ("Layani"), Britt Investment Baltimore LLC ("Britt"), Yehuda Ragones ("Ragones"), RDNA Investments, LLC ("RDNA"), Kandy, LLC ("Kandy"), Henya Karniel ("Karniel"), Yonason S. Keyak ("Y.S. Keyak"), Devora A. Keyak ("D. Keyak"), 4802 Frankford Ave, LLC ("Frankford LLC"), Yossef Keyak ("Y. Keyak"), Issac Krausz ("Krausz"), and Haim Taub ("Taub") are individuals and their wholly-owned entities who invested in various real estate properties with Defendants. Plaintiffs have filed a First Amended Class Action Complaint for Damages and Injunctive Relief ("FAC"), asserting civil RICO claims and a variety of state law claims pertaining to those real estate transactions. ECF 42. Defendants Isaac Ouazana and Benjamin Ouazana ("the Ouazanas"), along with their respective companies, I&B Capital Investments LLC, WAZ-Brothers, LLC, WAZ-Investments, LLC, and WAZ-Management, LLC ("WAZ-M") (collectively "Defendants"), have filed a motion to dismiss the FAC.[1] ECF 48. The Court has reviewed the motion, Plaintiffs' opposition, ECF 55, and Defendants' reply, ECF 56.

---

[1] The FAC also asserts claims in Counts Three and Four against "John and Jane Doe(s) and John Doe Entities, all whose true names are unknown." ECF 42. While Defendants purport to seek dismissal of those counts, they lack standing to do so and those claims remain viable. Defendants' attorneys have not entered an appearance on behalf of any of the unidentified Doe defendants.

No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons set forth below, the motion will be granted in part and denied in part.

I.  **FACTUAL BACKGROUND**

This Court notes that United States District Judge Ellen L. Hollander issued an 82-page memorandum opinion in this case on March 3, 2021, which contained a detailed explication of the factual background of this case and the relevant legal standards. ECF 38. Because the FAC only adds new information to those facts Plaintiff originally alleged, this Court declines to duplicate Judge Hollander's efforts, and incorporates the factual background and legal standards sections of her opinion by reference. The following facts, however, were added to the FAC to try to rectify the deficiencies that resulted in dismissal of the original Complaint. They are assumed true for purposes of adjudicating Defendants' motion.

At the time the FAC was filed, Plaintiffs' investigation had identified 392 Baltimore properties sold by the Ouazana Defendants to over one hundred investors/putative class members. ECF 42 ¶ 38. In connection with those transactions, Isaac Ouazana referred the investors (including Plaintiff Layani) to an accountant, Philippe Lerner, to provide bookkeeping services for the properties' holding companies. *Id.* ¶ 61. Lerner noticed that the accounting information the Ouazanas were providing about the properties consisted only of manual entries into Excel spreadsheets, without including the requisite backup information or complying with accepted accounting standards. *Id.* ¶ 62. Lerner also identified fabricated entries regarding the amount of rent received and for expenses that were not actually incurred. *Id.* ¶ 63. Lerner repeatedly asked the Ouazanas for accountings and for access to their books and records, including their "Buildium" property management platform, but those requests were rebuffed. *Id.* ¶¶ 64-65.

Plaintiffs later learned that Defendants have been repeatedly sued by the Maryland Department of the Environment ("MDE") for lead paint hazards at the properties they managed. *Id.* ¶ 67. The Ouazanas settled those cases, on behalf of nearly 70 affected investors, without disclosing the lawsuits to the investors, because the presence of the lead paint violations would have revealed that Defendants did not perform the renovations they had promised. *Id.* ¶¶ 68-69.

After learning that Plaintiff Ragones intended to file this lawsuit, Isaac Ouazana told Ragones that he knew "where the Ragones family lives and where the children go to school." *Id.* ¶ 70. Isaac Ouazana also "threatened Ragones to drive him to bankruptcy by increasing his legal costs with bad faith legal maneuvers in the instant lawsuit if Ragones persisted with it." *Id.* ¶ 71. Isaac Ouazana also threatened other victims by telephone, leading Plaintiff Taub to change his phone number. *Id.* ¶ 73. The Ouazanas verbally harassed the wife of the accountant, Lerner, in a kosher supermarket. *Id.* ¶ 74. Isaac Ouazana also showed up at Lerner's office and "screamed at him, demanding that he stop providing information about their practices." *Id.* ¶ 75. The Ouazanas confronted the rabbi at Lerner's synagogue, demanding that Lerner be expelled from the congregation because he is a "mossar," or a "derogatory Hebrew word combining the meanings of 'snitch' and traitor." *Id.* ¶ 76. The rabbi felt threatened by the Ouazanas' demeanor, tone, and physical movements. *Id.* The Ouazanas subsequently called the rabbi again to urge Lerner's expulsion, again using an aggressive tone and language. *Id.* Additionally, the Ouazanas tried to procure a former tenant to post a fake negative review online about Lerner's business. *Id.* ¶ 77.

The original Complaint, and Judge Hollander's opinion, described allegations of fraud surrounding the joint purchase, management, and eventual sale of 4004 Oakford Avenue. The original Complaint contained a notice of Lis Pendens for that property. *Id.* ¶ 180. The FAC alleges that nonetheless, "Defendants have attempted to sell this property again, without informing the

Layani Plaintiffs and without informing the prospective buyers or listing agent of the existence of the Lis Pendens." *Id.*

Isaac Ouazana entered into a written Partnership Agreement with Plaintiff Ragones on August 29, 2017, in which they agreed that they would be 50% partners in four properties: 3335 Edmondson Avenue (owned by Ouazana), 18 North Kussuth Street (owned 50/50), 4800 Frederick Avenue (owned by Ragones), 4048 Edgewood (owned by Ragnones). *Id.* ¶¶ 310-312. Unbeknownst to Ragones, Ouazana had already conveyed 3335 Edmondson to a third-party in July of 2016, and therefore could not contribute it to the partnership. *Id.* ¶ 313. The Partnership Agreement provided that Ragones would renovate 3335 Edmondson Avenue to bring it up to code. *Id.* ¶ 314. When eventually confronted about the unauthorized sale, Isaac Ouazana told Ragones that he thought Ragones did not want the property and that the sale had not been fully consummated. *Id.* ¶ 316. In the end, Ragones contributed his properties to the partnership and Isaac Ouazana did not actually contribute any. *Id.* ¶ 326.

As for 18 North Kossuth Street, the Ouazana Defendants told Ragones that they would pay 50% of the $65,000 price of the property and would be 50% partners with Ragones, who contributed $30,000. *Id.* ¶ 397. Ragones later learned that the actual price of the property was $20,000, meaning that Ragones paid 150% of the property price and only obtained 50% ownership. *Id.* With respect to all of Ragones's properties, the Ouazana Defendants converted the rental income and charged Ragones for fake expenses, while denying him access to accounting records and information. *Id.*

Defendants took similar actions towards a variety of other victims, most of whom are (1) retired or otherwise financially vulnerable, (2) inexperienced with real estate and investing, (3) typically Jewish, which allows Defendants to insist they submit to religious court before asserting

claims in civil court, and (4) residents of states or countries other than Maryland. *Id.* ¶ 398. Some of the victims also speak limited English, which makes it more difficult for them to understand real estate transactions or to seek help from U.S. authorities. *Id.*

For example, Plaintiff Karniel is an 80-year-old retiree and resident of Israel. *Id.* ¶ 399. In December, 2017, Isaac Ouazana offered Karniel to invest in two rental properties in Baltimore for a total investment of $138,000, which would include the cost of all renovations. *Id.* ¶ 401. Ouazana told Karniel that each property would rent for $1,1000, suggesting that her expected monthly rental income would be $2,200. *Id.* ¶ 404. Karniel made payment of the $138,000 but she did not receive any closing documents. *Id.* ¶¶ 406-07. Maryland land records demonstrate that the Ouazanas recorded deeds indicating that Karniel paid just $5,000 for each property. *Id.* ¶ 408. Karniel had agreed that the Defendants would manage the properties in exchange for an 8% management fee. *Id.* ¶ 409. For a few months, Defendants remitted to Karniel a portion of the promised rents minus the 8% fee, although numerous of their checks were returned for insufficient funds. *Id.* ¶ 411. In 2019, however, Defendants stopped remitting rent to Karniel and refused to provide her any accounting records. *Id.* ¶¶ 412-13. They also refused to provide evidence of repairs or copies of leases for any tenants. *Id.* ¶ 414. Karniel did not receive her promised return on investment, and instead sustained damages in the form of liability for unpaid utilities and transfer taxes. *Id.* ¶ 419.

Similarly, Y.S. Keyak and D. Keyak are retirees who live in Israel. *Id.* ¶ 420. In the summer of 2015, Defendants offered the Keyaks the opportunity to invest in two Baltimore rental properties for the total price of $183,000, with the agreement that the Defendants would manage the properties in exchange for a 10% management fee. *Id.* ¶ 422. Isaac Ouazana told the Keyaks that the properties were rented under the Section 8 federal housing subsidy program and that one

of the properties generated monthly income of $1,200. *Id.* ¶ 425. In August and October of 2015, the Keyaks signed agreements to purchase the two properties, along with a property management agreement with the Ouazana Defendants. *Id.* ¶ 425. The Keyaks paid $183,000 for the properties, plus another $950 to the Ouazanas to keep one property qualified under Section 8. *Id.* ¶ 428. However, the Keyaks later learned that the property had never been Section 8 qualified. *Id.* ¶ 429. Maryland land records show that the purchase price of one of the two properties was only $52,000, not the $113,000 the Ouazanas charged the Keyaks. *Id.* ¶ 431. The Ouazanas refused to provide accounting records or leases, failed to make repairs for which they charged the Keyaks, and eventually stopped remitting any rent payments. *Id.* ¶ 434-35. Moreover, the Ouazanas failed to put tenants' security deposits into escrow, and did not return those deposits once the Keyaks retained a new management company. *Id.* ¶ 438. The Ouazanas also failed to inform the Keyaks of city citations received for housing code violations at the properties, resulting in multiplied fines and eventually the properties being put up for tax sale. *Id.* ¶ 440. The Keyaks had to pay $25,000 to redeem the properties and to recover them before auction. *Id.* ¶ 441.

## II. LEGAL ANALYSIS

### A. RICO Allegations

The initial question presented in this case involves the precise line between "garden variety fraud" and civil RICO. In her opinion, Judge Hollander concluded that the allegations in the original complaint had not explained how Defendants' alleged conduct rose above "garden variety fraud" to pose a threat to social well-being. ECF 38 at 69-71. Essentially, the allegations in that original version of the complaint, she found, amounted to fraud between "business partners . . . in a business relationship." *Id.*

The new allegations in the FAC, however, taken as true for purposes of a motion to dismiss, successfully move Plaintiffs' claims into the realm of civil RICO. The FAC clarifies the extensive scope of Defendants' alleged conduct, consisting of 392 transactions in which Defendants systematically targeted vulnerable individuals, such as retirees living some distance from Baltimore with limited English skills. While, to be sure, the predicate offenses are mail and wire fraud, the nature and scope of the alleged conduct is far from routine, as modified by the new allegations. First, the FAC adds some particularity about the total number of victims and the identities and descriptions of some additional victims. Second, the FAC describes in detail Defendants' efforts to suppress the participation of other victims in this litigation, including their use of deception, threats, and a purported requirement to seek prior authorization from Jewish religious court. Third, the number and variety of the fraudulent acts alleged, over many years, is sufficiently pervasive to remove this case from the context of "garden variety fraud." A prior federal lawsuit brought by another victim entity, Jet Properties, LLC, did not deter the continued conduct. *See Jet Properties, LLC v. WAZ Investments, LLC*, Civil No. 17-cv-01345-JMC. Fourth, Defendants' conduct poses a "special threat to social well-being" due to the nature of the victims allegedly solicited – retirees on fixed incomes for whom significant financial losses imperil their ability to pay basic living expenses.

Defendants' alleged conduct, as pled, also satisfies the continuity-of-activity requirement, which has been described as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241 (1989). To show an open-ended pattern, a plaintiff must present evidence of conduct "that by its nature projects into the future with a threat of repetition." *Id.* at 241. To show a closed-ended racketeering pattern, a

plaintiff must satisfy a multi-factor test incorporating "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986); *see HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987). Because it is not readily evident whether Defendants' conduct has ceased, there remains a significant threat of repetition. But even assuming arguendo that the pattern of conduct has concluded, the scope of the alleged scheme would suffice to constitute a close-ended racketeering pattern.

A review of the primary cases cited by the parties leads to a similar conclusion about the adequacy of the Plaintiffs' civil RICO allegations. While unpublished and non-binding, *Professionals, Inc. v. Berry*, No. 91-1509, 1992 WL 64796, 959 F.2d 231 (Table) (4th Cir. Apr. 2, 1992), is instructive. In *Berry*, the defendants "began to solicit capital contributions from investors in Virginia and Maryland to finance the purchase of two parcels of land," titling the properties in the name of corporate entities, Professionals, Inc. and Professionals I, Inc. *Id.* at *1. The defendants then diverted approximately $500,000 from the two Professionals companies by a variety of means, without authorization from their investor shareholders. *Id.* Instead, the defendants provided the shareholders false or misleading reports of the financial condition of the two corporations. *Id.* The Complaint alleged 58 separate acts, occurring over a three-year period, and sixteen victimized investors. *Id.* The Fourth Circuit, considering the use of a variety of fraud techniques and the numbers of victims, concluded that the alleged behavior indicated "ongoing criminal activity of sufficient scope and persistence to pose a special threat to social well-being" and thus stated a viable civil RICO claim. *Id.* at *3 (citing *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1988)). The scheme alleged in this case, of course, is far broader in scope (both

temporally and in terms of the number of victim investors) than the *Berry* scheme deemed sufficient by the Fourth Circuit.

In *Whitney Bradley & Brown, Inc. v. Kammermann*, 436 F. App'x 257, 262 (4th Cir. 2011), the defendant was billing time to his employer when he was actually working for another entity. Further, in at least six instances, he double-billed expenses to his employer and to a client. *Id.* The Fourth Circuit believed that those incidents, involving six victims and fourteen total transactions over an eight-month period, were insufficient to amount to a civil RICO claim. *Id.* Here, of course, Defendants' conduct spanned many years and involved more than one hundred victims, so the *Whitney* case is readily distinguishable.

Finally, in *Foster v. Wintergreen Real Estate Company*, the Fourth Circuit concluded that "Plaintiffs failed to plead with particularity that any other persons were similarly harmed by Defendants' alleged fraud, and thus failed to show 'a distinct threat of long-term racketeering activity.'" 363 F. App'x 269, 274 (4th Cir. 2010) (quoting *H.J. Inc.*, 492 U.S. at 242, then citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)). The Foster Plaintiffs alleged that they had been told their properties for sale would be listed in the MLS system but that they were not, which depressed the property values at sale. *Id.* Their complaint summarily draws the conclusion that other customers of the defendants must have been harmed by the MLS scheme because "a comparison of the MLS listings for Nelson County with the Nelson County property transfer records during the relevant period reveals hundreds of properties ... which were, on information and belief, listed with Defendants but were not included in MLS." *Id.* Based on this fact and the vague reference to "interview[s] [with] a number of sellers," the plaintiffs argued that the defendants "did not obtain those sellers' consent to the omission of those properties from MLS." *Id.* The court found that the facts pled in the complaint did not permit it to infer "more

than the mere possibility of misconduct." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In contrast, Plaintiffs in this case cited to direct quotations from several of the victims establishing misconduct in their cases as well, and make reference to other victims who would have participated in this litigation absent Defendants' representations that they needed authorization from Jewish religious court. Unlike *Foster*, this is not a case in which Plaintiffs simply suggest that the number of real estate transactions equals the amount of fraud. Ultimately, then, comparing the facts of this case with those in *Berry*, *Kammermann*, and *Foster* corroborates that the Plaintiffs in this case have alleged sufficient facts to support a civil RICO cause of action.

In addition, Defendants' alternative attempt to relitigate their securities fraud argument is unavailing. I agree with Judge Hollander that the footnote carried over from the original complaint to the FAC does not amount to an allegation that Defendants committed federal securities fraud. The footnote reads:

> Maryland law views as 'securities' any investment schemes combining the sale of an interest in real property with a management agreement with the seller to expend the efforts necessary to fulfill the Plaintiffs' profit expectation. It is a matter of record that Defendants have not registered these securities with the Maryland Securities Division within the Office of the Attorney General. Plaintiffs reserve the right to seek leave to amend this complaint, as warranted, with any proper state or federal securities claims.

ECF 42 ¶ 49 n.7. Nothing in that footnote alleges a federal securities violation or even suggests the present applicability of any federal securities law. The case Defendants cite in support of their argument, *MLSMK Investment Co. v. JP Morgan Chase & Co.*, is inapposite. 651 F.3d 268 (2d Cir. 2011). This case is readily distinguishable from Bernie Madoff's Ponzi scheme, a quintessential example of securities fraud. Instead, this case is about fraud related to the purchase of real property, and the footnote simply (and ineffectively) reserves a hypothetical "right to seek leave to amend" the FAC with "any proper" federal securities claims. Of course, any party can

seek leave to amend a pleading at any time, though the discretion to grant or deny that motion rests with the Court.  At present, however, I concur with Judge Hollander that no federal securities claim has been alleged such that it would bar Plaintiffs' civil RICO action.

Finally, Defendants renew their argument that certain of Plaintiffs' claims are time-barred by RICO's four-year statute of limitations.  *See Agency Holding Corp. v. Malley Duff & Assoc., Inc.*, 483 U.S. 143, 156-57 (1987) (establishing four-year statute of limitations).  The Fourth Circuit and most others apply the "injury discovery rule" to determine when the statute of limitations begins to run.  *See Potomac Elec. Power Co. v. Electric Motor and Supply*, 262 F.3d 260, 266 (4th Cir. 2001) (noting that the limitations period "runs from the date when the plaintiff discovered, or should have discovered, the injury.").  A party is on "inquiry notice," meaning that the party should have discovered the injury, when it "has such knowledge as would put a reasonably prudent purchaser on notice to inquire, so long as that inquiry would reveal the facts on which a claim is ultimately based."  *Caviness v. DeRand Res. Corp.*, 983 F.2d 1295, 1303 (4th Cir. 1993).

Judge Hollander previously decided that Layani and Britt's claims regarding 314 N. Hilton Street and 726 N. Hilton Street, as to the Marketing/Selling type of fraud, are time-barred.  ECF 38 at 60.  Plaintiffs do not challenge those conclusions but correctly note that they are entitled to cite limitations-barred facts in their FAC to establish a pattern of racketeering.  ECF 55 at 53.  As to all remaining limitations issues raised by Defendants, this Court deems them premature. Dismissal of a complaint on limitations grounds is appropriate only where all of the facts necessary to compel such dismissal are evident from the face of the complaint.  *See Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (concluding "that the face of the complaint does not allege facts sufficiently clear to conclude that the statute of limitations had run, and the district court

11

therefore erred in dismissing the complaint on that basis[.]"). Defendants take umbrage at the fact that the FAC does not allege specific dates the relevant parties became aware or should have become aware of Defendants' alleged malfeasance. Despite Defendants' protestations that Plaintiffs are "concealing" those dates, their absence from the FAC renders Defendants' limitations argument premature and unavailing. Defendants may, of course, reassert their limitations defense if they are able to establish a factual record during discovery to support their assertions.

### B. Class Allegations

Because the two RICO claims survive dismissal, Plaintiffs' class claims are not critical to the continued existence of federal subject matter jurisdiction. Nevertheless, Defendants seek their dismissal. Under Federal Rule of Civil Procedure 23, Plaintiffs purport to sue on behalf of themselves, and those similarly situated who:

a. Purchased a full or fractional interest in properties sold directly or indirectly by Defendants, and who, within four years before the filing of this action were entitled to receive, requested or otherwise asked the Ouazana Defendants to render accounts and provide true and complete information regarding the person's investment funds; or

b. Had a property managed directly or indirectly by the Ouazana Defendants, and who, within four years before the filing of this action were entitled to receive, requested or otherwise asked the Ouazana Defendants to render accounts and provide true and complete information regarding the management of the person's property.

ECF 42 ¶ 36. In other words, the class claims focus exclusively on Defendants' alleged failure to provide accountings to a large number of investors.

The burden of showing that the Rule 23 requirements have been met will rest with Plaintiffs as the party seeking certification. *See Int'l Woodworkers v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981); *Bostron v. Apfel*, 182 F.R.D. 188, 192 n. 6 (D. Md. 1998) (stating that it is "well settled in the Fourth Circuit that the proponent of class certification has the burden

of establishing the right to such certification under Rule 23."). Here, however, this Court believes it would be premature to require Plaintiffs to make that showing without the benefit of discovery. In this case in particular, documents obtained through discovery may render Plaintiffs' accounting claims moot, or at least put Plaintiffs on different footing from the class members they currently deem "similarly situated." For the time being, however, this Court will deny without prejudice Defendants' motion to dismiss the class claims. *See Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1475 (N.D. Ga. 1997) (denying motion to dismiss class claims and denying motion to certify a class without prejudice subject to refiling after the close of class discovery). In the scheduling order, a deadline by which to file a motion for class certification will be set, and Defendants can re-raise their arguments in opposition to that motion.

### C. Individual State Law Claims

#### a. Counts Five (Fraud) and Six (Constructive Fraud)

The FAC presents the antithesis of what Fed. R. Civ. P. 8(a)(2) requires: "a short and plain statement of the claim showing that the pleader is entitled to relief." Instead, the FAC is a highly cumbersome, 167-page document loaded with myriad, often duplicative allegations. This Court does not doubt that, within the 167-page document, certain fraud and constructive fraud claims may be stated with particularity. The issue, however, is that the way in which those claims are alleged in Counts Five and Six does not give Defendants adequate notice of the particular claims to allow them to prepare a defense. Further, it does not permit this Court to assess whether any claim has been pled with the requisite particularity. Simply stating that misrepresentations and concealments are contained "in paragraphs 32-506" does not provide sufficient guidance to Defendants or this Court about which fraud claims Plaintiffs are trying to assert, and which particular facts support each claim. Counts Five and Six will therefore be dismissed, with Plaintiffs granted leave to file a Second Amended Complaint for the limited purpose of stating specifically,

via separate counts or via a table, the particular fraudulent representations or omissions they are relying on to support their fraud and constructive fraud claims.

### b. Counts Seven and Eight (Breach of Contract); Count Ten (Conversion); and Count 11 (Unjust Enrichment)

While these state law claims do not require pleading with the same degree of particularity as fraud claims, they suffer the same fatal deficiency noted above. In their counts, Plaintiffs have not identified the particular sales or management contracts they allege to have been breached, or the precise property they allege to have been converted, or the transactions that resulted in unjust enrichment. Instead, they simply refer by reference to wide swaths of the FAC. Any attempt by this Court to parse the 506 paragraphs in the fact section of the FAC to determine which facts support the various claims that are being brought would be an exercise in speculation, and could result in the Defendants or the Court assessing a claim Plaintiffs never intended to advance. Thus, this Court will dismiss the four counts listed above, granting leave to amend to particularize the claims being asserted.

Because it is granting leave to amend, this Court will briefly address Defendant's claim that certain of Plaintiffs' counts are duplicative or inconsistent. The Federal Rules of Civil Procedure allow parties to plead claims in the alternative. *See* Fed. R. Civ. P. 8(e)(2) ("A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal [or] equitable grounds."). Plaintiffs will not ultimately be able to recover both contractual and quasi-contractual remedies, but it is premature to dismiss either set of claims on that basis. *See, e.g.*, *Jones v. Koons Automotive Inc.*, 752 F. Supp. 2d 670, 688 (D. Md. 2010) (deeming it premature to dismiss unjust enrichment claims pled in the alternative at the motion to dismiss stage); *RaceRedi Motorsports, LLC v. Dart Mach., Ltd.*, 640 F. Supp. 2d 660, 666 (D. Md. 2009) (declining to dismiss unjust enrichment claim pled in the alternative where contract terms

remained in dispute); *MTBR LLC v. D.R. Horton, Inc.*, No. RDB–07–3363, 2008 WL 3906768, at *12 (D. Md. Aug. 22, 2008) (declining to dismiss quasi-contractual claim where parties did not agree that there was a valid agreement covering same subject matter).

### c. Count Nine (Breach of the Partnership Agreement)

This Court will not dismiss Count Nine, which adequately alleges a breach of the August 29, 2017 partnership agreement by Isaac Ouazana. However, Count Nine does not, as pled, adequately allege a claim against WAZ-M. WAZ-M is not named anywhere in the count, other than in the caption. To the extent Plaintiffs intended to include WAZ-M as a defendant in Count Nine, they will be afforded leave to amend the complaint to add factual allegations regarding WAZ-M's role. Of course, the amendment may also correct the typographical errors referenced in Plaintiffs' Opposition. *See, e.g.*, ECF 55 at 82.

### d. Count Twelve (Breach of Fiduciary Duty)

While Defendants contend that Plaintiffs have not alleged a fiduciary relationship on which to premise a claim for breach of fiduciary duty, the FAC alleges an agent-principal relationship in several places. *See, e.g.*, ECF 42 ¶¶ 39, 45, 53, 469, 526. Under Maryland law, agency constitutes a fiduciary relationship. *See Ins. Co. of N. Am. v. Miller*, 765 A.2d 587, 593 (Md. 2001). Without reaching other arguments made by Plaintiff in support of the count's viability, the existence of the agent-principal allegations renders dismissal Count Twelve inappropriate.

### e. Count Thirteen (Accounting)

Defendants' motion to dismiss this count is premature. This Court agrees with Defendants that if Plaintiffs receive the information they would obtain in an accounting via discovery in this case, they are unlikely to be able to maintain their claim. *See Bochenski v. M&T Bank*, No. CIV.A. ELH-14-1031, 2015 WL 1040281, at *32 (D. Md. Mar. 10, 2015) ("When a plaintiff properly pleads another cause of action that will entitle the plaintiff to discovery, the remedy of accounting

is generally superfluous."). As noted above, that aspect of the case may doom Plaintiffs' present class action aspiration. Nevertheless, the issue will be best addressed after Defendants have produced the relevant accounting materials in discovery, at which point they may again seek dismissal of the accounting claim. At this time, the motion to dismiss Count Thirteen will be denied.

### III. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss the FAC, ECF 48, will be GRANTED in part and DENIED in part. The motion is granted in that Counts Five, Six, Seven, Eight, Ten, and Eleven of the FAC will be dismissed, along with Count Nine insofar as it purports to state a claim against WAZ-M. Limited leave to amend is granted as described herein. The remainder of the motion to dismiss is denied. A separate order follows.

Dated: February 1, 2022                                    /s/
                                                Stephanie A. Gallagher
                                                United States District Judge